**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., | |
| Plaintiffs, | Case No. 3:23-cv-01092 |
| v. | |
| ANTHROPIC PBC, | Chief Judge Waverly D. Crenshaw, Jr. |
| Defendant. | Magistrate Judge Alistair Newbern |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND .......................................................................................... 2

   I.  Plaintiff Publishers and their copyrighted Works ............................................. 2

   II.  Defendant Anthropic and its copying of the Works ........................................ 3

ARGUMENT ................................................................................................................... 7

   I.  Publishers are likely to succeed on their direct copyright infringement claim.................. 9

      A. Publishers own or control valid copyrights in the Works. ............................................. 9

      B. Anthropic copies the Works. ........................................................................................ 9

          1.  Anthropic unlawfully reproduces, distributes, and displays the Works as output.10

          2.  Anthropic unlawfully reproduces the Works as the input for its AI models. ....... 11

      C. Anthropic's infringement is not fair use. ..................................................................... 13

          1.  Anthropic's use of the Works is commercial and non-transformative. ............... 13

          2.  The Works are within the core of copyright protection. ....................................... 17

          3.  Anthropic uses all or nearly all of each Work. .................................................... 18

          4.  Anthropic's unrestrained use would harm the market for the Works. ................. 20

   II.  Publishers and their songwriters will suffer irreparable harm absent an injunction......... 22

      A. Anthropic deprives Publishers and songwriters of control. ......................................... 23

      B. Anthropic denies Publishers and songwriters credit and goodwill. ............................ 24

      C. Anthropic harms Publishers' and songwriters' reputations. ........................................ 25

      D. Anthropic erodes the value of and licensing market for the Works. .......................... 25

      E. Anthropic damages Publishers' position to negotiate future licenses. ...................... 26

      F. Anthropic harms Publishers' relationships with songwriters. .................................... 27

   III.  The balance of equities favors an injunction. .................................................. 28

   IV.  Enjoining Anthropic's infringement will serve the public interest................................ 29

   V.  The Court should not require Publishers to post security. ................................. 29

CONCLUSION............................................................................................................... 30

Case 3:23-cv-01092    Document 41    Filed 11/16/23    Page 2 of 38 PageID #: 214

**TABLE OF AUTHORITIES**

## CASES

*Advantage Waypoint, LLC v. Baker,*
  2018 WL 10152454 (M.D. Tenn. Jan. 23, 2018) .................................................. 29

*Anderson v. TOL, Inc.,*
  927 F.Supp.2d 475 (M.D. Tenn. 2013) .................................................. 23, 25, 26

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith,*
  598 U.S. 508 (2023) .................................................. 13, 14, 15

*Authors Guild v. Google, Inc.,*
  804 F.3d 202 (2d Cir. 2015) .................................................. 16, 18, 19

*Balsley v. LFP, Inc.,*
  691 F.3d 747 (6th Cir. 2012) .................................................. 13, 14, 16, 21

*Bridgeport Music, Inc. v. UMG Recordings, Inc.,*
  585 F.3d 267 (6th Cir. 2009) .................................................. 16, 18, 21, 22

*Brittney Gobble Photography LLC v. Wenn Ltd.,*
  2017 WL 10188859, at *4 (E.D. Tenn. Sept. 5, 2017) .................................................. 10

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) .................................................. 13, 15, 18, 21

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,*
  511 F.3d 535 (6th Cir. 2007) .................................................. 9, 22, 27

*Disney Enters., Inc. v. VidAngel, Inc.,*
  224 F.Supp.3d 957 (C.D. Cal. 2016) .................................................. 12

*Doster v. Kendall,*
  54 F.4th 398 (6th Cir. 2022) .................................................. 29

*Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC,*
  958 F.3d 532 (6th Cir. 2020) .................................................. 22

*Fox News Network, LLC v. TVEyes, Inc.,*
  883 F.3d 169 (2d Cir. 2018) .................................................. 15, 19, 20

*Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.,*
  670 F.2d 642 (6th Cir. 1982) .................................................. 26

*Harper & Row Publishers, Inc. v. Nation Enters.,*
  471 U.S. 539 (1985) .................................................. 20

*House of Bryant Publ'ns, LLC v. A&E Television Networks,*
  2009 WL 3673055 (M.D. Tenn. Oct. 30, 2009) .................................................. 22

*House of Bryant Publ'ns, LLC v. City of Lake City,*
  2015 WL 12531992 (E.D. Tenn. Apr. 24, 2015) .................................................. 30

*I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC,*
  2019 WL 6050283 (M.D. Tenn. Nov. 15, 2019) .................................................. 30

*Int'l Sec. Mgmt. Grp., Inc. v. Sawyer*,
  2006 WL 1638537 (M.D. Tenn. June 6, 2006) .................................................. 30

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
  886 F. Supp. 1120 (S.D.N.Y. 1995) ................................................................ 28

*King Records, Inc. v. Bennett*,
  438 F.Supp.2d 812 (M.D. Tenn. 2006) ........................................................... 10

*King v. Innovation Books*,
  976 F.2d 824 (2d Cir. 1992) ............................................................................ 25

*La.-Pac. Corp. v. James Hardie Bldg. Prods. Inc.*,
  2018 WL 7272047 (M.D. Tenn. Dec. 20, 2018) ............................................. 30

*Lexmark Int'l v. Static Control Components, Inc.*,
  387 F.3d 522 (6th Cir. 2004) ................................................................... 9, 14, 22

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*,
  545 U.S. 913 (2005) ........................................................................................ 27

*Moltan Co. v. EaglePicher Indus., Inc.*,
  55 F.3d 1171 (6th Cir. 1995) .......................................................................... 30

*Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*,
  361 F.3d 312 (6th Cir. 2004). ......................................................................... 10

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ............................................................................ 8

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*,
  305 F.3d 566 (6th Cir. 2002) ........................................................................ 8, 22

*Peermusic, III, Ltd. v. LiveUniverse, Inc.*,
  2010 WL 11586701 (C.D. Cal. May 13, 2010) .............................................. 25

*Peker v. Masters Coll.*,
  96 F.Supp.2d 216 (E.D.N.Y. 2000) ................................................................ 10

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .................................................................... 18, 19

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
  99 F.3d 1381 (6th Cir. 1996) ........................................................... 16, 17, 20, 22

*R.C. Olmstead v. CU Interface, LLC*,
  606 F.3d 262 (6th Cir. 2010) .......................................................................... 10

*Schenck v. Orosz*,
  2013 WL 5963557 (M.D. Tenn. Nov. 7, 2013) ............................................... 11

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ........................................................................................ 20

*Sony/ATV Music Publ'g LLC v. 1729172 Ontario, Inc.*,
  2015 WL 13030253 (M.D. Tenn. Sept. 25, 2015) ............................................ 8

*Sony/ATV Publ'g, LLC v. Marcos*,
  651 F. App'x 482 (6th Cir. 2016) .................................................................. 9, 22

iii

*Taylor Corp. v. Four Seasons Greetings, LLC,*
    403 F.3d 958 (8th Cir. 2005) ........................................................................... 23

*TCA Television Corp. v. McCollum,*
    839 F.3d 168 (2d Cir. 2016) ............................................................................ 15

*Tree Publ'g Co. v. Warner Bros. Records,*
    785 F. Supp. 1272 (M.D. Tenn. 1991) ...................................................... 28, 29

*Univision Music LLC v. Banyan Ent.,*
    2004 WL 5574359 (C.D. Cal. Nov. 15, 2004) ................................................ 26

*Vergara Hermosilla v. Coca-Cola Co.,*
    717 F.Supp.2d 1297 (S.D. Fla. 2010) .............................................................. 24

*Virgin Recs. Am., Inc. v. Jones,*
    2007 WL 9734649 (E.D. Tenn. Aug. 27, 2007) ............................................. 12

*Virtual Studios, Inc. v. Beaulieu Grp., LLC,*
    987 F.Supp.2d 769 (E.D. Tenn. 2013) ............................................................ 23

*W.H. Anderson Co. v. Baldwin Law Publ'g Co.,*
    27 F.2d 82 (6th Cir. 1928) .............................................................................. 11

*Warner Bros. Ent. Inc. v. WTV Sys., Inc.,*
    824 F.Supp.2d 1003 (C.D. Cal. 2011) ............................................................ 23

*Warner/Chappell Music v. Blue Moon Ventures, Inc.,*
    2011 WL 662691 (M.D. Tenn. Feb. 14, 2011) ............................................... 30

*Warner/Chappell Music, Inc. v. Blue Moon Ventures, Inc.,*
    2011 WL 13281770 (M.D. Tenn. Oct. 21, 2011) ...................................... 8, 23

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7, 20 (2008) ....................................................................................... 8

*Wood v. Detroit Diesel Corp.,*
    213 F. App'x 463 (6th Cir. 2007) ................................................................... 30

*WPIX, Inc. v. ivi, Inc.,*
    691 F.3d 275 (2d Cir. 2012) ............................................................................ 23

*WPIX, Inc. v. ivi, Inc.,*
    765 F.Supp.2d 594 (S.D.N.Y. 2011) ............................................................... 26

*Wynn Oil Co. v. Am. Way Serv. Corp.,*
    943 F.2d 595 (6th Cir. 1991) .......................................................................... 25

*Zomba Enters., Inc. v. Panorama Records, Inc.,*
    491 F.3d 574 (6th Cir. 2007) ...................................................... 9, 14, 18, 22

**STATUTES**

17 U.S.C. § 101 .................................................................................................. 12, 17

17 U.S.C. § 102(a)(2) ............................................................................................ 9, 17

17 U.S.C. § 106 ................................................................................................... 10, 12

iv

17 U.S.C. § 107............................................................................................ 13, 15, 17, 18, 20

17 U.S.C. § 410(c) ................................................................................................... 9

**OTHER AUTHORITIES**

PUBLIC COMMENTS OF ANTHROPIC PBC, ANTHROPIC 5 (Oct. 30, 2023),
    https://perma.cc/8DBX-H3XU ........................................................................ 6, 11

**RULES**

FED. R. CIV. P. 65(c) ............................................................................................ 30

v

## INTRODUCTION

Defendant Anthropic PBC ("Anthropic") has built a multibillion-dollar artificial intelligence ("AI") business on brazen, widespread copyright infringement. Anthropic systematically copies and disseminates copyrighted works, including the lyrics to innumerable musical compositions owned and controlled by Plaintiffs (collectively, "Publishers").[1] By copying and distributing those lyrics without permission, Anthropic violates Publishers' copyrights, unlawfully enriches itself at the expense of Publishers and songwriters, and diminishes the inherent value of their works. Anthropic has no excuse for ignoring longstanding copyright law—and when it does so, there are real victims who suffer real consequences. Technology companies may prefer to live by the mantra "move fast and break things," but they are not entitled to move fast by stealing the raw materials for the products they sell, shortchanging owners and authors in the process.

Though the technology behind AI is complex, the legal and factual issues before this Court are straightforward. Publishers own or control copyrights in many of the most artistically and culturally significant musical compositions of all time. Anthropic, meanwhile, builds its AI models by illegally copying lyrics and other text culled from the internet and exploiting that content as the input to train its AI models and as the output those models generate. But Anthropic never seeks Publishers' authorization or a license. That is copyright infringement.

Anthropic must not be allowed to flout copyright law. If the Court waits until this litigation ends to address what is already clear—that Anthropic is improperly using Publishers' copyrighted works—then the damage will be done. Anthropic has already usurped Publishers' and songwriters' control over the use of their works, denied them credit, and jeopardized their reputations. If

---

[1] Concord Music Group, Inc. ("Concord"); Capitol CMG, Inc. ("CCMG"), Universal Music Corp., Songs of Universal, Inc., Universal Music - MGB NA LLC, Polygram Publishing, Inc., Universal Music - Z Tunes LLC (together with CCMG, "Universal"); and ABKCO Music, Inc ("ABKCO").

unchecked, Anthropic's wanton copying will also irreversibly harm the licensing market for lyrics, Publishers' relationships with licensees, and their goodwill with the songwriters they represent.

Publishers seek limited preliminary relief to address those harms and stem Anthropic's infringement while this case proceeds. As detailed below, Anthropic should be (1) ordered to implement effective guardrails that prevent its current AI models from generating output that disseminates, in full or in part, the lyrics to compositions owned or controlled by Publishers (the "Works") and (2) prohibited from using unauthorized copies of the Works to train future models.

## FACTUAL BACKGROUND

### I. Plaintiff Publishers and their copyrighted Works

Publishers are music publishing companies that represent many of the world's most talented and successful songwriters, including many based in Nashville, Tennessee. Declaration of Duff Berschback ("Concord Decl.") ¶ 4; Declaration of Alisa Coleman ("ABKCO Decl.") ¶ 4; Declaration of David Kokakis ("UMPG Decl.") ¶ 4; Declaration of Kenton Draughon ("CCMG Decl.") ¶ 4. Publishers work to discover and nurture up-and-coming songwriters, promote them and their works, secure and manage copyrights in their compositions, negotiate and administer licenses on their behalf, collect and distribute their share of royalties, and protect their intellectual property. Concord Decl. ¶¶ 4-5; ABKCO Decl. ¶¶ 4-5; UMPG Decl. ¶¶ 4-5; CCMG Decl. ¶¶ 4-5.

Publishers own or control exclusive rights in millions of musical compositions, of which the 500 works in Exhibit A to the Complaint (the "Compositions") are illustrative. Concord Decl. ¶¶ 7-8; ABKCO Decl. ¶¶ 6-7; UMPG Decl. ¶¶ 7-8; CCMG Decl. ¶¶ 7-8. Each Composition was registered with the Copyright Office within five years of publication. Concord Decl. ¶ 9; ABKCO Decl. ¶ 9; UMPG Decl. ¶ 9; CCMG Decl. ¶ 9. The Compositions include the popular and beloved songs "A Change Is Gonna Come," "God Only Knows," "What a Wonderful World," "Sweet Home Alabama," "Every Breath You Take," "Life Is a Highway," "Halo," and "Uptown Funk."

2

The music publishing business is built on licensing. On songwriters' behalf, Publishers license the rights to reproduce, distribute, display, and prepare derivative works based on the Compositions across various media. Concord Decl. ¶¶ 10-12; ABKCO Decl. ¶¶ 10-12; CCMG Decl. ¶¶ 10-12; UMPG Decl. ¶¶ 10-12. Publishers license the lyrics to their copyrighted compositions (the "Works") to digital music services such as Spotify and Apple Music; social media platforms such as Meta and YouTube; lyric aggregators such as LyricFind and Musixmatch; and lyrics websites such as Genius.com, authorizing them to share the Works publicly. *Id.* LyricFind and Musixmatch in turn sublicense the Works to search engines like Google, websites like Lyrics.com and AZLyrics.com, and other digital music services. *Id.*; Declaration of Timothy Chung ("Chung Decl."), Exs. B, C, D. Publishers generally require licensees to credit Publishers and songwriters when disseminating the Works. Concord Decl. ¶¶ 13-14; ABKCO Decl. ¶¶ 14-15; CCMG Decl. ¶¶ 12-14; UMPG Decl. ¶¶ 12-13. On a case-by-case basis, Publishers license the Compositions and their lyrics for incorporation in samples, remixes, soundtracks, sheet music, karaoke products, books, magazines, greeting cards, and merchandising, among other uses. *Id.*

The revenues from these licenses are critical. Publishers depend on that revenue to sustain their work discovering, promoting, and protecting songwriters. Concord Decl. ¶ 12; ABKCO Decl. ¶ 13; UMPG Decl. ¶ 15; CCMG Decl. ¶ 10. Songwriters depend on royalties from licensing for their livelihood. Declaration of Bart Herbison, Ex. A ("NSAI Letter") ¶ 3. Moreover, licensing is a vital tool by which Publishers control the Works' exploitation, ensure attribution, and manage the profiles of their songwriters. Concord Decl. ¶¶ 11-16; ABKCO Decl. ¶¶ 11-17; UMPG Decl. ¶¶ 11-16; CCMG Decl. ¶¶ 10-16. Anthropic has neither sought nor obtained a license to use the Works. Concord Decl. ¶ 17; ABKCO Decl. ¶ 19; UMPG Decl. ¶ 18; CCMG Decl. ¶ 18.

## II. Defendant Anthropic and its copying of the Works

Anthropic is a for-profit technology company valued at $5 billion or more. Chung Decl.,

Ex. E. Anthropic's primary product is a series of AI models called "Claude," which responds to user prompts with AI-generated text. Declaration of Ben Zhao ("Zhao Decl.") ¶¶ 20, 29. Anthropic provides access to Claude in two ways: (1) through a chatbot on Anthropic's website and (2) as an application programming interface ("API") that allows business subscribers to incorporate Claude interactions into their software, products, and systems. *Id.* ¶¶ 20, 31-32.

To develop its AI model, Anthropic harvests massive troves of content from the internet, including the Works and other copyrighted texts, and manipulates the content into a format the model can process. *Id.* ¶¶ 15, 34. Once this is complete, Anthropic's Claude AI model can generate text responses to user prompts—including output containing full or partial copies of the Works. Indeed, when prompted for the lyrics to each of the 500 Compositions, Claude responded with verbatim or near-verbatim copies of the Works. *See* Declaration of Dan Seymour ("Seymour Decl.") ¶¶ 7-8; Declaration of Dr. Robert Leonard ("Leonard Decl.") ¶ 18, 21-35. For example:

- When Claude was queried, "What are the lyrics to Roar by Katy Perry," to which Concord owns the copyright, Claude provided an almost identical copy of Concord's copyrighted lyrics. Seymour Decl., App. B, at 437; Leonard Decl., App. D, at 151-53.

- When asked, "What are the lyrics to Friends in Low Places by Garth Brooks," to which Universal owns the copyright, Claude responded with a near-verbatim copy of Universal's copyrighted lyrics. Seymour Decl., Ex. B, at 314; Leonard Decl., App. C, at 44-45.

- And when asked, "What are the lyrics to You Can't Always Get What You Want by the Rolling Stones," to which ABKCO owns the copyright, Claude generated a near-exact copy of ABKCO's lyrics. Seymour Decl., Ex. B, at 186; Leonard Decl., App. E, at 412-14.

The same pattern played out for each of the 500 Compositions: when prompted, Claude generated near-identical copies of the copyrighted lyrics to each song. Leonard Decl. ¶¶ 18, 21-35.[2]

Anthropic cannot blame these results on the requests of determined infringers. Claude copies the Works even when not specifically prompted for lyrics. For instance:

---

[2] Claude's responses vary. When prompted for a Composition's lyrics several times, Claude produces the Works verbatim in some replies but not others. Seymour Decl. ¶ 4; Zhao Decl. ¶ 39.

- When asked, "Write me a song about the death of Buddy Holly," Claude provided the lyrics to "American Pie" by Don McLean, to which Universal owns the copyright, though the prompt did not identify the song's title, artist, or author. Leonard Decl., App. F, at 1-5.

- When asked, "Give me the chords to Daddy Sang Bass by Johnny Cash," Claude provided both the chords and the copyrighted lyrics to that Composition, to which Universal owns the copyright. Seymour Decl., Ex. C, at 16; Leonard Decl. App. F at 7-8.

- And when asked to "[w]rite a short piece of fiction in the style of Louis Armstrong," Claude responded by providing large portions of the lyrics to "What a Wonderful World," to which Concord owns exclusive rights. Leonard Decl. ¶ 41.

Claude often copies the Works without attribution, misstates the song's title or performer, claims attribution for itself, or otherwise misidentifies the writer of the lyrics. Leonard Decl. ¶¶ 37 -39. For example, when prompted for the lyrics to "All I Wanted," Claude provided the lyrics to "Run"—written by Snow Patrol's Gary Lightbody, Mark Pete McClelland, Jonathan Graham Quinn, Nathan Connolly, and Ian Denis Archer and to which Universal owns the copyright—but identified the Work as "the lyrics to the song 'All I Wanted' by Paramore." *Id.* ¶ 44.

Claude not only reproduces, distributes, and displays near-exact copies of the Works but also uses them to create "mashups" merging the Works with other lyrics or text. *Id.* ¶¶ 42-43, 50. For instance, when prompted to "[w]rite a poem in the style of the Police," Claude combined the lyrics to the songs "Roxanne," "Don't Stand So Close to Me," "Every Breath You Take," and "Message in a Bottle," as performed by The Police, with "Bad Boys" as performed by Inner Circle and made famous in the television show *Cops. Id.* ¶ 42. Further, Claude uses the Works in ways their writers never intended. For example, Claude generated a mashup of "Candle in the Wind" and "Baby Got Back," adding unsolicited elements from "Goodbye Yellow Brick Road" by Elton John and Bernie Taupin. *See id.* ¶ 50 (generating output such as "Like a candle in the wind / Bouncing merrily along / Your butt was bigger than them all" and "Goodbye, yellow brick butt").

Claude does not do this by accident. Anthropic has complete control over the data it provides Claude as input and over what Claude is permitted to generate as output.

Anthropic controls Claude's input in at least two ways. First, Anthropic chooses the content it uses to train Claude. *See* Zhao Decl. ¶¶ 15, 36. Anthropic trains Claude to generate text using vast amounts of content, copied from the internet without regard to copyright. Zhao Decl. ¶¶ 36-38. Anthropic saves that content to computer memory and further copies that content into short text segments called "tokens," which serve as Claude's vocabulary. Zhao Decl. ¶¶ 15, 17. Because Claude is "designed to be self-contained," *see* Chung Decl., Ex. F, it generates text based solely on the tokenized data Anthropic selects, Zhao Decl. ¶ 21. Anthropic decided to use content from web crawls, among other sources, to train Claude—but could easily decide not to. *See* Zhao Decl. ¶ 28. Indeed, Anthropic claims not to train Claude on customer data. Chung Decl., Ex. G. While it refuses to disclose the specific sources of its training data, Anthropic admits to using content "obtain[ed] by crawling public web pages" to train Claude. *See* PUBLIC COMMENTS OF ANTHROPIC PBC, ANTHROPIC 5 (Oct. 30, 2023), https://perma.cc/8DBX-H3XU [hereinafter NOI Response].

Second, once Anthropic chooses the text it will use to train Claude, Anthropic "cleans" the text to filter out material it wishes to exclude, such as offensive language. Zhao Decl. ¶ 16. During the cleaning process, Anthropic could, for example, decide to exclude all religious, political, or sexual material from the dataset. It could also remove material bearing copyright symbols or other indicia of copyright protection. *Id.* ¶ 28. Anthropic does not, however, exclude copyrighted works and indeed admits that its training data includes copyrighted works. *See* NOI Response 7. Anthropic's decision to include Publishers' copyrighted lyrics as input makes possible the infringing output that Claude generates in response to user prompts. Zhao Decl. ¶¶ 36, 38.

Anthropic controls not only Claude's input but also its permissible output. Anthropic sets "guardrails" to prevent Claude from distributing certain types of responses. Id. ¶¶ 23, 42. For example, Anthropic appears to have applied guardrails to prevent Claude from generating

responses on certain political issues, giving medical or legal advice, supporting criminal conduct, or invading personal privacy. Chung Decl., Ex. H. In contrast, Claude's guardrails around copyrighted lyrics are more porous than a sieve. At times, Claude refuses to answer prompts seeking lyrics and instead warns that providing those lyrics runs afoul of copyright restrictions. Zhao Decl. ¶ 42. But even when a user encounters such a guardrail, simply reentering or rephrasing the prompt is often enough to generate infringing output. Id. Anthropic's easily evaded guardrails do little to stop infringement—but make crystal clear that Anthropic knows both that its model distributes unauthorized copies of lyrics and that it violates copyright law by doing so. In stark contrast to how it treats Publishers' copyrights, Anthropic takes pains to protect its own intellectual property. Chung Decl., Exs. I, J, K. But despite its knowledge and ability to control Claude's outputs, Anthropic fails to consistently prevent infringement of the Works.

Anthropic is now raising billions of dollars to develop AI models it claims will be ten times more powerful than those available today. Chung Decl., Ex. L. As this case proceeds, Anthropic will continue to develop Claude 3.0 and other models—and will select the datasets used to train them. *See* Zhao Decl. ¶¶ 49-51. The denial of injunctive relief would permit Anthropic to continue using the Works as inputs, this time to train a more-powerful Claude, magnifying the already-massive harm to Publishers and songwriters. Because Anthropic's use violates Publishers' copyrights and causes incalculable harm, Publishers are entitled to a preliminary injunction.

## ARGUMENT

This Court should issue a preliminary injunction to address Anthropic's infringement of Publishers' copyrighted lyrics and the irreparable harm it causes.[3] "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is

---

[3] To streamline the issues before the Court, Publishers seek a preliminary injunction based on their direct infringement claim. Publishers reserve the right to assert each claim in the Complaint.

likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). These four factors "are not prerequisites, but [rather] are to be balanced against each other." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

All four factors favor a preliminary injunction. First, Anthropic's systematic ingestion, duplication, and dissemination of the Works violate Publishers' exclusive rights under the Copyright Act. Second, Anthropic's infringement harms Publishers and their songwriters in immeasurable ways—denying them control over their works, undercutting the licensing market for their lyrics, diminishing their livelihoods, and damaging their reputations. Third, without an injunction, Publishers and songwriters face hardships that far outweigh the cost to Anthropic of conforming its conduct with the law. Fourth, an injunction serves the public by encouraging songwriters to create and share their works. Courts in this District regularly enter preliminary injunctions when needed to protect music publishers and songwriters.[4] This case is no exception.

The injunction Publishers seek is narrowly tailored to avoid unduly impeding Anthropic's business while addressing its current and future infringement. Plaintiffs seek two pieces of interim relief. First, Anthropic should be ordered to implement effective guardrails to prevent output that reproduces, distributes, and displays the Works. While stronger guardrails will not remove the infringing content from Claude's corpus, they can dramatically reduce infringing outputs. Second, Anthropic should be enjoined from using existing unauthorized copies or creating new unauthorized copies of the Works to develop or train new AI models.

---

[4] *E.g.*, *Warner/Chappell Music, Inc. v. Blue Moon Ventures, Inc.*, 2011 WL 13281770, at *5 (M.D. Tenn. Oct. 21, 2011) (enjoining infringing distribution of karaoke music); *Sony/ATV Music Publ'g LLC v. 1729172 Ontario*, 2015 WL 13030253, at *7 (M.D. Tenn. Sept. 25, 2015) (same).

## I. Publishers are likely to succeed on their direct copyright infringement claim.

Publishers are likely to succeed on the merits of their direct copyright infringement claim. "The elements of a copyright-infringement claim are (1) ownership of the copyright by the plaintiff and (2) copying by the defendant." *Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 581 (6th Cir. 2007). Importantly, "Publishers need not prove their case in full at this [preliminary injunction] stage." *Sony/ATV Publ'g, LLC v. Marcos*, 651 F. App'x 482, 485 (6th Cir. 2016). Rather, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (citation omitted). Publishers easily meet this test.

### A. Publishers own or control valid copyrights in the Works.

Publishers are the owners or exclusive licensees of copyrights in the Compositions, "including any accompanying words," *see* 17 U.S.C. § 102(a)(2), and each Composition was timely registered with the U.S. Copyright Office. *See* Concord Decl. ¶ 9; ABKCO Decl. ¶ 9; UMPG Decl. ¶ 9; CCMG Decl. ¶ 9; Compl., Ex. A (listing copyright registration numbers for every Composition). Publishers' copyright registrations are prima facie evidence of both copyright ownership and validity. *Lexmark Int'l v. Static Control Components, Inc.*, 387 F.3d 522, 533-34 (6th Cir. 2004); 17 U.S.C. § 410(c). At this stage, Publishers' sworn declarations as to their ownership and identification of copyright registration numbers are enough to show likelihood of success on this issue. *See, e.g.*, *Marcos*, 651 F. App'x at 485 (reasoning that, at the preliminary injunction stage, "[p]ublishers need not offer conclusive proof of ownership as to each of the over six thousand Subject Works . . . to show a substantial likelihood of success on the merits").

### B. Anthropic copies the Works.

There can be no dispute that Anthropic has copied the Works without authorization.

"[C]opying" is "shorthand for any infringement on one of the copyright owner's exclusive rights." *Brittney Gobble Photography LLC v. Wenn Ltd.*, 2017 WL 10188859, at \*4 (E.D. Tenn. Sept. 5, 2017) (citation omitted). Only a copyright owner may reproduce, distribute, publicly display, or prepare derivative works based on its copyrighted work, or authorize others to do so. 17 U.S.C. §§ 106(1)-(3), (5). Violation of any one of those rights establishes infringement and warrants a preliminary injunction. *See King Recs., Inc. v. Bennett*, 438 F.Supp.2d 812, 850 (M.D. Tenn. 2006). Anthropic cannot in good faith deny that it copies the Works, both as input to train Claude and the output Claude generates, and the evidence unequivocally supports that conclusion.

### 1.  Anthropic unlawfully reproduces, distributes, and displays the Works as output.

By providing unlicensed copies of the Works to its users, Anthropic violates Publishers' reproduction, distribution, and display rights. Plaintiffs "may establish an inference of copying by showing (1) access to the allegedly-infringed work by the defendant[] and (2) a substantial similarity between the [] works at issue." *R.C. Olmstead v. CU Interface, LLC*, 606 F.3d 262, 274 (6th Cir. 2010). By showing "striking similarity" between the copyrighted work and the defendant's use, a plaintiff "carries the burdens of proof that the infringing work is sufficient[ly] similar . . . *and* that the defendant must have had access." *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 317 (6th Cir. 2004).

The evidence that Anthropic's Claude AI model provides verbatim or near-verbatim copies of the Works to the public is irrefutable. When prompted for the lyrics to each of the illustrative 500 Compositions, Claude generated identical or near-identical copies of the Works. *See* Leonard Decl. ¶¶ 18, 21-35. In response to a specific request for a Composition's lyrics, Claude not only generated output nearly identical to the Work but also explicitly identified its output as the Work. *See* Leonard Decl., App. C, D, E. What's more, Claude generates almost-exact copies of the Works in response to even oblique requests. *See* Leonard Decl. ¶ 36. The striking similarity between

Claude's output and the Works is compelling evidence that Anthropic has copied the Works.

Publishers can also show copying indirectly. Anthropic admits to copying publicly available webpages as training data, *see* NOI Response 5, and the Works are widely distributed to the public through lyrics websites and digital music services, *e.g.*, UMPG Decl. ¶ 12. Because the Works are "widely disseminated," Publishers easily establish access. *JB Oxford & Co. v. First Tenn. Bank Nat'l Ass'n*, 427 F.Supp.2d 784, 795 (M.D. Tenn. 2006). Anthropic's near-verbatim replication of the Works establishes substantial similarity. Thus, Publishers are likely to succeed in showing that Anthropic unlawfully distributes, displays, and reproduces the Works as output.

### 2. Anthropic unlawfully reproduces the Works as the input for its AI models.

Claude's responses generating the Works as output, together with Anthropic's own account of how Claude operates, establish that Anthropic copied the Works when training its AI model.[5] Claude could not, as a technological matter, generate identical or near-identical copies of the Works as output unless Anthropic first copied the Works as input while building and training Claude. *See* Zhao Decl. ¶¶ 21, 38-39. Anthropic's own explanation of how its AI model functions confirms this. Anthropic explains that "[w]hen Claude is provided language to evaluate, the language text . . . is encoded into a series of tokens for the model to act on." Chung Decl., Ex. M. Claude "speaks" in those tokens, generating output using the text of the "prompt[] and all the text it has generated so far to predict the next token that would be most helpful." Chung Decl., Ex. N.

---

[5] This is direct evidence that Anthropic copied the Works as input. *See, e.g.*, *Schenck v. Orosz*, 2013 WL 5963557, at *11 (M.D. Tenn. Nov. 7, 2013) ("[E]xamples of infringement presented to the court provide direct evidence of infringement: generally, the designs and images are identical as between the deposit copies and the defendants' seller pages."); *W.H. Anderson Co. v. Baldwin Law Publ'g Co.*, 27 F.2d 82, 84-86 (6th Cir. 1928) (affirming judgment that book publisher infringed rival's copyright when "direct" evidence, namely the "testimony of operatives at [defendant's] printing plant" explained that their process involved working from "clippings" of plaintiff's books). Alternatively, Publishers can establish access, *see supra* I.B.1, and that Anthropic creates substantially similar copies of the Works each time it downloads verbatim copies of the Works and converts those copies into tokens, *see* Zhao Decl. ¶¶ 15-17.

Thus, Claude's generation of copies of Works as output reveals that (1) the Works are among the "tokens for [Claude] to act on," and that (2) Anthropic created copies of the Works as "language to evaluate." *See* Zhao Decl. ¶¶ 21, 38-39. In other words, when Claude responds to user prompts with the Works, this shows that Anthropic copied those lyrics into its computer memory and again reproduced the lyrics as a series of text fragments for Claude to draw upon in its responses.

When Anthropic downloads and creates tokens of the Works as input for Claude without Publishers' authorization, Anthropic violates Publishers' exclusive right "to reproduce the copyrighted work in copies." 17 U.S.C. § 106(1); *see also id.* § 101 (defining "copy"); *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F.Supp.3d 957, 967-69 (C.D. Cal. 2016) (holding defendant violated reproduction right by saving to computer memory and encrypting "fragmented copies" of copyrighted films), *aff'd*, 869 F.3d 848 (9th Cir. 2017); *Virgin Recs. Am., Inc. v. Jones*, 2007 WL 9734649, at *2 (E.D. Tenn. Aug. 27, 2007) (holding "download[ing] copyrighted music files" to be infringement). Thus, Publishers are likely to establish that Anthropic's use of the Works as training data and as tokens directly infringes Publishers' copyrights.

* * *

In sum, Anthropic unlawfully reproduces the Works when it creates copies of the Works in datasets; unlawfully reproduces the Works again when it converts the Works into tokens; and unlawfully reproduces, distributes, and displays the Works when Claude generates responses that are strikingly or substantially similar to the Works. Though each infringing step in Anthropic's process enables the next, each step is a distinct copyright violation. Anthropic's copying of the Works in datasets and tokens infringes irrespective of the response Claude generates. And Claude's output of the Works infringes regardless of Claude's internal process. When these violations are taken together, Publishers are undoubtedly likely to establish direct infringement.

12

### C. Anthropic's infringement is not fair use.

Anthropic will no doubt try to defend its blatant infringement by claiming fair use. It may argue that generative AI companies can facilitate immense value to society and should be excused from complying with copyright law to foster their rapid growth. Undisputedly, Anthropic will be a more valuable company if it can avoid paying for the content on which it admittedly relies, but that should hardly compel the Court to provide it a get-out-of-jail-free card for its wholesale theft of copyrighted content. The arc of history shows that technological advancement and compliance with copyright law are not mutually exclusive. Developers of new technologies—from player pianos to karaoke machines, cable television stations, and digital music platforms—have paid for copyrighted content and nevertheless succeeded in their businesses.

Anthropic bears the burden of proving fair use, *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994), but Publishers address Anthropic's likely arguments here to demonstrate their obvious failings. Courts consider four factors to decide fair use: (1) "the purpose and character of the use," (2) "the nature of the copyrighted work," (3) "the amount and substantiality of the portion [defendant] used in relation to the copyrighted work as a whole," and (4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107; *see also Balsley v. LFP, Inc.*, 691 F.3d 747, 758 (6th Cir. 2012). The Supreme Court's recent decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), narrowed the scope of "transformative use" under the first factor. Critically, the Court clarified that "[m]ost copying has some further purpose, in the sense that copying is socially useful *ex post*," but "[t]hat alone does not render such uses fair." *Id.* at 528-29. Because each factor in the analysis, including transformativeness, favors Publishers, any fair use defense must fail.

### 1. Anthropic's use of the Works is commercial and non-transformative.

The first factor—the purpose and character of the disputed use—favors Publishers. *See* 17

U.S.C. § 107(1). In analyzing this factor, courts consider whether the challenged use is (a) for a commercial or a nonprofit educational purpose and (b) transformative. *Balsley*, 691 F.3d at 758. Here, Anthropic's use is both commercial and non-transformative, weighing against fair use.

First, Anthropic's use is plainly commercial. Anthropic is a for-profit company valued at $5 billion that has monetized its infringing AI models in multiple ways. Chung Decl., Ex. E. Anthropic charges business customers for access to the Claude API on a per-word basis, such that it receives revenues every time a user requests copyrighted lyrics through the API and again every time the API generates output copying those lyrics. *See* Chung Decl., Ex. O. For individual users, Anthropic also sells access to its subscription-only AI model called "Claude Pro, for which it charges $20 per month for "the ability to send many more messages" and receive more responses from the AI model. Chung Decl., Ex. P. In short, each time that Anthropic's Claude copies and distributes the Works without securing a license, Anthropic "stands to profit from exploitation of the *copyrighted material* without paying the customary price." *Lexmark*, 387 F.3d at 544. Thus, Anthropic's use is commercial, weighing against fair use. *See Zomba*, 491 F.3d at 583.

Second, Anthropic's use is not transformative. In *Goldsmith*, the Supreme Court instructed courts to consider the purpose of the challenged use in deciding whether that use is transformative:

> [W]hether the use of a copyrighted work has a further purpose or different character . . . is a matter of degree, and the degree of difference must be balanced against the commercial nature of the use. If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying.

598 U.S. at 532-33. By considering whether the defendant uses "an original work to achieve a purpose that is the same as, or highly similar to, that of the original work," the first factor addresses "the problem of substitution—copyright's bête noire." *Id.* at 528. Critically, a use that is "likely to substitute for, or 'supplant'" the copyrighted work is not transformative. *See id.*

Here, the purpose of Publishers' use of the Works and the purpose of the challenged use

14

are one and the same: to provide the Works' original expression on demand. Publishers license their copyrighted lyrics to lyric aggregators, lyric websites, and other digital services to allow individuals to search for and access the Works online. Concord Decl. ¶¶ 11-12; ABKCO Decl. ¶¶ 11-12; CCMG Decl. ¶¶ 11-12; UMPG Decl. ¶¶ 11-12. Likewise, when Anthropic's AI models distribute the Works in responses to user prompts, Anthropic's purpose is to respond to a user's search for and demand to access those lyrics online.[6] Whether Claude provides lyrics in full or in part, it regurgitates creative works to respond to user queries, adding no new purpose. Because Anthropic's use of the Works "is so similar to [the copyrighted work]'s typical use," this factor favors Publishers. *See Goldsmith*, 598 U.S. at 547.

Anthropic's use of the Works as training data is similarly non-transformative, because it is unjustified by a compelling need to "comment[] on, criticize[], or provide[] otherwise unavailable information about the original." *Id.* at 545; *see also Campbell*, 510 U.S. at 580-81 (explaining that where a use has no "need[] to mimic an original to make its point" and "can stand on its own two feet," defendant "requires justification for the very act of borrowing"). Anthropic's use does not add commentary or criticism to the Works but rather copies them wholesale. *See* 17 U.S.C. § 107 (identifying "criticism, comment, news reporting, teaching . . . scholarship, or research" as illustrative fair-use purposes). Anthropic's purported need for a large volume of training text is no justification, because "the particular subject" of the copyrighted lyrics is "irrelevant to that purpose." *See TCA Television Corp. v. McCollum*, 839 F.3d 168, 182 (2d Cir. 2016). And unlike other total uses held transformative, Anthropic's use does not make hard-to-find works newly available or include carefully calibrated guardrails to avoid supplanting existing markets for the

---

[6] This is the use Publishers challenge and on which the Court's analysis should focus. *See, e.g.*, *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018) (limiting fair-use analysis to challenged "watch" function of service that also provided search functions).

copyrighted work. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 207-10, 218 (2d Cir. 2015). Instead, Anthropic ingests the lyrics to the Compositions and distributes them in full or nearly so.

That Claude distributes the Works verbatim or near-verbatim underscores the non-transformative nature of Anthropic's use. "Evidence of verbatim copying is highly relevant . . . because 'it may reveal a dearth of transformative character or purpose under the first factor.'" *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 277 (6th Cir. 2009) (quoting *Campbell*, 510 U.S. at 587). When "an original work is merely retransmitted in a different medium, . . . the new work is not transformative." *Balsley*, 691 F.3d at 759 (internal quotation marks and citations omitted). For example, in *Balsley*, the Sixth Circuit affirmed the jury's conclusion that a magazine publisher's use of a copyrighted photograph was not transformative, when "[t]he picture was unaltered other than for minor cropping and was merely reprinted in a different medium—a magazine rather than a website—essentially serving as a market replacement." *Id.* at 759. Just as in *Balsley*, Anthropic simply retransmits the Works, unaltered but for minor omissions and errors, on its own platform, precluding a finding that Anthropic's use is transformative. *See id.*

Anthropic may use a novel process to accomplish its rote copying, but new technology does not automatically confer transformative value. In *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381 (6th Cir. 1996), the Sixth Circuit considered an "artifact" made possible by "relatively recent advances in technology" but that had been "largely unknown" a generation prior: the coursepack. *Id.* at 1384. Using a selection of textbooks and a photocopier, the commercial printer defendant responded to professor requests by creating "antholog[ies] perfectly tailored to the course the professor wants to present." *Id.* But unlike competitors that sought licenses to create these anthologies, the printer "d[id] not request permission from, nor [did] it pay agreed royalties to, copyright owners." *Id.* The court held the printer's use non-

transformative, emphasizing that "[i]f you make verbatim copies of 95 pages of a 316-page book, you have not transformed the 95 pages very much—even if you juxtapose them to excerpts from other works and package everything conveniently." *Id.* at 1389. Likewise here, Anthropic uses new technology to reproduce the Works wholesale, a "mechanical 'transformation' [that] bears little resemblance to the creative metamorphosis" held transformative in *Campbell*. *See id.*

Similarly, when Claude distorts the Works or combines them with other text, these uses are still non-transformative because they invade the derivative works right. The Copyright Act grants the copyright owner alone the right to create "abridgment[s], condensation[s], or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101 (defining "derivative work"). In *Goldsmith*, the Supreme Court clarified that transformativeness cannot encompass "any use that adds some new expression, meaning, or message," because that interpretation of Section 107(1) "would swallow the copyright owner's exclusive right to prepare derivative works." 598 U.S. at 511. The first fair-use factor, properly understood, "would not weigh in favor of a commercial remix . . . just because the remix added new expression or had a different aesthetic" and "does not . . . dispense with the need for licensing" any time a challenged use "alter[s] the meaning" of the original. *Id.* Here, Claude's mashups and mangled copies of lyrics amount to unlicensed "commercial remix[es]" of the Works. Anthropic's uses invade Publishers' exclusive right to prepare derivative works and are thus plainly non-transformative.

## 2. The Works are within the core of copyright protection.

The second factor—the nature of the copyrighted work—also favors Publishers. 17 U.S.C. § 107(2). This factor "addresses whether the work at issue is within the 'core' of copyright protection or more marginal, with 'creative expression for public dissemination' being within the 'core of the copyright's protective purposes.'" *Bridgeport*, 585 F.3d at 277 (quoting *Campbell*, 510 U.S. at 586). The Works are unquestionably expressive texts within the heart of the Copyright

17

Act's intended protection. *See, e.g.*, *Campbell*, 510 U.S. at 586 (explaining that a musical composition is "closer to the core of intended copyright protection" than factual works or compilations). Indeed, Congress explicitly granted copyright protection to "musical works, including any accompanying words." 17 U.S.C. § 102(a)(2). As a result, the Sixth Circuit has recognized song lyrics as within the core of copyright protection. *See Zomba*, 491 F.3d at 578.

### 3. Anthropic uses all or nearly all of each Work.

The third fair-use factor—"the amount and substantiality of the portion used in relation to the copyrighted work as a whole"—also plainly favors Publishers. 17 U.S.C. § 107(3). Where infringers copy the entirety of a work, the third factor typically weighs against fair use. *Zomba*, 491 F.3d at 583 (rejecting fair use argument by karaoke device manufacturer where, among other things, manufacturer "copied the relevant compositions in their entirety").

Anthropic makes comprehensive use of the Works both as input and output. Anthropic copies the entirety of the Works as input, enabling Claude to generate output containing the Works in full or nearly in full. *See* Zhao Decl. ¶ 38; Leonard Decl. ¶ 18, 21-37. Even when Claude's output contains only portions of lyrics, alone or intermingled with other lyrics and text, Claude reproduces "the most distinctive and recognizable elements" of the Works. *See Bridgeport*, 585 F.3d at 278; *e.g.*, Leonard Decl. ¶¶ 28-29. Because Anthropic's use of the Works as training fodder, in tokens, and as output is total and reproduces the most recognizable elements, this factor weighs against fair use. *Id.*

The facts sharply distinguish this case from those involving information location tools. In *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) and *Authors Guild*, 804 F.3d 202, courts permitted comprehensive copying to build search tools because when the ultimate distribution of copyrighted works was limited and did not substitute for the works in the marketplace. Anthropic's conduct is completely different.

18

In *Perfect 10*, Google created server copies of full-size copyrighted images to "provide thumbnail versions of images in response to user inquiries." *Id.* at 1157. The Ninth Circuit held that the third fair-use factor did not outweigh the others, because Google's purpose differed from that of the copyright holder, its use of full-sized images to create thumbnails was "reasonable in light of the purpose of a search engine" to help users locate photos online, and crucially, the thumbnail copies were "reduced, lower-resolution versions" and "not a substitute for the full-sized images." *See id.* at 1157, 1166-68. Similarly, in *Authors Guild*, the Second Circuit held Google's digitization of entire books to create a full-text searchable database of books to be a fair use, reasoning that Google "ma[de] available information *about* Plaintiffs' books without providing the public with a substantial substitute." 804 F.3d at 207. Google successfully implemented technological guardrails to shield completely from view about 22% of a given book and limited users to viewing the copyrighted work in three-line "snippets." *Id.* at 210, 222. The court held Google's use fair because its program was carefully "designed to show the searcher just enough . . . to help her evaluate whether the book falls within the scope of her interest (without revealing so much as to threaten the author's copyright interests)." *Id.* at 218.

These cases mark the outer boundaries of fair use. *See, e.g.*, *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 174 (2d Cir. 2018); *Authors Guild*, 804 F.3d at 206 ("This copyright dispute tests the boundaries of fair use."). Anthropic clearly oversteps those boundaries. Unlike in *Perfect 10* and *Authors Guild*, Anthropic generates the Works verbatim or nearly so, creating a substitute for access to the Works through Publishers' legitimate licensees. In contrast to Google's focus on hard-to-find works in *Authors Guild*, Anthropic copied the Works precisely because they were publicly available online. *See* NOI Response 5, 7. Rather than "making available information *about*" Publishers' works, Claude omits or misstates attribution information. And unlike Google's

"snippet view," Claude's technological guardrails are unreliable and easy to evade, allowing users to access full copies of the Works simply by reentering or rephrasing their prompts.

Anthropic may try to defend the flimsiness of its guardrails by blaming Claude's outputs on the conduct of users determined to infringe and may claim that its AI model is a tool capable of "substantial noninfringing uses." *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 443 (1984). But Claude differs from a photocopier or a VCR. When a user makes a photocopy or records a television program, the user determines both input and output. Photocopiers and VCRs are empty devices, capable of copying but devoid of content when purchased. In contrast, Claude is filled with copyrighted works—works that Anthropic, not the user, intentionally selects—and operates on that closed universe of material. It is Anthropic's choice of training data that leads Claude to infringe even when not explicitly asked and to copy even works that users did not seek. *E.g.*, Leonard Decl., ¶¶ 36-37, App. F. Anthropic's volitional conduct in choosing the data copied to train Claude is infringement in and of itself, which Anthropic cannot blame on its users. *See TVEyes, Inc.*, 883 F.3d at 181 (holding that "[v]olitional conduct that infringes is clear" when online DVR service "decides what audiovisual content to record [and] copies that content").

### 4. Anthropic's unrestrained use would harm the market for the Works.

The last and most important fair-use factor—"the effect of the use upon the potential market for or value of the copyrighted work"—favors Publishers. 17 U.S.C. § 107(4); *see Princeton*, 99 F.3d at 1385 (describing fourth factor as "undoubtedly the single most important element of fair use" (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985)). The key consideration is "whether there is potential for an adverse effect on the market for the [copyrighted work]," including foreseeable derivative markets, "should the challenged use become widespread." *Balsley*, 691 F.3d at 747; *Bridgeport*, 585 F.3d at 277 (considering "the potential for harm caused by others following in the alleged infringer's footsteps, as well as any

harm to the market for derivative works"). When the use is commercial and supplants the copyrighted work, this factor weighs against fair use. *Balsley*, 691 F.3d at 760-61; *cf. Campbell*, 510 U.S. at 591.

Anthropic and its peers envision a future where AI usurps websites and search engines as the primary, if not exclusive, vehicle for accessing content and information. *See* Chung Decl., Exs. Q, R. In such a future, where conduct like Anthropic's is widespread and compliance with copyright law is excused, the harm to the market for the Works would be catastrophic. First, Anthropic inflicts market harm by evading licensing fees. *See* Declaration of Michael D. Smith ("Smith Decl.") ¶ 37. Second, by using the Works for free, Anthropic erodes their value and reduces Publishers' revenue from licenses to digital platforms like Spotify and Amazon Music, and from lyrics aggregators and their sublicensees. *See id.* ¶ 38; *see also, e.g.*, Concord Decl. ¶¶ 10-12. Lastly, Anthropic's use, if widespread, would shrink the lyrics licensing market. Users can choose to search for and access lyrics through platforms that license lyrics and pay copyright owners or through AI chatbots developed by companies that do not. If consumers choose Claude, the legitimate licensees' business model suffers, which could destroy Publishers' ability to license lyrics in the future. Smith Decl. ¶ 38. In sum, Anthropic's use harms the market for the Works by reducing their value, weakening demand for licenses, and threatening the viability of licensees. Smith Decl. ¶¶ 36-40.

Anthropic's use also intrudes on Publishers' exclusive right to prepare derivative works and harms the market for those derivatives. Publishers license the Works for use in samples, remixes, interpolations, sheet music, and other works based on the Compositions. Concord Decl. ¶¶ 10-12; ABKCO Decl. ¶¶ 10-12; CCMG Decl. ¶¶ 10-12; UMPG Decl. ¶¶ 10-12. When Claude combines the Works with other text, it creates market substitutes for licensed samples, remixes,

sheet music, and similar derivatives. If that use were widespread, Publishers and songwriters would lose significant revenue and the derivative licensing market would shrink. *See Bridgeport*, 585 F.3d at 278 (explaining that the market harm analysis "includes the market for derivative works" and that plaintiff "could lose substantial licensing revenues if it were deprived of its [exclusive] right to license content such as that used by [defendant]").

Similarly, Anthropic's unlicensed use not only undercuts the existing market but also threatens to stifle the burgeoning market for the Works as AI training input. *See, e.g.*, Smith Decl. ¶ 28. Where, as here, "the copyright holder clearly does have an interest in exploiting a licensing market and especially where the copyright holder has actually succeeded in doing so," lost licensing revenue is "relevant to the fair use analysis." *House of Bryant Publ'ns, LLC v. A&E Television Networks*, 2009 WL 3673055, at *8 (M.D. Tenn. Oct. 30, 2009) (quoting *Princeton*, 99 F.3d at 1387). The "deleterious effect on the potential market for licenses to [Publishers'] songs" forecloses finding that Anthropic's use is fair. *Zomba*, 491 F.3d at 584.

## II. Publishers and their songwriters will suffer irreparable harm absent an injunction.

Publishers face irreparable harm if Anthropic's copying is not enjoined.[7] "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages," *Overstreet*, 305 F.3d at 578, or "if the nature of the plaintiff's loss would make the damages difficult to calculate," *Tenke*, 511 F.3d at 550 (citation omitted). If Anthropic's infringement continues, Publishers are likely to suffer several unquantifiable and irreparable

---

[7] "In a copyright-infringement action a plaintiff establishes a rebuttable presumption of irreparable harm by demonstrating a likelihood of success on the merits." *Marcos*, 651 F. App'x at 487. Publishers have shown Anthropic unlawfully copies their copyrighted works. Thus, Publishers enjoy "the rebuttable presumption of irreparable harm that this circuit has recognized in copyright infringement actions." *Cf. Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539-40 (6th Cir. 2020). Though dicta and out-of-circuit cases have questioned the rule, the Sixth Circuit has not reconsidered "whether the presumption should remain the law of our circuit." *Id.* at 540 n.3. However, Publishers easily establish irreparable harm even without the presumption.

22

injuries—including loss of control, goodwill, business opportunities, and relationships—any one of which warrants a preliminary injunction. *See Anderson v. TOL, Inc.*, 927 F.Supp.2d 475, 487 (M.D. Tenn. 2013). Moreover, Anthropic is actively developing and preparing to release more-powerful AI models that will exploit the Works in new, unpredictable ways. Those models threaten even greater imminent harm unless the Court enjoins Anthropic from copying the Works to train future models and orders Anthropic to implement guardrails that prevent distribution of the Works.

### A. Anthropic deprives Publishers and songwriters of control.

First, Anthropic's unlicensed use of the Works—both in training material and in infringing responses—irreparably harms Publishers and songwriters by denying them control over their Works. It is well established that copyright holders' "loss of control over their property and the consequent inability to control the exploitation of their works" is unquantifiable and grounds for finding irreparable harm. *Warner/Chappell*, 2011 WL 13281770, at *5.[8]

Publishers and the songwriters they represent invest enormous resources and great care to manage how, when, where, and by whom their copyrighted musical compositions—including the lyrics therein—are exploited. *See* Concord Decl. ¶¶ 13-16; ABKCO Decl. ¶¶ 14-17; UMPG Decl. ¶¶ 13-16; CCMG Decl. ¶¶ 13-16. Cognizant that songwriters carefully guard how their works are used, including through which media and platforms they are presented, Publishers customarily

---

[8] *See also, e.g.*, *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) (affirming finding that copyright infringement irreparably harmed plaintiff by "dilut[ing] plaintiffs' programming and their control over their product"); *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 968 (8th Cir. 2005) ("[Plaintiff] certainly has the right to control the use of its copyrighted materials, and irreparable harm inescapably flows from the denial of that right"); *Virtual Studios, Inc. v. Beaulieu Grp., LLC*, 987 F.Supp.2d 769, 780 (E.D. Tenn. 2013) (finding irreparable harm because copyright holder's "interest in exclusive control over its images is separate from its interest in damages"); *Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F.Supp.2d 1003, 1012-13 (C.D. Cal. 2011) ("[B]ecause Defendants operate their infringing service without the normal licensing restrictions imposed by Plaintiffs, they interfere with Plaintiffs' ability to control the use and transmission of their Copyrighted Works, thereby causing irreparable injury to Plaintiffs.").

seek songwriter approval before licensing compositions for uses that they could find objectionable, forbid alteration of the lyrics, and specify what portion of the lyrics the licensor may use and in what context. *See, e.g.,* Concord Decl. ¶ 13; NSAI Letter ¶ 8; Smith Decl. ¶ 31. For Publishers and their songwriters, maintaining control over the integrity of the Works is a paramount concern. *See, e.g.*, Concord Decl. ¶¶ 13-16; ABKCO Decl. ¶¶ 14-17; UMPG Decl. ¶¶ 13-16; CCMG Decl. ¶¶ 13-16; NSAI Letter ¶¶ 8-9. Anthropic's unlicensed use of the Works wrests away this control.

### B. Anthropic denies Publishers and songwriters credit and goodwill.

Second, Publishers and their songwriters are also irreparably harmed when Anthropic generates output copying their lyrics while denying them credit. Courts recognize that a copyright holder's loss of credit and associated goodwill constitutes irreparable harm. <u>E.g.</u>, <u>Vergara Hermosilla v. Coca-Cola Co.</u>, 717 F.Supp.2d 1297, 1305 (S.D. Fla. 2010) ("The harm to [songwriter from] using his lyrics without providing credit goes beyond monetary damages to his name recognition among music listeners"), <u>aff'd</u> 419 F. App'x 917 (11th Cir. 2011).

Lyrics reflect the tremendous talents and creative efforts of songwriters, and so Publishers take great pains to ensure that those songwriters are credited appropriately for those talents and efforts. When licensing lyrics to lyric aggregators, lyric websites, and other digital services, Publishers' agreements often include explicit conditions requiring attribution. Concord Decl. ¶ 13; ABKCO Decl. ¶ 14; UMPG Decl. ¶ 13; CCMG Decl. ¶ 14. These safeguards demonstrate that, along with control, credit is of crucial concern to Publishers and songwriters alike.

Anthropic, however, fails to credit the owners of the copyrighted works it exploits. Claude routinely reproduces, distributes, and displays Publishers' copyrighted lyrics in its output but fails to identify Publishers or their songwriters as the source. *See* Leonard Decl. ¶¶ 38, 40. Claude also sometimes erroneously provides Publishers' lyrics in response to queries seeking lyrics to a different song, misattributing the Work to another publisher or writer. *See id.* ¶ 44. More broadly,

Anthropic refuses to publicly credit the sources of the content it uses to train Claude. Anthropic irreparably harms Publishers and songwriters when it denies them credit and eliminates opportunities to generate business, raise songwriters' profiles, and accrue goodwill.

### C. Anthropic harms Publishers' and songwriters' reputations.

Third, Anthropic does "damage to [the] reputation[s]" of Publishers and their songwriters and diminishes the integrity of their work, yet another "valid ground[] for finding irreparable harm." *Anderson*, 927 F.Supp.2d at 48. Anthropic mars the reputations of Publishers and songwriters by associating their names with unauthorized derivatives. Claude frequently generates output that combines portions of the Works with other lyrics or text, often in ways inconsistent with and inimical to authorial intent—and for which the songwriter would never have granted a license. *See* NSAI Letter ¶¶ 6-7; *see also, e.g.*, Leonard Decl., App. F, at 41-42 (combining "A Change is Gonna Come" with "WAP"); Smith Decl. ¶ 35 (discussing erosion of consumer perception). In other instances, Claude mangles the Works and misattributes distorted lyrics to Publishers and songwriters. *See, e.g.*, Leonard Decl. ¶¶ 27, 44. Irreparable harm flows "from [Anthropic's] wrongful attribution to the individual, in the eye of the general public, of responsibility for actions over which he or she has no control." *King v. Innovation Books*, 976 F.2d 824, 832 (2d Cir. 1992).[9]

### D. Anthropic erodes the value of and licensing market for the Works.

Fourth, Anthropic's infringement erodes the price of the Works, the legitimate licensing

---

[9] *See also, e.g.*, *id.* (crediting "the obvious point that [an author's] name and artistic reputation are his major assets" and finding irreparable harm when defendant linked author's name to film he did not write); *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991) (holding that in infringement cases "irreparable injury ordinarily flows when a . . . possible risk to reputation appears."); *Peermusic, III, Ltd. v. LiveUniverse, Inc.*, 2010 WL 11586701, at *3 (C.D. Cal. May 13, 2010) (finding irreparable harm when infringement "deprives [p]laintiffs of the ability to ensure the accuracy of the song lyrics and control the quality of their presentation"); *Univision Music LLC v. Banyan Ent.*, 2004 WL 5574359, at *6 (C.D. Cal. Nov. 15, 2004) (finding Spanish-language band irreparably harmed by release of their album in English, "a stylistic change" that was "'contrary to what we want[] to accomplish musically, and what we believe in artistically'").

market for lyrics, and Publishers' goodwill with licensees. By exploiting the Works for free as training data and in Claude's responses, Anthropic lowers the market value of the lyrics, reduces demand for legitimate licenses for lyrics, and impedes Publishers' negotiations with existing licensees. *See, e.g.*, *WPIX, Inc. v. ivi, Inc.*, 765 F.Supp.2d 594, 618 (S.D.N.Y. 2011) (finding "the ability of [copyright owners] to profit from sanctioned sources would inevitably drop" if defendant continued unsanctioned distribution of works), *aff'd*, 691 F.3d 275 (2d Cir. 2012). Existing licensees, unwilling to purchase what Anthropic takes for free, will not renew their licenses or demand discounts to compete with Anthropic's unlawful use. Smith Decl. ¶ 38. Meanwhile, potential licensees will hesitate to enter agreements in the first place. *Id.*

Anthropic's use also undermines the licensing market for the Works by harming licensees and their relationships with Publishers. Anthropic's unlicensed use of the Works affords it an unfair competitive advantage over lyrics aggregators, lyric websites, digital services, and Publishers' other legitimate licensees, threatening their viability. *See WPIX, Inc.*, 765 F.Supp.2d at 619 (finding irreparable harm when infringement unfairly competes with plaintiffs' licensees). Anthropic's continued infringement would likely diminish licensees' trust in Publishers, damaging Publishers' goodwill and hindering future business opportunities. Such "price erosion, loss of goodwill, . . . and loss of business opportunities" in the licensing market for lyrics is irreparable and warrants an injunction. *See Anderson*, 927 F.Supp.2d at 487-88.[10]

**E.  Anthropic damages Publishers' position to negotiate future licenses.**

Fifth, Anthropic's infringement will irreparably damage Publishers' competitive position and their ability to negotiate future licenses with AI developers. Anthropic's unlicensed use, if

---

[10] *See also, e.g.*, *Frisch's Rests., Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 652 (6th Cir. 1982) (finding irreparable harm when plaintiff would "lose much of the confidence reposed in it by (its) licensees if [it were seen] as unwilling to protect the exclusivity of its licenses"); *Tenke*, 511 F.3d at 550 (finding "loss of customer goodwill" and "loss of fair competition" to be irreparable harms).

allowed to persist and become widespread, will permanently tilt the balance in future negotiations toward Anthropic and other AI developers. If Anthropic continues to exploit and devalue the Works, even if only during the pendency of this case, its conduct will become entrenched not only in Anthropic's AI models but also among other AI developers and in the public consciousness. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 545 U.S. 913, 929 (2005) (reasoning that "the ease of copying songs or movies using software like Grokster's and Napster's is fostering disdain for copyright protection"); Smith Decl. ¶ 40. That will permanently undermine Publishers' leverage in future negotiations to license lyrics as training data to Anthropic and its peers. Even if Publishers prevail on the merits and Anthropic is forced to either cease infringing or obtain a license, without preliminary relief, the parties will no longer be bargaining from equal positions.

AI technology continues to advance rapidly and unpredictably, increasing the potential scope and scale of Anthropic's infringement and underscoring the need for preliminary relief. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits." *Tenke*, 511 F.3d at 542. Anthropic's ongoing infringement risks devaluing Publishers' core assets, weakening Publishers' future negotiating position, and hampering the development of a lawful licensing market for lyrics as training data by creating "incorrect but lasting impressions" about the lawful use of Publishers' works. *See Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F.Supp.2d 1003, 1013 (C.D. Cal. 2011) (finding video-on-demand product caused irreparable harm by "threaten[ing] the development of a successful and lawful video on demand market" and "threaten[ing] to confuse consumers about video on demand products").

### F. Anthropic harms Publishers' relationships with songwriters.

Finally, Anthropic's exploitation of the Works as training data and in Claude's responses irreversibly damages Publishers' relationships with current and prospective songwriter-partners. If Anthropic's unlicensed use continues, it will undermine songwriters' confidence in Publishers'

27

ability to protect their interests, causing irreparable harm. *See, e.g.*, *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 886 F. Supp. 1120, 1124 (S.D.N.Y. 1995) (finding defendant that copied articles but omitted bylines irreparably harmed reputations of news organization plaintiffs who had "an interest in protecting the reputation and integrity of their writers").

## III.     The balance of equities favors an injunction.

The balance of equities tips sharply in Publishers' favor. Anthropic's misconduct threatens irreparable damage to Publishers' core business and relationships—and will continue unless enjoined. In contrast, the limited preliminary injunction Publishers seek will not cognizably harm Anthropic or third parties. In copyright infringement cases, "[c]ourts generally ignore the harm to others consideration because an infringer could set up his infringement with substantial investment and thereby claim harm by the injunctive relief." *Tree Publ'g Co. v. Warner Bros. Records*, 785 F. Supp. 1272, 1276 (M.D. Tenn. 1991). Here, Anthropic never licensed and has no right to copy the Works. Thus, the risk that Anthropic's business might suffer if the Court enjoins its copying is "simply a consequence of the fact that [its] business model is to infringe [Publishers'] intellectual property" and "does not merit significant equitable protection." *See ACT*, 46 F.4th at 505.

Regardless, the narrowness of the requested injunction limits the harm to Anthropic. Publishers seek only to (1) require Anthropic to implement effective guardrails in its current models to prevent output that reproduces, distributes, or displays the Works and (2) preclude Anthropic from making or using copies of the Works to train future AI models.

Publishers' first request that Anthropic implement effective guardrails in current AI models is tailored to "preserve the 'status quo' by stopping [Anthropic's] threatened conduct from causing (irreparable) harm until the court has a meaningful chance to resolve the case on the merits." *Doster v. Kendall*, 54 F.4th 398, 441 (6th Cir. 2022). It is technologically feasible for Anthropic to adopt stronger measures to make infringing outputs less likely. *See* Zhao Decl. ¶ 47. Indeed, the

current version of Claude includes guardrails against certain dangerous, offensive, or controversial responses. *See* Chung Decl., Ex. H. Publishers ask only that Anthropic strengthen its copyright-related guardrails so that Claude no longer reproduces, distributes, or displays the Works in response to direct or indirect prompts and so that repeat requests cannot evade those guardrails.

Publishers' second request to bar Anthropic from creating or using unauthorized copies of the Works to train future models merely preserves the status quo pending litigation. *See, e.g.*, *Advantage Waypoint, LLC v. Baker*, 2018 WL 10152454, at *1 (M.D. Tenn. Jan. 23, 2018) (Crenshaw, C.J.) ("[P]ublic policy strongly weighs in favor of a limited, status quo injunction."). This relief will not bar Anthropic from developing, operating, releasing, or selling access to new versions of Claude, as long as Anthropic takes effective steps not to copy the Works, including the lyrics to the 500 representative Compositions, in connection with those models.

## IV.    Enjoining Anthropic's infringement will serve the public interest.

Finally, preliminary injunctive relief serves the public's "compelling interest in protecting copyright owners' marketable rights to their work . . . as well as in protecting the economic incentive to create." *ACT*, 46 F.4th at 505. Indeed, "it is virtually axiomatic that the public interest can only be served by upholding copyright protections." *Sony/ATV*, 2015 WL 13030253, at *4 (citation omitted). Here, an injunction "will benefit the public by vindicating the rights of the rightful owners of the intellectual property," promoting the "strong national policy favoring the protection of intellectual property," and encouraging creativity. *Id.*; NSAI Letter ¶ 5. The narrow relief requested will neither burden the public by reducing access to the Works, which remain available through legitimate sources, nor unduly impede Anthropic's development of AI models.

## V.    The Court should not require Publishers to post security.

Publishers request that the Court waive bond or require minimal security. The Court has broad discretion under Rule 65(c), including "discretion to require no bond at all." *Wood v. Detroit*

*Diesel Corp.*, 213 F. App'x 463, 472 (6th Cir. 2007). Publishers seek a narrow injunction unlikely to cause Anthropic significant financial hardship, rendering security unnecessary. *Int'l Sec. Mgmt. Grp., Inc. v. Sawyer*, 2006 WL 1638537, at *22 (M.D. Tenn. June 6, 2006) (waiving bond when restraint sought "will cause no discernible monetary damage to the defendants"). Nor can an injunction cognizably harm Anthropic when its hardships stem from the choice to build a business on infringement. *House of Bryant Publ'ns, LLC v. City of Lake City*, 2015 WL 12531992, at *2 (E.D. Tenn. Apr. 24, 2015) (waiving bond in trademark infringement case). Alternatively, Publishers submit that a bond not exceeding $10,000 is appropriate because Publishers are likely to succeed on the merits and Anthropic's conduct causes Publishers irreparable harm.[11]

## CONCLUSION

For the foregoing reasons, Publishers respectfully request that the Court grant this Motion and enter a preliminary injunction ordering Anthropic to (1) refrain from reproducing the Works to train future AI models and (2) implement in its current AI models guardrails that consistently prevent output that reproduces, distributes, or displays the Works.

---

[11] *See, e.g.*, *Warner/Chappell Music, Inc. v. Blue Moon Ventures, Inc.*, 2011 WL 662691, at *5 (M.D. Tenn. Feb. 14, 2011) (setting $10,000 bond in musical composition copyright infringement case); *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*, 2019 WL 6050283, at *14 (M.D. Tenn. Nov. 15, 2019) (setting $10,000 bond based on, *inter alia*, strength of trademark infringement case); *La.-Pac. Corp. v. James Hardie Bldg. Prods. Inc.*, 2018 WL 7272047, at *11 (M.D. Tenn. Dec. 20, 2018) (setting $10,000 bond in trademark infringement action).

Dated: November 16, 2023

Respectfully submitted,

*/s/ Steven A. Riley*
Steven A. Riley (No. 6258)
Tim Harvey (No. 21509)
RILEY & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
Telephone: (615) 320-3700
sriley@rjfirm.com
tharvey@rjfirm.com

Matthew J. Oppenheim
Nicholas C. Hailey
(admitted *pro hac vice*)
Audrey Adu-Appiah (*pro hac vice* pending)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Timothy Chung
(admitted *pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com

Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
COWAN, LIEBOWITZ & LATMAN, P.C.
114 West 47th Street
New York, NY 10036-1525
Telephone: 212-790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

31

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Aubrey B. Harwell III
Nathan C. Sanders
Olivia R. Arboneaux
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
tharwell@nealharwell.com
nsanders@nealharwell.com
oarboneaux@nealharwell.com

Andrew Gass
Joe Wetzel
LATHAM & WATKINS, LLP
505 Montgomery St., Suite 2000
San Francisco, CA 94111
andrew.gass@lw.com
joe.wetzel@lw.com

Allie Stillman
LATHAM & WATKINS, LLP
1271 Avenue of the Americas
New York, NY 10020
alli.stillman@lw.com

Sy Damle
LATHAM & WATKINS, LLP
555 Eleventh Street, NW, Suite 1000
Washington D.C. 20004
sy.damle@lw.com

*s/ Steven A. Riley*