IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case No. 3:23-cv-01092 <br><br> Chief Judge Waverly D. Crenshaw, Jr. <br> Magistrate Judge Alistair Newbern |

## DECLARATION OF MICHAEL D. SMITH

I, **Michael D. Smith**, hereby declare pursuant to 28 U.S.C. § 1746:

1. I am the J. Erik Jonsson Professor of Information Technology and Marketing at Carnegie Mellon University's Heinz College of Information Systems Management and Public Policy Management.

2. I submit this declaration in connection with Plaintiffs' Motion for a Preliminary Injunction filed by Plaintiffs Concord Music Group, Inc., Capitol CMG, Inc., Universal Music Corp., Songs of Universal, Inc., Universal Music – MGB NA LLC, Polygram Publishing, Inc., Universal Music – Z Tunes LLC, and ABKCO Music, Inc. (collectively, "Publishers"), in their lawsuit against Defendant Anthropic PBC.

3. My statements set forth below are based on my specialized knowledge, education, and experience, as applied to the facts and circumstances of this case. If called upon, I would and could competently testify as to the matters contained herein.

## I. My Assignment

4. I have been retained to serve as an economic expert on behalf of Publishers. I have been asked to offer an opinion on two matters: (1) the economic impact of Anthropic's use of Plaintiffs' copyrighted works on Plaintiffs and the songwriters they represent; and (2) the economic feasibility of complying with the preliminary injunction Plaintiffs seek on Anthropic. In addition to my general background in understanding economics and intellectual property, I have reviewed the filings by Publishers, Anthropic's Public Comments to the U.S. Copyright Office's Notice of Inquiry Regarding Artificial Intelligence and Copyright, and the market for license agreements for song lyrics as detailed herein.

## II. My Background

5. Much of my training and research is in economics and management issues, but I have a particular expertise in economic issues associated with intellectual property. My research has focused on the impact of unlicensed distribution of copyrighted entertainment goods on the legal markets for those goods.

6. I co-direct Carnegie Mellon University's Initiative for Digital Entertainment Analytics.

7. I am co-author of the book "Streaming, Sharing, Stealing: Big Data and the Future of Entertainment" (MIT Press, 2016).

8. I teach a course on managing disruption in media and entertainment and have written book chapters and articles discussing how unlicensed access to copyrighted works impacts legal markets for entertainment products in a variety of outlets including the World Trade

Organization,[1] U.S. Patent and Trademark Office,[2] and the World Intellectual Property Organization.[3]

9. I have testified on economic issues associated with copyright law before the Senate Judiciary Committee, Subcommittee on Intellectual Property in a hearing titled "Copyright Law in Foreign Jurisdictions: How are other countries handling digital piracy?"[4]

10. In December 2019, I gave the Digital Piracy Summit keynote address on the impact of digital piracy at the National Intellectual Property Rights Coordination Center, in Arlington, Virginia.[5]

11. In April 2013, I also served as a panelist for the Congressional International Anti-Piracy Caucus, discussing education, enforcement, and the economics of piracy and counterfeiting.[6]

12. I have also given a talk at the White House Office of the Intellectual Property Coordinator on piracy, regulation, and digital media.[7]

---

[1] Michael D. Smith & Rahul Telang. *The Enforcement of Intellectual Property Rights in a Digital Era*, in World Trade Organization, Trade in Knowledge: Intellectual Property, Trade and Development in a Transformed Global Economy 498 (Anthony Taubman & Jayashree Watal eds. 2022).
[2] Brett Danaher, Michael D. Smith & Rahul Telang. *Piracy Landscape Study: Analysis of Existing and Emerging Research Relevant to Intellectual Property Rights Enforcement of Commercial-Scale Piracy* (U.S. Pat. and Trademark Off., Economic Working Paper No. 2020-02, March 20, 2020), https://www.uspto.gov/sites/default/files/documents/USPTO-Piracy-Landscape.pdf.
[3] Brett Danaher, Michael D. Smith & Rahul Telang, *Copyright Enforcement in the Digital Age: Empirical Economic Evidence and Conclusions*, World Intell. Prop. Org., Advisory Comm. on Enf't (Aug. 25, 2015), https://www.wipo.int/edocs/mdocs/enforcement/en/wipo_ace_10/wipo_ace_10_20.pdf.
[4] Michael D. Smith, Written Testimony Before Senate Judiciary Committee, Subcommittee on Intellectual Property: Copyright Law in Foreign Jurisdictions: How Are Other Countries Handling Digital Piracy? (Mar. 10, 2020), https://www.judiciary.senate.gov/imo/media/doc/Smith%20Testimony1.pdf.
[5] Michael D. Smith, Keynote Address at the Digital Piracy Summit at the National Intellectual Property Rights Coordination Center: Digital Piracy: Industry Harm, Consumer Harm, and Law Enforcement Effectiveness, (Dec. 13, 2019).
[6] Michael D. Smith, Panelist at the Congressional Institutional Anti-Piracy Caucus at the Rayburn House Office Building: Education, Enforcement, and the Economics of Piracy and Counterfeiting (Apr. 28, 2014).
[7] Michael D. Smith, Address at the Office of the Intellectual Property Coordinator, Executive Office of the President, Eisenhower Executive Office Building: Piracy, Regulation, and Digital Media (Apr. 22, 2013).

13. I hold a B.S. degree in Electrical Engineering and a M.S. degree in Telecommunications from the University of Maryland, and a Ph.D. degree in Management Science from MIT's Sloan School of Management. My full curriculum vitae is attached to this declaration as **Exhibit A**.

### III. Anthropic's Economic Model

14. The rapid development of generative AI is poised to change the way people and businesses operate across the world. Generative AI also comes with the potential for immense global economic growth—with some estimates of as much as $4.4 trillion in value added annually.[8] As more and more firms seek to adopt AI tools for their businesses, companies that develop, license, and provide these AI tools and systems will have increasingly great value. As AI licensing and deployment by companies increases over time, the economic impact will similarly grow—perhaps exponentially—to be greater in the next several years than today.

15. At a high level, generative AI developers such as Anthropic operate on a technology licensing and direct-to-consumer model. After the technology is developed, AI developers offer product licenses to customer firms. Developers like Anthropic also make their AI products directly available to retail consumers through chatbots on website interfaces and often with monthly paid subscriptions for upgraded services. This revenue model is a consumer-driven one and capable of generating massive amounts of revenue, particularly from advertising, much like it does for large tech firms such as Google. Anthropic reportedly projects to earn nearly $17 million in monthly revenue by end of year and is seeking a $500 million annualized rate by the end of 2024.[9]

---

[8] Yiwen Lu, *Generative A.I. Can Add $4.4 Trillion in Value to Global Economy, Study Says*, N.Y. TIMES (June 14, 2023), https://www.nytimes.com/2023/06/14/technology/generative-ai-global-economy.html.
[9] Chris McKay, *Anthropic Discussing $2B Funding with Google and Others Just Days After $1.25B Amazon Investment*, MAGINATIVE (Oct. 4, 2023), https://www.maginative.com/article/anthropic-discussing-2b-funding-with-google-and-others-just-days-after-1-25b-amazon-investment/.

16. All companies that create products, whether real or intellectual, have a cost of the goods sold. Companies like Nike must pay for fabric, Nestlé must pay for cocoa, and IKEA must pay for wood. Companies regularly pay for their raw materials, and they then factor the cost of those raw materials into the price of their products. The same is true in the context of intellectual property. Netflix pays for movie rights, Apple pays for patents, and Universal Music Group pays artists. These companies are paying for the intellectual property that they use, sell or license.

17. For AI models like Claude, the raw materials are the training materials—such as Publishers' lyrics—and the ultimate products are their query responses. As is the case for other firms, there is no economic reason for Anthropic or any AI company to get a free pass from paying for the content that they use to make money. Indeed, in its filing to the Copyright Office's Notice of Inquiry on AI, Anthropic explicitly says "[w]e recognize the importance of proactively addressing the perspectives of rights holders, artists, and creators."[10]

18. Anthropic was recently reportedly valued at $5 billion or more[11] and is allegedly seeking a valuation of between $20 billion and $30 billion inclusive of newly-raised funds.[12] Anthropic has benefited from high-profile partnerships and received billions of dollars from large tech firms including Google—which agreed to invest up to $2 billion in the company[13]—and

---

[10] *Public Comments of Anthropic PBC*, ANTHROPIC (Oct. 30, 2023), https://perma.cc/8DBX-H3XU.
[11] Krystal Hu and Jaiveer Shekhawat, *Google-backed Anthropic raises $450 mln in latest AI funding*, REUTERS (May 23, 2023), https://www.reuters.com/markets/deals/alphabet-backed-ai-startup-anthropic-raises-450-million-funding-freeze-thaws-2023-05-23.
[12] Chris McKay, *Anthropic Discussing $2B Funding with Google and Others Just Days After $1.25B Amazon Investment*, MAGINATIVE (Oct. 4, 2023), https://www.maginative.com/article/anthropic-discussing-2b-funding-with-google-and-others-just-days-after-1-25b-amazon-investment/.
[13] Berber Jin and Miles Kruppa, *Google Commits $2 Billion in Funding to AI Startup Anthropic*, WALL STREET JOURNAL (Oct. 27, 2023), https://www.wsj.com/tech/ai/google-commits-2-billion-in-funding-to-ai-startup-anthropic-db4d4c50.

Amazon—which recently invested up to $4 billion.[14] Anthropic has also reportedly signed a multiyear deal with Google Cloud worth more than $3 billion.[15]

### A. Value of Publishers' Lyrics to Anthropic

19. As described in the Declaration of Ben Zhao ("Zhao Decl."), in the context of AI, song lyrics are not just another piece of writing. Zhao Decl. ¶ 39. They have an unusual structure and content and are likely weighted more heavily in the Claude system versus a much larger set of ordinary prose. *Id.* ¶ 40. Anthropic may also have "fine-tuned" Claude, whereby the model's responses to certain prompts were reinforced by Anthropic in a supervised learning process. *Id.* ¶ 19. In other words, for Claude to generate outputs involving the creation or delivery of Publishers' lyrics, the trainer had to direct the AI model to use Publishers' lyrics more often than other parts of the training dataset. *Id.* ¶ 18. Thus, the relative prominence of Publishers' lyrics in the Claude system is likely greater than that of ordinary prose.

20. While the system could be trained without Publishers' compositions, they have a value to Anthropic beyond the market price of the songs themselves given their relative weight in the AI models.

### IV. Music Publishers' Economic Model

21. Music publishers occupy an integral place in the music industry by facilitating the creation and promotion of musical compositions. By seeking out songwriters to create, exploit, and distribute compositions, Publishers generate opportunities for songwriters to compose works and receive compensation and/or royalties for the exploitation of their works.

---

[14] Steve Dent, *Amazon bets $4 billion on OpenAI rival Anthropic*, Engadget (Sept. 25, 2023), https://www.engadget.com/amazons-invests-4-billion-in-anthropic-openai-rival-095321755.html.
[15] Berber Jin and Miles Kruppa, *Google Commits $2 Billion in Funding to AI Startup Anthropic*, WALL STREET JOURNAL (Oct. 27, 2023), https://www.wsj.com/tech/ai/google-commits-2-billion-in-funding-to-ai-startup-anthropic-db4d4c50.

22. Historically, music publishing consisted of the acquisition of compositions, printing of sheet music and books, distribution and sale of the printed music, and the compensation of songwriters and composers. Although music technology and the consumption habits of consumers have changed over the years, music publishers' roles and economic models have largely remained the same: facilitating the creation and exploitation of works by songwriters and collecting payments on their behalf.

23. Today, music publishers' business models center around securing agreements with songwriters, in which songwriters assign their works (or a percentage of control) to the publishers or commit to create works in return for advance payments and/or royalty payments from the works' exploitation. Songwriters can negotiate the terms of these agreements and may reserve rights of approval related to certain exploitations by the music publishers based on their personal or business values.

24. Given their central role in music publishers' businesses, songwriters and their compositions hold great economic value for Publishers. Critical to the success of both parties is the ability to control and commercially exploit the songwriters' works as they see fit. Unauthorized uses of songwriters' works disrupt Publishers' businesses and diminish the economic value of songwriters and their creations.

A. The Value of Song Lyrics

25. Song lyrics have important commercial value, generally. Apart from being the fabric for countless sound recordings, they are regularly licensed on their own in many ways, including, among others, by music services, websites, other artists, and karaoke businesses. They are enjoyed by consumers, studied by critics, and sampled by musicians.

26. Song lyrics also play an important commercial role for music publishers. The Declarations of Duff Berschback, Alisa Coleman, Kenton Draughon, and David Kokakis describe numerous licenses of different sorts for complete song lyrics, demonstrating the existence of a strong market for these works.

### B. AI Company Licenses

27. Song lyrics can also be valuable in the licensing market for use by AI companies. Rights holders could license their song lyrics to AI companies for a variety of uses, including music recommendation or music search services. Under such arrangements, music publishers could license compositions and could deliver works to enable a variety of AI-powered technologies.

28. In recent months, several AI companies have publicly entered into license agreements concerning a variety of other forms of creative content. These examples demonstrate a growing creative licensing market involving AI companies:

- Stability AI's Stable Audio (an AI music generator) was trained on AudioSparx, which purports to be a legitimate library of licensed music.[16]

- Generative AI by Getty Images is an image-generation program trained on licensed images.[17]

---

[16] Emilia David, *Stability AI Releases AI Audio Platform*, THE VERGE (Sept. 13, 2023), https://www.theverge.com/2023/9/13/23871635/stability-ai-generative-audio-model-platform.
[17] *Getty Images Launches Commercially Safe Generative AI Offering*, GETTY IMAGES (Sept. 25, 2023), https://newsroom.gettyimages.com/en/getty-images/getty-images-launches-commercially-safe-generative-ai-offering.

- OpenAI agreed to license news articles from the Associated Press's archive,[18] as well as images, videos, and music libraries and their associated metadata from Shutterstock.[19]

### C. Catalog Agreements

29. One category of lyric licenses is catalog licenses. These are licenses to use Publishers' entire catalog of compositions (sometimes excluding certain songwriters, who may reserve the right of approval for such uses). Given the sheer size of Publishers' collective catalogs, these licenses can implicate a very large number of works and value for the Publishers. These include licenses for lyrics only and for music and lyrics together. Lyrics-only licenses include deals with LyricFind, which is a service that allows users to look up song lyrics, lyric translations, and lyric videos and display them on demand. Publishers have also granted LyricFind the right to issue sublicenses to other websites to deliver the same or similar services.

30. Publishers have also licensed their lyrics to streaming services—which often display lyrics alongside the work being streamed—karaoke businesses, and others. Such licensees include Apple, Singa, and Sybersound. These licenses are generally subject to strict limits on the use of the compositions.

31. Publishers have also issued catalog licenses to numerous online services, authorizing those services to display and/or publicly perform both the music and lyrics to Publishers' compositions. Publishers have licensed their catalogs to social media sites such as

---

[18] Matt O'Brien, *ChatGPT-maker OpenAI signs deal with AP to license news stories*, AP NEWS (July 13, 2023), https://perma.cc/HZF6-S7KF.
[19] *Shutterstock Partners with OpenAI and Leads the Way to Bring AI-Generated Content to All*, Shutterstock (Oct. 25, 2022), https://www.shutterstock.com/press/20435; *Shutterstock Expands Partnership with OpenAI, Signs New Six-Year Agreement to Provide High-Quality Training Data*, SHUTTERSTOCK (July 11, 2023), https://investor.shutterstock.com/news-releases/news-release-details/shutterstock-expands-partnership-openai-signs-new-six-year ("As part of this expanded collaboration, OpenAI has secured a license for access to additional Shutterstock training data including Shutterstock's image, video and music libraries and associated metadata").

YouTube, Facebook, and others. While these licenses permit users to utilize Publishers' compositions in various ways without individually clearing those uses ahead of time, there are typically strict limits on the amount of the original work that may be used, the context in which the work is used, and other requirements. These licenses by necessity also limit the use of Publishers' songs to audiovisual works on that particular site. In other words, social media sites are "walled gardens" where Publishers' songs can only be used in certain limited ways.

32. Anthropic's failure to take a license from each of the Publishers has obviously damaged them to the extent of the value of those licenses. But the harm goes beyond that.

### D. Market for Individual Compositions

33. In addition to licenses for their full catalogs, Publishers also routinely license whole or parts of individual musical works. These include using the lyrics in merchandise (e.g., posters, clothing, and coffee mugs), advertising, motion pictures and television programs, books, and many other uses. One of the most common are so-called "lyrical sample" licenses in which music publishers grant the right to use a portion of musical composition in another songwriter's work. These licenses are individually negotiated, taking into consideration the value of the licensed work and the likely commercial value of the licensee's work. Lyrical samples are typically licensed for a flat fee of $500–$2,500 but can be as high as $20,000 for a famous work, particularly where the sample was initially used without authorization. Importantly, these agreements specify the exact use that will be made of the lyric sample, including the precise amount to be used and in what context. Licensees are not given "free rein" to do anything they want with Publishers' compositions.

34. Anthropic/Claude uses Publishers' compositions as samples in new works of its own creation. This is essentially what Publishers offer when their works are licensed as individual

compositions. But Anthropic's use vastly exceeds the scope of any existing license. Claude creates its own "samples" of varying lengths, to be combined with some unknown set of new lyrics, to be used in any type of written work or musical work with lyrics. No existing license represents a perfect comparison for the extent of this grant of rights. It would certainly represent multiples of any current commercial license.

35. Anthropic's uses of Publishers' compositions contrary to the songwriters' and Publishers' intent also devalues the works themselves. Such is the case for consumers who enjoy songs based on the content or messaging in the lyrics. For example, unauthorized "mashups" of religious faith-based music with sexually explicit words or themes can erode consumers' perception of songwriters or publishers. *See* Declaration of Kenton Draughon ¶ 22. This discourages the future consumption of works from these songwriters or publishers with the consequence of devaluing current and future works.

V. **The Economic Impact of Anthropic's Failure to License Lyrics**

36. In copying Publishers' entire catalog of compositions as training material, and then delivering copies of Publishers' work on demand, for free, Anthropic is offering a service no different than many of Publishers' licensees, without any of the accompanying restrictions on use. This conduct gives rise to several economic harms felt by Publishers.

37. First, by using Publishers' lyrics without paying a license fee, Anthropic cheats Publishers of substantial fees they otherwise would have enjoyed had Anthropic entered into a licensing agreement to use Publishers' lyrics. The value of similar licensing agreements for Publishers' song lyrics is generally subject to the exact terms negotiated by the contracting parties but, as described above, serve an integral role in Publishers' core businesses. Publishers' losses in

licensing fees can be expected to be significant, directly stemming from Anthropic's failure to license for Publishers' lyrics.

38. Further, by not paying a license fee, Anthropic undermines Publishers' ability to renew licenses with the existing licensees. For example, lyric aggregators would be disincentivized from entering into license agreements with Publishers when Anthropic is effectively allowed to take and exploit the lyrics for free. Similarly, other potential licensees would be disincentivized from entering into agreement with Publishers in the first place.

39. Beyond licensing, Anthropic's infringement undermines the entire value of the market for song lyrics. As my colleagues and I have demonstrated in extensive research, the unauthorized use or reproduction of copyrighted works reduces the market value of these works, which obviously means lowered income for publishers and songwriters.[20] Specifically, in a 2020 Piracy Landscape Study conducted for the U.S. Patent and Trademark Office, my colleagues and I document that 29 of the 33 peer-reviewed academic studies of the impact of piracy on legal sales found that piracy caused statistically and economically significant harm to sales in legal markets.[21]

40. This contraction in the market has an indirect effect as well. When illegal content circulates widely in the marketplace, it has a depressing effect on even legal sales. Our research has shown that presence of freely available unlicensed content reduces the prices consumers are willing to pay for licensed content.[22]

---

[20] Brett Danaher, Michael D. Smith & Rahul Telang. *Piracy Landscape Study: Analysis of Existing and Emerging Research Relevant to Intellectual Property Rights Enforcement of Commercial-Scale Piracy* (U.S. Pat. and Trademark Off., Economic Working Paper No. 2020-02, March 20, 2020), https://www.uspto.gov/sites/default/files/documents/USPTO-Piracy-Landscape.pdf.
[21] *Id.*
[22] *See, e.g.,* Miguel Godinho de Matos, Pedro Ferriera & Michael D. Smith, *The Effect of Subscription Video-On-Demand on Piracy: Evidence from a Household Level Randomized Experiment*, 64 MGMT. SCIENCE 12, 5610 (2017).

41. These harms are felt by Publishers whether Anthropic provides complete copies of Publishers' lyrics or in part. In delivering complete, verbatim or near-verbatim copies of Publishers' lyrics, Anthropic usurps a service typically provided by licensees such as lyric aggregators or karaoke services, who are required to pay licensing fees for their use of Publishers' lyrics. As detailed above, this conduct robs Publishers of licensing fees, inhibits their ability to negotiate licenses, undermines the value of the market for song lyrics, and reduces the prices consumers are willing to pay.

42. The same harms befall Publishers when Anthropic provides Publishers' lyrics in part or combined with other texts or materials obtained from other sources since such uses of Publishers' lyrics would require licensing agreements as well.

43. Anthropic's delivery of Publishers' lyrics without attribution also divests songwriters of recognition and reputation among consumers and music publishers, further undermining the economic value of their compositions and services.

44. Even if Anthropic were to implement guardrails that restrict some infringing responses by Claude, Publishers would still face the same economic harms so long as Anthropic continues to exploit Publishers' lyrics without obtaining any licenses for its uses.

45. Ultimately, all of this combines to depreciate the value of creative output. In the context of music publishing, this hurts the publisher companies, the songwriters, and their licensees.

46. In the long run, this depreciation in market incentives reduces artists' incentives to create, which harms everyone.[23]

---

[23] *See, e.g.,* Rahul Telang & Joel Waldfogel, *Piracy and New Product Creation: A Bollywood Story*, 43 INFO. ECON. AND POLICY, 1 (2018); Brett Danaher & Michael D. Smith, *Digital Piracy, Film Quality, and Social Welfare*, 24 GEO. MASON L. REV. 4, 923 (2017).

## VI. Economically, Claude is Not Like a VCR Machine

47. From an economic standpoint, Claude is unlike other devices capable of infringing conduct, such as a VCR machine. Before a user could potentially infringe with a VCR, they were first required to purchase the equipment, then they could use that VCR to copy content to which the user had access. A VCR is a standalone product that essentially has no contact with its manufacturer after it has been sold, whereas an AI service like Claude is completely controlled by its creator on an ongoing basis.

48. Claude is more akin to an online content distribution service that is distributing infringing content. Claude curates and controls a pre-loaded "library" of content—i.e., the universe of training data—which users interact with on a per-query basis. The user gets infringing content from Claude's training data because Claude is preloaded with the infringing content.

## VII. The Remedy Sought is Not Unreasonable

49. The remedy sought is comprised of two pieces: (1) an injunction against continued use of Publishers' lyrics for training purposes in future AI models, and (2) effective guardrails in currently available AI models to prevent outputs that copy Publishers' lyrics.

50. With regard to item (1), an injunction would not require Anthropic to incur any operation-ending fees, even were it to assume some costs to remove Publishers' lyrics from its AI models training data for future models. The economic obligation would be limited to forward-looking expense in complying with the injunction.

51. With regard to item (2), it appears that Anthropic has already developed the technology to deploy guardrails. So, the added expense is not the development of guardrails, but simply engineering them to be effective.

52. Alternatively, Anthropic can license Publishers' lyrics, much in the same way other licensees for Publishers' lyrics—such as YouTube, Spotify, and Apple Music—have.

53. Anthropic currently has at least a $4.4B market capitalization and is reportedly seeking a valuation of $20 billion to $30 billion inclusive of newly-raised funds.[24] In addition to requiring Anthropic to seek permission from Publishers for the use of their lyrics, the payment of a reasonable license fee for the use of Publishers' content is reasonable and affordable.

54. Even if Anthropic had to license all copyrighted music, it could still well afford the fee.

55. Anthropic can choose not to license Publishers' works and use other materials to train its system.

56. Ultimately, the economic harms for Publishers are likely to be greater than any costs incurred by Anthropic. Continued unlicensed use by Anthropic of Publishers' works inflicts upon Publishers present and future losses in revenue and severe disruptions to Publishers' core businesses, relationships, and competitive standing. These harms exceed the potential costs or fees Anthropic might incur in order to comply with the injunction or seek to license Publishers' works.

### E. The Market Always Adjusts to Disruptive Technologies

57. There have been numerous examples of technological developments in which emerging technology companies said they would not be able to afford the price of content licenses. These include:

- Peer-to-peer music sharing (P2P) (e.g., Napster);
- Internet radio (e.g., Pandora);

---

[24] Chris McKay, *Anthropic Discussing $2B Funding with Google and Others Just Days After $1.25B Amazon Investment*, MAGINATIVE (Oct. 4, 2023), https://www.maginative.com/article/anthropic-discussing-2b-funding-with-google-and-others-just-days-after-1-25b-amazon-investment/.

15
Case 3:23-cv-01092    Document 52    Filed 11/17/23    Page 15 of 19 PageID #: 2748

- Social media platforms (e.g., Youtube, Instagram)
- Streaming media (e.g., Apple Music, Spotify, Deezer); and
- The "metaverse."

58. In each instance, emerging technology companies were sued and took the position that paying for licenses would bankrupt them. In some cases, individual companies were not able to stay in business because their particular business model was not sustainable. But in every instance, the technology model itself survived after licensing, with some platforms learning to operate legitimate businesses even while paying for content, and in other instances with the market finding different technologies that accomplished the same thing. Examples include:

- P2P: In general, none of the more notorious P2P companies such as Napster, Grokster, and Limewire continued to operate as P2P companies after being sued for copyright infringement. However, Napster has emerged as a music streaming company,[25] and Mega (a company related to Megaupload founded by Kim Dotcom) now removes infringing files within hours of a request.[26]

- Internet radio: Internet radio (webcasting) services of all sizes complained that they could not afford licenses. In 2007, the Copyright Royalty Board ruled that they would have to pay certain statutory rates and many threatened to go out of business. But in 2009, SoundExchange and the webcasters came together to negotiate rates that have allowed the webcasters to thrive.[27]

---

[25] NAPSTER, https://www.napster.com/us (last visited Nov. 11, 2023).
[26] Andy Maxwell, *Mega: 144,000+ Users Have Been Terminated for Repeat Copyright Infringement*, TORRENTFREAK (Oct. 21, 2021), https://torrentfreak.com/mega-144000-users-have-been-terminated-for-repeat-copyright-infringement-211021/.
[27] *See* John Timmer, *Pandora Lives! SoundExchange Cuts Deal on Webcasting Rates*, ARSTECHNICA (July 7, 2009), https://arstechnica.com/tech-policy/2009/07/soundexchange-cuts-deal-on-music-webcasting-rates/;

- Social media platforms: When YouTube first launched, it was sued by Viacom for copyright infringement. The parties tried to negotiate a license but the deal fell through.[28] Eventually YouTube was purchased by Google and implemented a ContentID system and agreed to compensate creators for content. In 2017, Facebook signed a deal with Universal Music Group to license content and began to respond to takedown notices.[29]

- Streaming media: Most streaming services started out with content licenses, but they paid low rates, complaining that they could not pay more. Over time they began to pay higher rates. For example, Apple Music agreed to pay artists for streams even during its free trial period.[30] Spotify has been the subject of complaints from artists for years that it paid below market rates. One of Spotify's executives said that the platform was designed to distribute music, not to pay artists.[31] After considerable pushback, Spotify recently announced it will increase its payments to artists and rightsholders.[32] Deezer, a French streaming music service, also recently increased payments to rightsholders. Its predecessor, Blogmusik.net launched without content licenses and was quickly

---

David Oxenford, *Pureplay Webcasters and SoundExchange Enter into Deal Under Webcaster Settlement Act to Offer Internet Radio Royalty Rate Alternative for 2006-2015*, BROADCAST LAW BLOG (July 7, 2009), https://www.broadcastlawblog.com/2009/07/articles/pureplay-webcasters-and-soundexchange-enter-into-deal-under-webcaster-settlement-act-to-offer-internet-radio-royalty-rate-alternative-for-2006-2015/.

[28] *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) (No. 10–3270–cv) ECF No. 63 at 16.

[29] Kerry Flynn, *Facebook Signs First-Ever Music Deal with a Record Label*, MASHABLE (Dec. 21, 2017), https://mashable.com/article/facebook-music-rights-record-label-universal-music-group.

[30] Tim Fernholz and Heather Timmons, *Taylor Swift Has Successfully Shamed Apple Music into Paying Artists All the Time*, QUARTZ (June 21, 2015), https://qz.com/433499/taylor-swift-wont-put-1989-on-apples-streaming-music-app-until-she-gets-paid.

[31] Paul Resnikoff, *Spotify Executive Calls Artist 'Entitled' for Requesting Payment of One Penny Per Stream*, DIGITAL MUSIC NEWS (June 29, 2021), https://www.digitalmusicnews.com/2021/06/29/spotify-executive-entitled-pay-penny-per-stream/.

[32] Tim Ingham, *Spotify Is Changing Its Royalty Model to Crush Streaming Fraud and Introduce a Minimum Payment Threshold. Its Plan? To Shift $1 Billion in Payouts Towards 'Working Artists' Over the Next 5 Years*, MUSIC BUSINESS WORLDWIDE (Oct. 24, 2023), https://www.musicbusinessworldwide.com/spotify-is-changing-its-royalty-model-to-crush-streaming-fraud/.

shuttered. But the company was reformed and struggled for several years, complaining that it could not afford market-based license fees.[33] Today it is financially healthy, and just agreed to increase the amounts it pays rightsholders.[34]

- The "metaverse": Web3 presents a vast array of complicated licensing rules in a nascent technology. While many platforms are likely to argue that they cannot afford licenses and should not have to pay for them, there is general acknowledgement that just because the technology is new, that does not mean emerging companies do not have to pay for licenses.[35]

59. Ultimately, AI is just another form of content distribution; it should license input just as other tech platforms have done.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my personal knowledge and belief.

Executed in Pittsburgh, PA, this 16th day of November, 2023

Michael D. Smith

---

[33] Pascal Rozat, *Deezer: Profitability Down the Line?*, INA GLOBAL (Aug. 18, 2011), https://web.archive.org/web/20150403164334/http://www.inaglobal.fr/en/music/article/deezer-profitability-down-line?tq=4.

[34] Umar Shakir, *Universal Music Group Lands New Royalty Model That Boosts Popular Artists*, THE VERGE (Sept. 6, 2023), https://www.theverge.com/2023/9/6/23861232/universal-music-deezer-streaming-deal.

[35] Stuart Dredge, *Metaverse Music Licensing: 'We Have a Window to Sort This out'*, MUSICALLY (June 30, 2022), https://musically.com/2022/06/30/metaverse-music-licensing-we-have-a-window-to-sort-this-out/.

# CERTIFICATE OF SERVICE

       I hereby certify that on November 17, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Aubrey B. Harwell III
Nathan C. Sanders
Olivia R. Arboneaux
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
tharwell@nealharwell.com
nsanders@nealharwell.com
oarboneaux@nealharwell.com

Andrew Gass
Joe Wetzel
LATHAM & WATKINS, LLP
505 Montgomery St., Suite 2000
San Francisco, CA 94111
andrew.gass@lw.com
joe.wetzel@lw.com

Allie Stillman
LATHAM & WATKINS, LLP
1271 Avenue of the Americas
New York, NY 10020
alli.stillman@lw.com

Sy Damle
LATHAM & WATKINS, LLP
555 Eleventh Street, NW, Suite 1000
Washington D.C. 20004
sy.damle@lw.com

                                                  *s/ Steven A. Riley*