**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

|  |  |
| --- | --- |
| CONCORD MUSIC GROUP, INC., ET AL., | Case No. 3:23-cv-01092 |
| *Plaintiffs*, | |
| v. | Chief Judge Waverly D. Crenshaw, Jr. |
| ANTHROPIC PBC, | Magistrate Judge Alistair Newbern |
| *Defendant*. | |

**DECLARATION OF DAWN R. HALL**
**IN SUPPORT OF DEFENDANT'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INUNCTION**

I, Dawn R. Hall hereby declare pursuant to 28 U.S.C. § 1746:

1.     I submit this declaration in connection with Plaintiffs' Motion for a Preliminary Injunction ("Plaintiffs' PI Motion") filed by Plaintiffs Concord Music Group, Inc.; Capitol CMG, Inc.; Universal Music Corp.; Songs of Universal, Inc.; Universal Music – MGB NA LLC; Polygram Publishing, Inc.; Universal Music – Z Tunes LLC; and ABKCO Music, Inc. (collectively, "Publishers" or "Plaintiffs"), in their lawsuit against Defendant Anthropic PBC ("Anthropic").[1]

2.     My declaration set forth below is based on my professional skills, educational background, knowledge, experience, and training as applied to the facts and circumstances of this case.  If called upon, I am prepared to testify as to the matters contained herein.

---

[1]  Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction ("Memorandum for PI"), ECF No. 41.

## I. SCOPE OF ASSIGNMENT

3.     I have been retained by Latham & Watkins LLP ("Counsel") on behalf of Anthropic to serve as a damages expert to opine on Plaintiffs' contentions related to irreparable harm and application for a Preliminary Injunction ("PI").  I understand Plaintiffs allege that, in building and operating Anthropic's artificial intelligence ("AI") model known as Claude, Anthropic trains Claude utilizing copyrighted works owned or controlled by Plaintiffs ("Works" or "Works-in-suit").[2]  I also understand Plaintiffs allege Claude generates text output containing copyrighted Works owned or controlled by Plaintiffs.  I understand Plaintiffs allege each of these uses is a distinct copyright violation and that Plaintiffs are seeking a PI against Anthropic for both its internal use of the Works when training Claude as well Claude's external outputs.[3]

4.     In addition to my skills, knowledge, experience, education, and training in economics and intellectual property matters, my opinions are based on information gathered and provided to me as of the date of this declaration.  I have reviewed Plaintiffs' PI motion (including declarations), Anthropic's Public Comments to the U.S. Copyright Office's Notice of Inquiry Regarding Artificial Intelligence and Copyright, license agreements produced by Plaintiffs, relevant case law, and publicly available information.

## II. PROFESSIONAL BACKGROUND

5.     I am a Senior Managing Director in the Forensic and Litigation Consulting practice of FTI Consulting, Inc. ("FTI").  I hold a Bachelor of Science degree in Business Administration (Finance) from the University of Notre Dame.  For more than 26 years, I have advised both corporations and attorneys on a variety of matters with respect to economic, accounting, and

---

[2] Publishers license the rights to reproduce, distribute, display, and prepare derivative works based on the Compositions across various media.
[3] Memorandum for PI, p. 12.

financial issues relating to, among other areas, damages in commercial litigation and intellectual property matters. Prior to its acquisition by FTI in 2003, I was a Manager in KPMG's Forensic Services practice.

6.     I have directed numerous commercial litigation engagements involving claims of patent, trademark, and copyright infringement; false advertising; breach of contract; theft of trade secrets; unfair competition; antitrust; business interruption; tortious interference; and business valuation matters. I have conducted complex studies related thereto, including market definition and competitive analyses; calculation of damages; evaluation of lost profits and reasonable royalty measures of damages; analysis of lost sales, incremental profits, manufacturing, and marketing capacities; past and future price erosion; unjust enrichment; and interest. I have testified in matters relating to these studies. I have co-authored two chapters regarding reasonable royalty damages and lost profits, as well as a chapter regarding calculating profits in trademark, copyright, and design patent cases. I have authored other publications, which I have listed in my curriculum vitae, attached as **Exhibit A** to this declaration. My curriculum vitae further describes my professional credentials.

## III.    OVERVIEW OF IRREPARABLE HARM

7.     I understand that irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through a monetary award.[4] I further understand that a showing of irreparable harm is "indispensable" where a plaintiff seeks a preliminary injunction.[5]  Lost customer goodwill, damages to reputation, interference with customer relationships, and loss of fair competition may be valid grounds for finding irreparable

---

[4] *See U.S. v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002); *see also Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007).
[5] *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019); *see also Kentucky v. Biden*, 57 F.4th 545, 555 (6th Cir. 2023).

harm.[6] However, a party seeking injunctive relief must "show more than a speculative risk" of harm.[7] It must demonstrate with evidence that it "will suffer actual and imminent harm" in the absence of immediate injunctive relief[8] and is likely to succeed on the merits.[9]

8. For purposes of this declaration only, I have been asked to assume Plaintiffs can establish a likelihood of success on the merits and other factors supporting injunctive relief. This declaration thus focuses exclusively on the issue of whether any harm suffered by Plaintiffs between now and a final adjudication on the merits would be irreparable. Specifically, I evaluate the ability to compensate Plaintiffs with monetary relief for the infringements alleged in their Complaint and offer my observations below to assist the Court or fact finder in considering that question. I have also been asked to evaluate Plaintiffs' claims of price erosion, degradation of the licensing market for the Works, and reputational harm related to alleged infringements, including publisher and songwriter credit and goodwill.

9. Based on my experience, I understand that a finding of irreparable injury and/or injunction may be favored when reliable principles and methods are applied to sufficient facts or data, such as: irreversible loss of market share; price erosion; loss of goodwill or intangible assets that cannot be readily compensated by monetary damages; and where there is difficulty in calculating damages, among other factors. I also understand that there must be a causal nexus between the defendant's wrongful conduct and the injury, and the injury must be actual and

---

[6] *See, e.g.*, *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503 (6th Cir. 2022); *Tenke Corp.*, 511 F.3d at 550.
[7] *Cheetah Miner USA, Inc. v. 19200 Glendale, LLC*, 2023 WL 6601863, at *2 (6th Cir. Oct. 10, 2023).
[8] *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (internal quotation marks omitted).
[9] *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 367 (6th Cir. 2022).

imminent. Speculative harm or the mere possibility of harm is insufficient to obtain injunctive relief.

10. Under Plaintiffs' contention of irreparable harm, Plaintiffs claim the harm they would suffer in the absence of an injunction between now and a final judgment transcends the limits of monetary compensation, including harm to the licensing market for the Works,[10] deprivation of Publishers' and songwriters' control over the Works,[11] denial of Publishers' and songwriters' credit and goodwill,[12] harm to Publishers' and songwriters' reputations,[13] erosion of the value of and licensing market for the Works,[14] damage to Publishers' position to negotiate a future license,[15] and harm to Publishers' relationships with songwriters.[16] I do not see any evidence to support these claims in the materials supporting Plaintiffs' motion or in Plaintiffs' most recent document production. Plaintiffs' allegations of irreparable harm in their PI Motion are either counterfactual, speculative, or well within the realm of being known and quantifiable.

11. I also understand that, in copyright cases, the availability of statutory damages, in part, accounts for any difficulties in calculating precise damages associated with infringing conduct. Plaintiffs' Complaint includes a claim that they "are entitled to statutory damages."[17]

## IV. SUMMARY OF OPINIONS

12. Notwithstanding Anthropic's position on the merits, assuming Anthropic is found at the end of this lawsuit to have infringed Plaintiffs' copyrights for any unintentional output of the Works, Plaintiffs' irreparable harm allegations in Plaintiffs' PI Motion are either

---

[10] Memorandum for PI, p. 20.
[11] Memorandum for PI, p.23.
[12] Memorandum for PI, p.24.
[13] Memorandum for PI, p.25.
[14] Memorandum for PI, pp.25-26
[15] Memorandum for PI, pp. 26-27.
[16] Memorandum for PI, pp. 27-28.
[17] *See* Complaint, p. 50.

counterfactual, speculative, or well within the realm of being known and quantifiable. There are a number of public sources that serve as a more direct source for users to obtain lyrics for free such as Genius.com ("Genius"), LyricFind.com ("LyricFind"), Musixmatch.com ("Musixmatch"), Lyrics.com, and AZLyrics.com ("AZLyrics"). At the same time, Anthropic's product is not a reliable source of lyrics, and I understand Anthropic has put in place additional guardrails to make it even less so. To the extent that Anthropic, during the pendency of the suit and notwithstanding the additional guardrails it has put in place, allegedly generates text containing copyrighted works owned or controlled by Publishers, it is my opinion that Anthropic's alleged use of Plaintiffs' Works-in-suit has not caused irreparable harm to Plaintiffs and will not cause irreparable harm between now and a final judgment in the absence of injunctive relief. In addition, it is my opinion that any alleged harm caused by Anthropic's actions prior to and during the lawsuit is quantifiable and compensable by monetary damages because it flows from the alleged loss of licensing revenues that can be readily determined.

13. Any harm to Plaintiffs from now until a final judgment will be defined as it would in any license by the established scope of use during the finite term of the litigation. Licenses often include the calculation of damages for any past infringing uses and a royalty for any future use. I understand that in similar cases, courts routinely find that plaintiffs, copyright holders, including music publishers, can be made whole through monetary damages, denying even a permanent injunction on the grounds that cash could compensate for any future infringement and thus cannot establish the likelihood of irreparable harm.[18]

14. Damages can be quantified by reviewing factors commonly reviewed by experts in determining damages adequate to compensate an intellectual property holder in intellectual

---

[18] *E.g., ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 322 (2d Cir. 2022).

property infringement disputes. Based on my experience in the determination of damages in other intellectual property matters, a proper analysis would take into account licensing considerations, including comparable agreements, exclusivity of rights, availability of alternatives, benefits of the intellectual property including risks involved, contributions to profit, market demand, innovation, loss of control, goodwill, business reputation, brand equity, business opportunities, and relationships, among other things.[19]

15.    Publishers object that "when Anthropic licenses its Claude API to commercial clients, it is essentially including in those licenses Publishers' copyrighted content, which it has no right to license and is unauthorized."[20] However, if Plaintiffs establish that they have been harmed during the pendency of litigation due to uses of their copyrighted content in connection with Anthropic's licensing of Claude API, such harm can be rectified by a monetary award to Publishers at the end of this lawsuit, just like a licensing fee or royalty, which can be quantified using standard economic models.

16.    Plaintiffs' PI Motion, the various declarations produced in support of their motion, and the license agreements, amendments and term sheets produced on January 8, 2024,[21] January

---

[19] "This standard is similar, if not the same, as the standard for calculating a reasonably royalty in the context of patent damages. For a reasonable royalty for patent infringement, the hypothetical negotiation also requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began." *Oracle Am., Inc. v. Google Inc.*, 847 F. Supp. 2d 1178, 1181 (N.D. Cal. 2012).
[20] Complaint, p. 44.
[21] On January 8, 2024, Plaintiffs produced 31 agreements, amendments, and term sheets that I have not had the opportunity to analyze in detail. I reserve the right to update my opinions based on a detailed review of those documents.

11, 2024,[22] and January 14, 2024,[23] demonstrate that any alleged harm between now and a final judgment is not irreparable. Michael D. Smith, in his declaration, discusses the viability of licenses in which the Publisher's entire catalog is licensed and notes that given "the sheer size of Publishers' collective catalogs, these licenses can implicate a very large number of works and value for the Publishers."[24] In other words, the Publishers themselves recognize use of their Works can be quantified in monetary terms and is valuable. Further, Mr. Smith, in discussing the economic impact of Anthropic's failure to license lyrics, establishes the possibility of monetary compensation to reverse and repair the harm.[25] His opinion hinges on the notion that Publishers' harm is due to Anthropic "using Publishers' lyrics without paying a license fee," exploiting "the lyrics for free" and similar statements made by him throughout his declaration.[26] Such statements imply that any harm suffered due to nonpayment for usage can be easily rectified by means of monetary compensation at the end of the lawsuit.

17. In addition, Publishers' business model is to negotiate and administer licenses on behalf of songwriters and compensate them with their share of royalties.[27] It is typical to utilize existing license agreements as a "starting point or an aid" in calculating a license fee or monetary damages.[28]

---

[22] On January 11, 2024, Plaintiffs produced an additional 17 agreements, amendments, and term sheets that I have not had the opportunity to analyze in detail. I reserve the right to update my opinions based on a detailed review of those documents.

[23] On January 14, 2024, Plaintiffs produced an additional 75 agreements, amendments, and term sheets that I have not had the opportunity to analyze in detail. I reserve the right to update my opinions based on a detailed review of those documents.

[24] Declaration of Michael D. Smith in Support of Plaintiffs' Motion for Preliminary Injunction ("Smith Declaration"), p. 9.

[25] Smith Declaration, pp. 11-13.

[26] Smith Declaration, pp. 11-12.

[27] Memorandum for PI, p. 2. Declaration of Duff Berschback in Support of Plaintiffs' Motion for Preliminary Injunction, ("Concord Declaration"), p. 3.

[28] *See Fox Broad. Co. v. Dish Network LLC*, 747 F.3d 1060, 1073 (9th Cir. 2014).

18. Based on my review of the market and the license agreements produced by Plaintiffs on January 8, 2024,[29] January, 11 2024,[30] and January 14, 2024,[31] it is clear that any harm Plaintiffs have incurred can be cured through a monetary award similar to the licensing fees the Plaintiffs so often collect under the terms of license agreements, such as those permitting the reproduction, distribution, and display of Plaintiffs' lyrics, including on various freely accessible websites. Monetary compensation would be an adequate measure to compensate Plaintiffs in this matter, repairing and reversing any alleged harm, and will not have a material negative impact on Plaintiffs' overall financial condition, particularly between now and the end of this lawsuit. In the sections that follow, I detail the evidence I am aware of to date indicating Publishers' propensity to license which would support the reparable nature of Plaintiffs' claims.

19. Plaintiffs' claims of irreparable harm from use of their work purely for back-end training are entirely unsupported. Plaintiffs have provided no explanation of how they might be harmed in any way that is not compensable through money damages.

20. At the same time, the harm to Anthropic from the injunction Plaintiffs seek is irreparable. ███████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████

---

[29] On January 8, 2024, Plaintiffs produced 31 agreements, amendments, and term sheets that I have not had the opportunity to analyze in detail. I reserve the right to update my opinions based on a detailed review of those documents.

[30] On January 11, 2024, Plaintiffs produced an additional 17 agreements, amendments, and term sheets that I have not had the opportunity to analyze in detail. I reserve the right to update my opinions based on a detailed review of those documents.

[31] On January 14, 2024, Plaintiffs produced an additional 75 agreements, amendments, and term sheets that I have not had the opportunity to analyze in detail. I reserve the right to update my opinions based on a detailed review of those documents.

## V.     ANY HARM CONCERNING CLAUDE'S OUTPUTS IS REPARABLE

21.     Plaintiffs allege Claude generates text containing copyrighted Works owned or controlled by Publishers and such results cause Plaintiffs irreparable harm.  As a threshold matter, I understand Anthropic's Claude is not designed to output copyright material and Anthropic always had guardrails in place to prevent that result.[32]   I understand that "[w]ith many companies perceived to be rushing unchecked into developing large language models, Anthropic aspires to set a strict ethical standard, which is deeply rooted as the premise of the entire company."[33]   I further understand Anthropic has now implemented additional technological guardrails to ensure it is very unlikely to output Plaintiffs' Works.[34]

### a.     Publishers' Statements Demonstrate a Propensity to License

22.     Plaintiffs admit that their business model is to routinely enter into license agreements relating to the musical compositions in their catalogs and to collect the income arising from such transactions to compensate their songwriters as per their applicable share of the income.[35]   Plaintiffs also admit "licensing is a vital tool by which Publishers control the Works' exploitation, ensure attribution and manage the profiles of their songwriters"[36] demonstrating that a license is adequate to compensate for use of the Works.   As listed below, Plaintiffs' own

---

[32]   *See* Declaration of Jared Kaplan ("Kaplan Declaration"), pp. 9-11.
[33]   https://www.forbes.com/sites/sunilrajaraman/2023/11/21/openai-faces-competitive-pressure-from-anthropic/?sh=7f2886955352
[34]   Kaplan Declaration, pp. 11-12.
[35]   Complaint, p. 14. Smith Declaration, pp. 6-7.  *See also* Complaint, p. 15 and Smith Declaration, pp. 6-8 ("Licensing for the use of musical compositions—including for use of lyrics in internet-based media—is an important revenue source for Publishers and a fundamental means by which songwriters earn a living.  Publishers depend on licensing and otherwise exploiting these exclusive rights under the Copyright Act, among others, to earn revenue from their catalogs of musical compositions…")
[36] Memorandum for PI, p. 3. Concord Declaration, pp. 3-4; ABKCO Declaration, pp. 4-5. UMPG Declaration, pp. 3-5; CCMG Declaration, pp. 3-5.

witnesses admit to Publishers' demonstrated propensity to license their Works, which contradicts Plaintiffs' position that they have experienced irreparable harm.

23.    Michael D. Smith, Plaintiffs' economic expert, has admitted[37] the following:

- Song lyrics "are regularly licensed on their own in many ways, including, among others, by music services, websites, other artists, and karaoke businesses."[38]

- "The Declarations of Duff Berschback, Alisa Coleman, Kenton Draughon, and David Kokakis describe numerous licenses of different sorts for complete song lyrics, demonstrating the existence of a strong market for these works."[39]

- "Song lyrics can also be valuable in the licensing market for use by AI companies. Rights holders could license their song lyrics to AI companies for a variety of uses, including music recommendation or music search services. Under such arrangements, music publishers could license compositions and could deliver works to enable a variety of AI-powered technologies."[40]

- Catalog licenses "are licenses to use Publisher's entire catalog of compositions… Lyrics-only licenses include deals with LyricFind, which is a service that allows users to look up song lyrics, lyric translations, and lyric videos and display them on demand. Publishers have also granted LyricFind the right to issue sublicenses to other websites to deliver the same or similar services."[41]

---

[37] For purposes of this declaration only, I assume the truth of the statements in Mr. Smith's declaration.
[38] Smith Declaration, p. 7.
[39] Smith Declaration, p. 8.
[40] Smith Declaration, p. 8.
[41] Smith Declaration, p. 9.

- "Publishers have also licensed their lyrics to streaming services—which often display lyrics alongside the work being streamed—karaoke businesses, and others. Such licensees include Apple, Singa, and Sybersound. These licenses are generally subject to strict limits on the use of the compositions."[42]

- "Publishers have also issued catalog licenses to numerous online services, authorizing those services to display and/or publicly perform both the music and lyrics to Publishers' compositions."[43]

- "Publishers have licensed their catalogs to social media sites such as YouTube, Facebook, and others."[44]

- "In copying Publishers' entire catalog of compositions as training material, and then delivering copies of Publishers' work on demand, for free, Anthropic is offering a service no different than many of Publishers' licensees."[45]

- Mr. Smith concludes "Anthropic can license Publisher's lyrics, much in the same way other licenses for Publishers' lyrics - such as YouTube, Spotify, and Apple Music - have."[46]

24. Mr. Smith's admissions highlight Plaintiffs' nonsensical and contradictory irreparable harm position.

25. Duff Berschback, Executive Vice President of Business and Legal Affairs at Concord Music Group, Inc., has admitted[47] the following:

---

[42] Smith Declaration, p. 9.
[43] Smith Declaration, p. 9.
[44] Smith Declaration, pp. 9-10.
[45] Smith Declaration, p. 11.
[46] Smith Declaration, p. 16.
[47] For purposes of this declaration only, I assume the truth of the statements in Mr. Berschback's declaration.

- Concord, one of the Plaintiffs in this matter, "promotes, markets, and licenses musical compositions; and administers licenses, collects royalties, and provides various other important administrative functions on behalf of songwriters."[48]

- "Concord possesses and exploits its exclusive rights, among other things, to reproduce and/or distribute the Concord Works to the public, including the lyrics contained in those Works, and to license these exclusive rights, including the exercise of these rights over the internet."[49]

- "As a music publisher, Concord actively seeks out and enters into licensing opportunities for its songwriters' compositions (including with respect to the Concord Works), collects the income arising from such transactions, and compensates its songwriters with their applicable share of the income. Concord's songwriters, in turn, rely on that income to earn a living so that they can continue to enrich the world with new music."[50]

- "Concord licenses the Concord Works and other compositions from its catalog for use by third parties in all media formats, including in sound recordings, public performances, printed sheet music, commercials, advertisements, motion pictures, television shows, and by various digital services, lyrics aggregators, and/or lyrics websites."[51]

- "[T]here is a well-established market through which Concord licenses its lyrics to trusted lyric services providers. In particular, Concord licenses the lyrics to the Concord

---

[48] Concord Declaration, p. 2.
[49] Concord Declaration, pp. 2-3.
[50] Concord Declaration, p. 3.
[51] Concord Declaration, p. 3.

Case 3:23-cv-01092    Document 67-17    Filed 01/16/24    Page 13 of 40 PageID #: 3165

Works to lyric aggregators and lyric websites (such as LyricFind.com) and certain other digital services (such as Apple Music and Music Choice)."[52]

26.     Mr. Berschback's admissions further highlight Plaintiffs' nonsensical and contradictory irreparable harm position.

27.     Alisa Coleman, Chief Operating Officer of ABKCO Music, Inc. has stated the following:[53]

- "ABKCO possesses and exploits its exclusive rights, among other things, to reproduce and/or distribute the ABKCO Works to the public, including the lyrics contained in those Works, and to license these exclusive rights, including the exercise of these rights over the internet."[54]

- "ABKCO regularly enters into licensing agreements relating to the musical compositions in its extensive catalog, collects the income from these agreements, and compensates its songwriters accordingly."[55]

- "ABKCO licenses the ABKCO Works and various other musical compositions, including their lyrics, for use in sound recordings, public performances, printed sheet music and musical notation websites and applications, commercials, advertisements, motion pictures, television shows, karaoke products, greeting cards, books and magazines, various digital services, social media platforms, lyrics aggregators, and/or lyrics websites. Through these licensing arrangements and others, ABKCO and its

---

[52] Concord Declaration, p. 3.
[53] For purposes of this declaration only, I assume the truth of the statements in Ms. Coleman's declaration.
[54] Declaration of Alisa Coleman in Support of Plaintiffs' Motion for Preliminary Injunction, ("ABKCO"), p. 3.
[55] ABKCO Declaration, pp. 3-4.

licensing partners disseminate ABKCO's compositions to the public and foster the enjoyment of those works."[56]

- "ABKCO also frequently enters into licenses relating to the lyrics to the ABKCO Works in particular. That includes licenses for the lyrics to the ABKCO Works to be displayed on the internet, including through licenses with various websites and other online services, for example, lyric aggregators (such as Musixmatch.com and LyricFind.com), lyric websites (such as Genius.com), and other digital services and platforms (such as Apple Music, Facebook, and Instagram). Other licenses that involve lyrics include those relating to greeting cards (such as Hallmark and American Greetings), karaoke products (such as Touchtunes and Singa), books and novels (such as Stephen King's 11/22/63 and Jacqueline Woodson's Brown Girl Dreaming) and merchandise (such as Lyric Culture's apparel and jewelry products). In addition, ABKCO also has a longstanding license with Alfred Music that includes lyrics. Alfred Music produces physical and digital sheet music and other types of musical notations such as guitar tablatures in the form of songbooks, personality folios, piano/vocal folios, among others. ABKCO's licenses with lyric aggregators and Alfred Music permit these licensees to further license to third parties."[57]

28.     Ms. Coleman's admissions further highlight Plaintiffs' nonsensical and contradictory irreparable harm position.

---

[56] ABKCO Declaration, p. 4.
[57] ABKCO Declaration, p. 4.

29.     David Kokakis, Chief Counsel at Universal Music Publishing Group ("UMPG"), has stated the following:[58]

- "The UMPG Plaintiffs rely on a model of licensing."[59]

- "The UMPG Plaintiffs license the UMPG Works (along with various other musical compositions from UMPG's extensive catalog) and their accompanying lyrics for use in sound recordings, public performances, samples, printed sheet music, commercials, advertisements, motion pictures, television shows, lyric aggregators, lyric websites, and numerous other digital platforms and services. Through these licensing agreements, the UMPG Plaintiffs and their partners offer consumers a variety of authorized means to enjoy the UMPG Plaintiffs' musical compositions."[60]

- "The UMPG Plaintiffs have entered into various licensing agreements for the lyrics to the UMPG Works specifically. Among other things, the UMPG Plaintiffs have licensed lyrics to lyric "aggregators," such as LyricFind.com and Musixmatch.com."[61]

- "These lyric aggregators are granted the right to distribute the UMPG Plaintiffs' lyrics through their own websites, as well as the right to sublicense the UMPG Plaintiffs' lyrics to other lyric websites and digital services, subject to the UMPG Plaintiffs' prohibition on certain uses and/or right to object to certain sublicenses."[62]

- "Additionally, the UMPG Plaintiffs have also licensed directly to lyric websites, such as Genius.com, and to various other digital services, including Amazon Music, Apple

---

[58] For purposes of this declaration only, I assume the truth of the statements in Mr. Kokakis's declaration.

[59] Declaration of David Kokakis in Support of Plaintiffs' Motion for Preliminary Injunction, ("UMPG Declaration") p. 3.

[60] UMPG Declaration, pp. 3-4.

[61] UMPG Declaration, p. 4.

[62] UMPG Declaration, p. 4.

Music, Meta, Snapchat, Spotify, and YouTube, among others. Through these licensed channels and others, authorized copies of the lyrics to the UMPG Works are widely disseminated and available to the public, allowing consumers to access and enjoy authorized copies of the lyrics to the UMPG Works in the form intended by their authors."[63]

30.     Mr. Kokakis's admissions further highlight Plaintiffs' nonsensical and contradictory irreparable harm position.

31.     Kenton Draughon, Vice President of Administration and Operations for Capitol CMG, Inc. ("CCMG"), has stated the following:[64]

- "As a music publisher, a core part of CCMG's business is negotiating and entering into licensing agreements with respect to the CCMG Works and the other faith-based musical compositions in CCMG's catalog."[65]

- "CCMG relies on these licenses to earn revenue from our catalogs of musical compositions, to compensate our songwriters, and to further our mission of promoting songwriters and their creation of Christian music."[66]

- "CCMG has licensed its lyrics to Christian Copyright Licensing International ("CCLI"), through which CCMG licenses its lyric reproduction rights for use in church services. CCMG's income from its CCLI licensing constitutes a substantial portion of CCMG's revenues. Similarly, CCMG has also licensed its lyrics to PraiseCharts.com,

---

[63] UMPG Declaration, p. 4.
[64] For purposes of this declaration only, I assume the truth of the statements in Mr. Draughon's declaration.
[65] Declaration of Kenton Draughon in Support of Plaintiffs' Motion for Preliminary Injunction, ("CCMG Declaration"), p. 3.
[66] CCMG Declaration, p. 3.

a website that provides licensed digital sheet music for popular praise and worship songs. Additionally, CCMG has licensed its lyrics to MultiTracks.com, in connection with church karaoke performances."[67]

- "Beyond these licenses with CCLI, PraiseCharts.com, and MultiTracks.com, CCMG has also entered into lyrics licenses with lyric aggregators like Musixmatch and LyricFind, lyric websites, and other digital platforms like Meta and YouTube. More broadly, CCMG licenses the CCMG Works and other musical compositions for various other uses in sound recordings, public performances, printed sheet music, commercials, advertisements, motion pictures, television shows, and numerous digital services."[68]

- "CCMG licenses the CCMG Works and the lyrics contained in them in a number of different ways, including through lyric aggregators, lyric websites, and other digital services."[69]

- [T]here is a well-established licensing market for lyrics."[70]

32.     Mr. Draughon's admissions further highlight Plaintiffs' nonsensical and contradictory irreparable harm position.

### b.     Plaintiffs' Licenses Produced to Date Reinforce Plaintiffs' Propensity to License and Provide a Basis for Calculating Any Damages

33.     Plaintiffs state that "there is an existing market through which Publishers license their copyrighted lyrics."[71]   As noted above, Plaintiffs have also repeatedly established that Publishers routinely enter into license agreements with authorized lyrics aggregators and websites.

---

[67] CCMG Declaration, p. 4.
[68] CCMG Declaration, p. 4.
[69] CCMG Declaration, p. 5.
[70] CCMG Declaration, pp. 7-8.
[71] Complaint ¶ 9.

For example, Mr. Kenton Draughon,[72] Mr. David Kokakis,[73] and Ms. Alisa Coleman[74] in their declarations have all discussed various licenses that would be probative in this matter. Evaluation and analysis of such licensing terms and any related documents can be instructive in the determination of any potential reasonable royalties. Relevant factors when assessing the comparability of preexisting licenses may include, amongst other things, the date of the agreement, intended purpose of the license, type of content being licensed, the scope of the license and rights granted, territory, exclusivity conditions, the bargaining positions of the parties, the presence of any threat of litigation and/or if the agreement was entered into for settlement purposes or as a cross license. Based on my experience in the determination of reasonable royalty rates, adjustments to a preexisting license may be necessary to determine the most appropriate rate for a specific matter. It is routine for experts to provide opinions on those necessary adjustments and for the fact finder to issue monetary awards based on those opinions.

34. I understand from Counsel that the Publishers were requested to produce documents detailing their licensing history, licensing policy and procedures, licensing negotiations, and royalty reports, among other things.[75] On January 8, 2024, January 11, 2024, and January 14, 2024, Plaintiffs produced approximately 123 license agreements, amendments, and term sheets.

---

[72] Mr. Draughon mentioned the following licenses that CCMG has entered into: Christian Copyright Licensing International ("CCLI"), PraiseCharts.com, MultiTracks.com, lyrics licenses with lyric aggregators like Musixmatch and LyricFind, lyric websites, and other digital platforms like Meta and YouTube. *See* CCMG Declaration, p. 4.
[73] Mr. Kokakis mentioned the following licenses that UMPG has entered into: lyric websites, such as Genius.com digital services, including Amazon Music, Apple Music, Meta, Snapchat, Spotify, and YouTube. *See*, UPMG Declaration, p. 4.
[74] Ms. Coleman mentioned the following as licenses that ABKCO has entered into: lyrics licenses with lyric aggregators like Musixmatch and LyricFind lyric websites, such as Genius.com digital services and platforms such as Apple Music, Facebook, and Instagram, license with Alfred Music that includes lyrics. *See*, ABKCO Declaration, p. 4.
[75] 2023-12-04 Defendant Anthropic PBC's First Set of Requests For the Production of Documents and Things to Plaintiffs (Nos. 1-22).

In addition to demonstrating a propensity to license, the sheer number of agreements produced by the publishers in the early stages of this action supports the conclusion that there is a lack of irreparable harm here. ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████ While I have not calculated damages in this Declaration, should it be necessary, I could analyze the licenses and any corresponding royalty and usage data as benchmarks to inform a reasonable royalty opinion.

35.     The agreements produced are further evidence that Plaintiffs have entered into license agreements, or have the propensity to enter into license agreements, with third parties for their music catalog and may be instructive to a reasonable royalty analysis.  Not all licenses will be equally probative or useful to the exercise of calculating a monetary award, but at least some of the licenses produced to date provide benchmarks to calculate damages for Anthropic's alleged unauthorized outputs between now and a final judgment on the merits.  To the extent additional

---

[76] See ABKCO_0000000001-0020; CONCORD_0000000001-0145; UMPG_0000000001-0047; UMPG_0000000053-0066.

[77] See ABKCO_0000000001-0020; CONCORD_0000000001-0145; UMPG_0000000001-0047; UMPG_0000000053-0066; ABKCO_0000000025-0368.

information is produced subsequent to this declaration, I reserve the right to review such information and amend my opinions accordingly.[78]

36.     Overall, I have not seen any evidence that Anthropic's actions have caused Plaintiffs irreparable harm or would cause irreparable harm between now and a final judgment on the merits.  As discussed above, I understand that Anthropic's Claude is not designed to output copyrighted material.  Unlike other sources such as Genius, LyricFind and Musixmatch where the intended purpose of the platform is to generate copyrighted material, I understand Anthropic always had guardrails in place to prevent such results.[79]  Hence, any copyrighted output generated by Claude would be unintended and considered a "bug," not a feature of Anthropic's product.[80]  I understand Claude's intended purpose is a collaboration tool with protections in place to prevent regurgitation.  To the extent it is found that Anthropic's uses required a license, as discussed by Plaintiffs in their PI motions and declarations, license agreements in this industry are prolific for different uses and different terms, and any interim harm between now and a final judgment can be valued and calculated.

**c.     Plaintiffs' Irreparable Harm Allegations Regarding Output Are Counterfactual and/or Speculative**

37.     Plaintiffs have not identified or demonstrated any "hardships" that would be faced by Publishers and songwriters as a result of Anthropic's alleged unlawful use between now and a final judgment that are not compensable by monetary damages.  Although the Publishers contend

---

[78] On January 8, 2024, Plaintiffs produced 31 agreements, amendments, and term sheets.  On January 11, 2024, Plaintiffs produced an additional 17 agreements, amendments, and term sheets. And on January 14, 2024, two days before the submission of this declaration, Plaintiffs produced an additional 75 agreements and amendments. I have not had the opportunity to analyze these agreements, amendments, and term sheets in detail.  I reserve the right to update my opinions based on a detailed review of those documents.

[79] Kaplan Declaration, p. 10.  Anthropic has implemented numerous guardrails to prevent outputs that might result from inadvertent "memorization."

[80] Kaplan Declaration, pp. 8-10.

injuries such as loss of control, goodwill, business opportunities, and relationships are not easily quantifiable, they can be reparable and compensated through monetary damages, particularly when dealing with a time-limited period.[81]  I understand that when Plaintiffs argue that their "damages are impossible to quantify" because Anthropic's infringing conduct threatens their relationships with existing licensees, and undermines their negotiating leverage with prospective licensees,[82] the court needs "factual (or theoretical) support" to credit that claim.[83]  However, I have not seen any evidence of the above mentioned harm being presented by Plaintiffs to date.  To the contrary, the continued existence of free, licensed lyric sites undercuts the claim of present harm.

38.    Indeed, the nature of Anthropic's product makes it unlikely that the absence of an injunction between now and the end of 2025 would cause any such harms in the future. Anthropic's product is not a material substitute, let alone a close substitute, for existing sites licensed by Plaintiffs that provide free display of the lyrics of the Works at issue.  Moreover, Plaintiffs have publicly condemned and brought a lawsuit against Anthropic for its alleged unlicensed uses.  Therefore, it is nonsensical to suggest  Anthropic's alleged conduct threatens their relationships with existing licensees, and undermines their negotiating leverage with prospective licensees,[84] given Publishers filed a public lawsuit against Anthropic seeking up to $150,000 per work infringed.[85]  Either Plaintiffs prevail on their lawsuit against Anthropic and any award can be used as negotiating leverage with licensees or Plaintiffs lose on the merits and Anthropic's actions are deemed non-infringing.  Regardless of the merits, the pendency of the

---

[81] *See* Initial Case Management Order at p. 11, ECF No. 64 (setting a schedule that anticipates case resolution by the end of 2025).
[82] Memorandum for PI, pp. 26-28.
[83] *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 322 (2d Cir. 2022).
[84] Memorandum for PI, pp. 26-28.
[85] https://www.rollingstone.com/music/music-news/umg-concord-abkco-sue-anthropic-ai-company-copyright-infringement-1234856761/

lawsuit itself could enhance Plaintiffs' leverage in licensing negotiations between now and a final judgment.

### i. Anthropic's use has not harmed any established market for the Works

39. Plaintiffs claim Anthropic inflicts market harm by evading licensing fees, erodes their value and reduces Publishers' revenue from licenses to digital platforms like Spotify and Amazon Music, and from lyrics aggregators and their sublicensees, and shrinks the lyrics licensing market.[86] Plaintiffs claim "Anthropic's use harms the market for the Works by reducing their value, weakening demand for licenses, and threatening the viability of licenses."[87] This assertion is not supported by any evidence.[88] Plaintiffs have not provided any evidence, support, documents or data demonstrating an actual or potential loss of licensing revenue, any difficulty in maintaining royalty rates over time, any licensees who did not renew their license as a result of Anthropic's alleged unlawful use. Plaintiffs have not identified or demonstrated any actual or potential confusion among artists and customers due to alteration of lyrics. Further, any such harm caused by Anthropic's actions is quantifiable and compensable by monetary damages because it flows from the alleged loss of licensing revenues that can be contractually defined and quantified.

40. I understand there are a number of public sources that serve as a more direct source for users to obtain lyrics for free such as Genius, LyricFind, Musixmatch, Lyrics.com and AZLyrics. Publishers license the copyrighted lyrics to "lyric aggregators such as LyricFind and Musixmatch; and lyrics websites such as Genius.com," authorizing them to share it publicly on

---

[86] Memorandum for PI, p.21.
[87] Memorandum for PI, p.21.
[88] The Smith's declaration does not cite to any data, studies, financial reports, or quantitative information as support to assert that license fees for the use of Plaintiffs' lyrics have decreased since Anthropic introduced Claude.

their freely accessible websites.[89]  Further, LyricFind and Musixmatch sublicense those lyrics to "search engines like Google, websites like Lyrics.com and AZLyrics.com, and other digital music services"[90] and are accessible to the public via websites for free.  The existence of these public and free-to-user sources of lyrics, and the limitations of Anthropic's own product, contradicts Plaintiff's allegations of a degraded licensing market for the Works.  Anthropic is neither designed for nor a good substitute for the lyric aggregator websites discussed above.[91]  And even if it were, a monetary award for any unintended use of the Works would replace any lost revenue to the Plaintiffs, and any harm would be reparable.

       **1.**       **Freely-available licensed lyric sites are prevalent and provide easy access to the lyrics of the Works**

41.    For example, Genius, a platform boasting "the world's biggest collection of song lyrics and musical knowledge,"[92] states that it "is fully licensed to display lyrics across all of its properties . . . [and since] 2013, entered into licenses with every major music publisher: Sony/ATV Music Publishing, EMI Music Publishing, Universal Music Publishing Group, and Warner/Chappell Music. In addition, [Genius] developed a form license with the National Music Publishers' Association (NMPA) which today covers more than 96% of the independent publisher market."[93]

---

[89] Memorandum for PI, p. 3. CCMG Declaration, p. 4; UMPG Declaration, p. 4; ABKCO Declaration, p. 4.

[90] Memorandum for PI, p. 3. Declaration of Timothy Chung in Support of Plaintiffs' Motion for Preliminary Injunction, Exhibits B, C, and D.

[91] Anthropic has not developed Claude, nor does it intend to develop Claude, to function simply as a resource for users to obtain copies of already-existing materials in response to queries. *See* Kaplan Declaration, p. 4.

[92] https://genius.com/

[93] https://genius.com/static/licensing



42.    Genius has a wide outreach and covers a wide market which proves that the Publishers' Works are already available broadly and is not exclusive as the Plaintiffs suggest.



43.    Similarly, LyricFind, identifying itself as "The Trusted Source For Lyric & Data Licensing," claims to set itself apart from the competitors by providing the "HIGHEST QUALITY LYRICS" which are "Reliable and accurate," having proper "RIGHTS MANAGEMENT" through "Detailed and trusted publisher royalty reporting" and having "GLOBAL LICENSING" capabilities with "Worldwide coverage from over 30,000 publishers."[94]  LyricFind partners with platforms such as, Google, YouTube, Amazon, TikTok, Pandora and their trusted publishers, including Sony Music Publishing, Universal Music Publishing Group, and Walt Disney.[95] Further,

---

[94] https://www.lyricfind.com
[95] https://www.lyricfind.com

LyricFind is the official lyric data provider to Sony Music, Universal Music Publishing Group and Warner Music Group.[96]

    44.    Since 2004, LyricFind has licensed the lyrics, providing royalties to songwriters and publishers.[97]  As shown below, LyricFind explicitly references its lyric licenses and provides information for how publishers, distributors, performing rights organizations, or music societies can license lyrics to LyricFind.

## Publishing With LyricFind

LyricFind licenses over 65,000 catalogues of lyrics from music publishers, aggregators, and performing rights organizations worldwide. By providing licensed lyric display and monetization services, LyricFind ensures songwriters and publishers earn royalties for each and every use of their lyrics.

## A Trusted Licensing Partner

LyricFind is the preferred partner of music publishers everywhere. Since pioneering the lyric licensing space in 2004, LyricFind has paid millions of dollars to publishers year after year for an otherwise untapped resource.










### 1. How do I display my lyrics?

If you are a publisher, distributor, performing rights organization, or music society, and you would like to license your lyrics to us, please email publisher@lyricfind.com.

If you're an artist or songwriter who administers the copyright for your lyrics and wishes to monetize your lyrics, we suggest registering with one of our global partners and opting in to our licensing agreement through them. This will allow you to collect royalties generated from the usage of your lyrics on the platforms we power. For a complete list of our partners and how to register, go to Partner Registration.

If you cannot license your lyrics through one of our global partners, but are looking to have LyricFind display your lyrics, head to our Dashboard and create an account to submit your lyrics and song information. Please note, registering directly with LyricFind will not allow you to monetize your lyrics and collect royalties at this time.

---

[96] https://www.lyricfind.com
[97] https://www.lyricfind.com

45.     Also, it is a simple and straightforward task to obtain lyrics of a particular song from LyricFind, generating the output in no time with little effort.  Dr. Robert Leonard admits he was able to identify publicly available lyrics from LyricFind.[98]

46.     Another site, Musixmatch, enables distribution of lyrics "everywhere" and "[o]ver 20 million people from around the world contribute to creating the largest catalog of lyrics ever."[99] It boasts of "making music better" by working with "thousands of music publishers across the globe to maximize song success."[100]   Musixmatch also "[e]arn[s] royalties from global distribution" and "pay[s] royalties directly back to the rights' owners."[101] In addition, Musixmatch works with Spotify, Apple music, Amazon, Google, etc. and with music publishers such as Sony Music Publishing, Universal Music Group, and BMG.[102]

47.     Musixmatch enables publishers to license their lyrics in exchange for royalties.



[98] Declaration of Dr. Robert Leonard in Support of Plaintiffs' Motion for Preliminary Injunction, ("Leonard Declaration"), p. 3.
[99] https://www.Musixmatch.com
[100] https://www.Musixmatch.com
[101] https://www.Musixmatch.com
[102] https://www.Musixmatch.com

48. Once a song is chosen, Musixmatch is able to generate the output in seconds as demonstrated below.



49. Lyrics.com states that it is the "Web's Largest Resource for Music, Songs & Lyrics" with "a vast compilation of song lyrics, album details, and featured video clips for a seemingly endless array of artists."[103] Google Play lists Lyrics.com as an app,[104] and as shown below, the lyrics offered by Lyrics.com are licensed.



50. Another site, AZLyrics, has "a large, legal, every day growing universe of lyrics where stars of all genres."[105]

### 2. Anthropic's product is not a substitute for licensed lyric sites

51. I understand that, even before Anthropic put in place more recent guardrails, it was not possible to reliably obtain lyrics of the Works-in-suit from Anthropic's product. As Plaintiffs'

---

[103] https://www.lyrics.com
[104] https://play.google.com/store/apps/details?id=com.stand4.lyrics&hl=en_US&gl=US
[105] https://www.azlyrics.com/

own technical expert admits as to the outputs referenced in the Complaint, "getting consistent results of this sort from Claude is unlikely."[106] His report indicates that Anthropic's product often declines to fulfill requests to obtain lyrics from Claude.[107] A limited review of pre-suit prompts and outputs by Plaintiffs and their agents reveals many instances where Claude did not provide the requested song lyrics.[108] Licensed lyric websites, and indeed a simple Google search, much more reliably output the requested lyrics.[109] I understand that after implementation of additional guardrails, it is very unlikely for Anthropic's product to output lyrics of the Works at issue.[110]



---

[106] Declaration of Ben Y. Zhao ("Zhao Declaration"), pp. 15-16.
[107] Zhao Declaration, pp. 15-16.
[108] Declaration of Julia Lowd ("Lowd Declaration") pp. 6-8.
[109] Kaplan Declaration, p. 8.
[110] Kaplan Declaration, pp. 11-13.

52.     This is confirmed by information from Anthropic.  Below is an example of what a Claude user sees if she requests the lyrics to one of the Works subject to this litigation followed by an example of lyrics requested from a lyrics website which also include a player for the song:[111]



53.     For that reason, my opinion is that during the pendency of the litigation, Anthropic's product is not likely to be, or be perceived by others as, a substitute for Plaintiffs' licensing market for lyric sites, and will not affect Publishers' existing licensing market.[112]

        **ii.**      **Anthropic does not deny Publishers and songwriters control, credit and goodwill; has not harmed Publishers' and songwriters' reputations; has not eroded the value of and licensing market for the Works; and has not damaged Publishers' position to negotiate future licenses**

54.     Plaintiffs claim Publishers and songwriters have experienced irreparable harm "by denying them control over their works,"[113] "denying them credit" and "eliminat[ing] opportunities

---

[111] *See* Complaint Exhibit A; Kaplan Declaration, p. 12.
[112] Kaplan Declaration, p. 8.
[113] Memorandum for PI, p. 23.

to generate business, raise songwriters' profiles, and accrue goodwill,"[114] "damag[ing] Publishers' and songwriters' reputations and diminish[ing] the integrity of their work,"[115] "erod[ing] the price of the Works, the legitimate licensing market for lyrics, and Publishers' goodwill with licensees,"[116] "damag[ing] Publishers' competitive position and their ability to negotiate future licenses with AI developers"[117] and "irreversibly damag[ing] Publishers' relationships with current and prospective songwriter-partners."[118]

55.     As discussed above, as a threshold matter, I understand Anthropic's Claude is not designed to output copyright material and Anthropic always had guardrails in place to prevent that result.[119] I understand that as a general matter, outputting verbatim material portions of training data is an unintended and relatively rare occurrence with generative AI platforms, not a desired result.[120] I understand that "[w]ith many companies perceived to be rushing unchecked into developing large language models, Anthropic aspires to set a strict ethical standard, which is deeply rooted as the premise of the entire company."[121] I further understand Anthropic implemented additional technological guardrails to ensure it was extremely unlikely to output the Works-in-suit material rendering Plaintiffs' request for a preliminary injunction as it relates to Claude output moot.[122]

---

[114] Memorandum for PI, pp.24-25.
[115] Memorandum for PI, pp. 24-25.
[116] Memorandum for PI, pp. 25-26.
[117] Memorandum for PI, pp. 26-27.
[118] Memorandum for PI, pp. 27-28.
[119] *See* Kaplan Declaration, pp. 8-10.
[120] Kaplan Declaration, pp. 8-10.
[121] https://www.forbes.com/sites/sunilrajaraman/2023/11/21/openai-faces-competitive-pressure-from-anthropic/?sh=2888c0a953527f2886955352
[122] Kaplan Declaration, pp. 11-12.

56.     I further understand the only evidence in the record of allegedly infringing output was created by the Plaintiffs (or their representatives) themselves.[123]   I understand from Ben Zhao's declaration in support of the Publisher's PI Motion, that he had tried to generate output from Claude for lyrics/works in dispute and that there were instances when Claude refused to provide Publishers' Works due to guardrails preventing copyright infringement.[124]  Anthropic's Jared Kaplan, co-founder and Chief Science Officer, has testified that Anthropic enhanced its guardrails to make the future output of the works-in-suit "extremely unlikely."[125]   This demonstrates attribution or refusal to reproduce because of copyright law.

57.     Now that Plaintiffs have sued Anthropic in a very public lawsuit, claiming to support the interests of songwriters and alleging the need for AI developers to secure licenses to use Publishers' works, it is even more unlikely that any allegedly unauthorized uses by Anthropic between now and a final judgment in this lawsuit would irreparably harm Plaintiffs and affect Plaintiffs' negotiations with longtime lyric aggregator (or other) licensees. Under the circumstances, it is highly unlikely Plaintiffs would suffer any harm, let alone irreparable harm, in the absence of preliminary injunctive relief between now and a final judgment in 2025.

58.     Notwithstanding Anthropic's position on the merits, Plaintiffs' irreparable harm allegations in Plaintiffs' PI Motion are either counterfactual, speculative, unsupported or well within the realm of being known and quantifiable.

59.     Plaintiffs have not provided any evidence, support, documents, or data demonstrating they have been harmed or are likely to be harmed as a result from Anthropic's

---

[123] *See, e.g.*, Declaration of Dan Seymour, p. 3; Leonard Declaration, pp. 4-6; Zhao Declaration, pp. 15-16.
[124] Zhao Declaration, p. 15.
[125] Kaplan Declaration, pp. 12-13

alleged unlawful actions in the absence of preliminary injunctive relief. Plaintiffs have not provided any evidence that "Anthropic lowers the market value of the lyrics, reduces demand for legitimate licenses for lyrics and impedes publishers' negotiations with existing licenses."[126] Plaintiffs have not produced any evidence demonstrating Plaintiffs had to reduce their licensing fees as a result of Anthropic's actions. Plaintiffs have not identified a single potential licensee it lost as a result of Anthropic's actions. Plaintiffs haven't identified a single negotiation with an existing licensee that was impacted and how it was impacted as a result of Anthropic's actions. Plaintiffs haven't provided any evidence a licensee was unwilling to accept a license, unwilling to renew its licenses or demanded discounts to compete with Anthropic's unlawful use. Plaintiffs have not provided any evidence demonstrating that there would be limited opportunity to recover lost customers, artists/song writers or confidence and goodwill in the market including with artists/song writers and customers. Plaintiffs, seeking injunctive relief, must "show more than a speculative risk" of harm.[127] They must demonstrate with evidence, not just because Plaintiffs say so, that they "will suffer actual and imminent harm" in the absence of immediate injunctive relief.[128]

60. Even if there were evidence to support Plaintiffs' allegations and Anthropic's imposition of additional guardrails to prevent future outputs of the works-in-suit were somehow ineffective at blocking those outputs between now and trial, such harm between now and a final judgment could be remedied and compensable by monetary damages and quantified in the form of

---

[126] Memorandum for PI, p. 26.
[127] *Cheetah Miner USA, Inc. v. 19200 Glendale, LLC*, 2023 WL 6601863, at *2 (6th Cir. Oct. 10, 2023).
[128] *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (internal quotation marks omitted).

a monetary award commensurate with licensing fees such as those Plaintiffs so frequently enter into for the use of its Works.

61. Plaintiffs admit they have previously exploited and fully licensed their works to companies such as digital platforms like Spotify and Amazon Music and lyrics aggregators and their sublicensees, for uses allegedly similar to those made by Anthropic, in exchange for monetary compensation in the form of a license fee.[129] While Anthropic disputes Plaintiffs' claims, and Anthropic's inadvertent and admittedly unreliable regurgitation output of lyrics in some cases hardly seems like a viable substitute for the lyric functionality of Spotify, Amazon Music, etc., any such harm caused by Anthropic's actions could be remedied by monetary compensation, which can be quantified because it flows from the alleged loss or reduction of licensing revenues that can be contractually defined and quantified.

## VI. PLAINTIFFS' ALLEGATIONS OF HARM CONCERNING CLAUDE'S TRAINING ARE REPARABLE

62. Plaintiffs also claim Anthropic unlawfully violates Plaintiffs' copyrights by training Claude utilizing copyrighted Works causing Plaintiffs irreparable harm, even absent output of lyric content. I understand that Dr. Peterson has analyzed whether there is an existing or potential licensing market for the use of copyrighted works as training materials for generative AI models like Claude and has concluded there is not. For purposes of this declaration only, I assume that Plaintiffs are able to successfully establish a likelihood of success on the merits of their training claim.

63. I understand from Counsel that unauthorized use of copyrighted content to train AI is currently being litigated in almost two dozen copyright infringement cases around the country,

---

[129] Memorandum for PI, p. 3; Concord Declaration, pp. 3-4; ABKCO Declaration, 4-5; UMPG Declaration, pp. 3-5; CCMG Declaration, pp. 3-5.

however, no other plaintiff has sought preliminary injunctive relief.[130]  I understand that other AI companies, such as Open AI, believe training is fair use and "regurgitation" is a rare bug that AI companies are working on to drive to zero.[131]  I further understand that as a general matter, outputting verbatim material from portions of training data is an unintended and relatively rare occurrence with generative AI platforms, not a desired result.[132]  Anthropic's imposition of additional guardrails to prevent the output of the Works-in-suit is consistent with these views.

64.  Plaintiffs nevertheless contend that, due to the inclusion of their Works as training data, part of a back-end technological process invisible to the public, constitutes an irreparable harm.  But this kind of use is not a substitute for any other use authorized by the license agreements produced by Plaintiffs, all of which authorize the distribution or display of their works to the public, and none of which appears to allow for AI training.  In all events, I have not seen any evidence or discussion in the Plaintiffs' motion for PI, including the declarations, of how they might conceivably be harmed in a way that could not be compensated by monetary relief.  Further, Plaintiffs simply assert that inclusion of their content in training data deprives them of control over their Works, deprives attribution credit, and harms their goodwill and reputation without explaining why and how they would suffer any irreparable harm from such use in any event.  As

---

[130] *See, e.g.*, *Kadrey*, 2023 WL 8039640, at *2 (granting motion to dismiss all claims except the training claim); *Anderson v. Stability AI Ltd.*, 2023 WL 7132064, at *1, *17 (N.D. Cal. Oct. 30, 2023) (dismissing all claims against AI companies except direct infringement claims relating to training); *Silverman v. OpenAI, Inc.*, ECF No. 63 No. 23-cv-03416-AMO (N.D. Cal. Dec. 7, 2023) (announcing intention to grant motion to dismiss in written order); *Tremblay v. OpenAI, Inc.*, ECF No. 85, No. 23-cv-03223-AMO (N.D. Cal. Dec. 7, 2023) (same); *Chabon v. OpenAI, Inc.*, ECF No. 32, No. 23-cv-04625-AMO (N.D. Cal. Dec. 7, 2023) (same); *see also* Gass Decl. Ex. TK (Dec. 7, 2023 hearing transcript); *Getty Images (US), Inc. v. Stability AI, Inc.*, No. 23-cv-00135-GBW (D. Del.); *Authors Guild v. OpenAI, Inc.*, No. 23-cv-08292-SHS (S.D.N.Y.); *Sancton v. OpenAI, Inc.*, No. 23-cv-10211-SHS (S.D.N.Y.); *N.Y. Times Co. v. Microsoft Corp.*, No. 23-cv-11195-SHS (S.D.N.Y.); *Basbanes v. Microsoft Corp.*, No. 24-cv-00084 (S.D.N.Y.).

[131] https://openai.com/blog/openai-and-journalism.

[132] Kaplan Declaration, pp. 8-10.

far as the harm to the value of licensing opportunities and ability to negotiate future licenses caused by using unauthorized data to train Claude is concerned, those are readily measurable and compensable through monetary relief, to the extent they are likely at all, against the backdrop of a pending public litigation against Anthropic.

## VII. THE ONLY EVIDENCE OF IRREPARABLE HARM IN THE RECORD IS OF IRREPARABLE HARM TO ANTHROPIC IN THE EVENT AND INJUNCTION ISSUES

65.     In contrast to the Plaintiffs' claim of irreparable harm to their brand, goodwill, and market position in the absence of a preliminary injunction, in the event that the Court issues a PI against Anthropic, I agree with Mr. Kaplan that Anthropic would be irreparably harmed if it were "prohibited from using unauthorized copies of [Plaintiffs'] Works to train future models."[133]  I understand that if Anthropic was prohibited from including Plaintiffs' works in the training corpus in the ████████████████████████████████████████████████████ ███████████████████████████████████████████, causing Anthropic irreparable harm.

66.     I understand it took Anthropic ███████████████████████████ ███████, before it released Claude as an application programming interface ("API") to certain business users in late 2022 and a ███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████.[134] ████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████████.[135]

[133] Memorandum for PI, p. 2.
[134] Kaplan Declaration, pp. 2-3.
[135] Kaplan Declaration, pp. 13-14.

Additionally, I also understand it would ████████████████████████████████
███████████████████████████████████████████████████[136]

67.    The market acknowledges "[w]e are still in the early days of one of the most important technology inflection points in history, but in this fast-moving environment, adopting a wait-and-see posture is as good as being left behind."[137] "We're in the heart of the generative AI hype cycle, and there are major new developments weekly."[138]  In a fast-paced and new booming market such as in the technology space, particularly AI, the importance of entering the market early is of utmost importance, with all major technology companies clamoring to create a niche for themselves with enhanced products and new product offerings, while the late entrants try to play catch-up.

68.    The grant of a preliminary injunction, ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████[139] would preclude Anthropic from capitalizing on early entry into the AI space, putting Anthropic at a competitive disadvantage as other companies benefit from a head start in the market.  The "early entry into a new industry or product category" provides the company with an "insuperable head start."[140]  Becoming and remaining one of the initial market entrants provides an advantage over later entrants as technical knowledge is accumulated and mastered.[141]  Early entrants also generate a "base of customers who would find it inconvenient or

---

[136] Kaplan Declaration, pp. 13-14.
[137] https://www.bain.com/insights/youre-out-of-time-to-wait-and-see-on-ai-tech-report-2023/
[138] https://www.cnet.com/tech/mobile/will-apple-enter-the-generative-ai-race-all-eyes-are-on-wwdc/
[139] Kaplan Declaration, pp. 13-14.
[140] https://hbr.org/2005/04/the-half-truth-of-first-mover-advantage
[141] https://hbr.org/2005/04/the-half-truth-of-first-mover-advantage

costly to switch to the offerings of later entrants".[142] ███████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████, gaining brand recognition and scooping up a loyal customer

base that would find it costly or inconvenient to switch to a later entrant.[143]

     69.    Although Anthropic sets itself apart from the other players in the AI market with

its "research-driven approach and focus on AI safety" and their use of techniques to avoid biases

or errors,[144] the grant of a PI is specifically harmful at this juncture when Anthropic raised Series

C funding to "grow [its] product offerings, support businesses that will responsibly deploy Claude

in the market, and further AI safety research."[145]  Availability of funds for research and

development is an integral part of growth of a technology company, especially in this kind of fast-

paced and competitive product space.  Anthropic's loss of its current and future revenue stream

will limit funds for investments in research and development to bring more sophisticated products

in the market thereby benefiting the public.

     70.    The landscape of AI is "a testament to the relentless pursuit of innovation by

technologists that have shaped its trajectory."[146] Anthropic's inability to succeed may also

negatively impact other startups.  The grant of a PI would thus not only irreparably harm Anthropic

but could have a domino effect on the greater AI industry as well.

     71.    While the true harm if a preliminary injunction were granted is immeasurable, the

appropriate related bond amount would have to be significant to cover the ███████████████

---

[142] https://hbr.org/2005/04/the-half-truth-of-first-mover-advantage
[143] https://hbr.org/2005/04/the-half-truth-of-first-mover-advantage
[144]    https://www.forbes.com/sites/digital-assets/2023/11/07/the-evolution-of-ai-from-ibm-and-aws-to-openai-and-anthropic/?sh=21ca3fa57190
[145] https://www.anthropic.com/index/anthropic-series-c
[146]https://www.forbes.com/sites/digital-assets/2023/11/07/the-evolution-of-ai-from-ibm-and-aws-to-openai-and-anthropic/?sh=21ca3fa57190

[147][148]

likely resulting in a loss in valuation of the company. Therefore, any potential injunction bond amount would have to be commensurate with the cumulative amount of these losses. ▮

▮ would not be an unreasonable estimate of the appropriate bond amount should the Court grant an injunction requiring Anthropic to restart the training of the models under development.

---

[147] Kaplan Declaration, pp. 13-14.
[148] Kaplan Declaration, pp. 13-14.

I declare under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing statements are true and correct.

Executed on January 16 , 2024 at New York, New York.

_____
Dawn R. Hall