# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

CONCORD MUSIC GROUP, INC., ET AL.,

        Plaintiffs,

        v.

ANTHROPIC PBC,

        Defendant.

Case No. 3:23-cv-01092

Chief Judge Waverly D. Crenshaw, Jr.
Magistrate Judge Alistair Newbern

## PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND: CORRECTING THE RECORD ................................................................ 2

   I.   Anthropic trained Claude intending it to respond to prompts for lyrics. ........................... 2

   II.   Anthropic's newly adopted guardrails are inconsistent and ineffective. ........................... 3

ARGUMENT ................................................................................................................... 3

   I.   Anthropic's jurisdictional and venue arguments do not bar injunctive relief. ................... 3

   II.   Publishers are likely to succeed on their copyright infringement claim. ........................... 3

       A.  Anthropic's new guardrails do not moot Publishers' motion. ...................................... 4

       B.  Anthropic cannot duck responsibility by claiming lack of volition. ............................. 4

       C.  Anthropic's exploitation of Publishers' lyrics for AI training is not fair use. .............. 6

          1.  Anthropic's use is commercial and not transformative. ......................................... 7

          2.  Lyrics are undisputedly within the core of copyright protection. ........................... 9

          3.  Anthropic does not deny it copies Publishers' lyrics fully or nearly so. ................. 9

          4.  Anthropic's use harms the market for Publishers' lyrics. .................................... 10

   III.  Anthropic ignores the irreparable harm its infringement causes. .................................... 11

   IV.  The balance of equities and public interest both favor the preliminary injunction. ......... 13

   V.   Publishers' requested preliminary injunction is not overbroad. ...................................... 14

   VI.  Anthropic's request for a ▓▓▓▓▓▓▓ security bond is baseless. ......................................... 15

# TABLE OF AUTHORITIES

**CASES**

*A&M Recs., Inc. v. Napster, Inc.*,
114 F.Supp.2d 896 (N.D. Cal. 2000) ...................................................................... 11

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ........................................................................................................ 4

*Am. Broad. Cos., v. Aereo, Inc.*,
573 U.S. 431 (2014) ..................................................................................................... 5

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
11 F.4th 26 (2d Cir. 2021) ........................................................................................ 10

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ......................................................................................... 6, 7, 8, 9

*Arista Recs. LLC v. Lime Grp. LLC*,
2011 WL 1641978 (S.D.N.Y. Apr. 29, 2011) ........................................................ 6

*Associated Press v. Meltwater U.S. Holdings*,
931 F.Supp.2d 537 (S.D.N.Y. 2013) ....................................................................... 9

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) .................................................................................... 10

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) ...................................................................................... 10

*Avg. Joe's Ent. Grp. v. SoundCloud, LTD.*,
2018 WL 6582829 (M.D. Tenn. Oct. 17, 2018) ...................................................... 5

*Bridgeport Music, Inc. v. Dimension Films*,
410 F.3d 792 (6th Cir. 2005) ..................................................................................... 5

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ...................................................................................................... 7

*Capitol Recs., LLC v. ReDigi Inc.*,
910 F.3d 649 (2d Cir. 2018) ....................................................................................... 6

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008) ....................................................................................... 5

*Disney Enters., Inc. v. VidAngel, Inc.*,
224 F.Supp.3d 957 (C.D. Cal. 2016) ..................................................................... 11

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ...................................................................................... 8

*Ever-Seal, Inc. v. Halferty*,
2022 WL 418692 (M.D. Tenn. Feb. 10, 2022) ...................................................... 15

*Food & Water Watch v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) .................................................................................... 3

Case 3:23-cv-01092    Document 92    Filed 02/14/24    Page 3 of 22 PageID #: 3831

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018) ..................................................................... 5, 6, 7

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ..................................................................................... 4

*Google LLC v. Oracle America, Inc.*,
141 S. Ct. 1183 (2021) ................................................................................. 9

*Jones v. Coleman*,
2017 WL 1397212 (M.D. Tenn. Apr. 19, 2017) ........................................ 13

*Los Angeles County v. Davis*,
440 U.S. 625 (1979) ..................................................................................... 4

*Northland Family Planning Clinic, Inc. v. Cox*,
487 F.3d 323 (6th Cir. 2007) ....................................................................... 4

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
99 F.3d 1381 (6th Cir. 1996) ..................................................................... 15

*Ringold v. Black Ent. Television, Inc.*,
126 F.3d 70 (1997) ....................................................................................... 6

*Sony/ATV Publ'g, LLC v. 1729172 Ontario, Inc.*,
2015 WL 13030253 (M.D. Tenn. Sept, 25, 2015) ..................................... 14

*Sony/ATV Publ'g, LLC v. Marcos*,
651 F. App'x 482 (6th Cir. 2016) .............................................................. 15

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019) ....................................................................... 4

*Taylor Corp. v. Four Seasons Greetings, LLC*,
403 F.3d 958 (8th Cir. 2005) ..................................................................... 11

*Tree Publ'g Co. v. Warner Bros. Recs.*,
785 F. Supp. 1272 (M.D. Tenn. 1991) ...................................................... 13

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975) ..................................................................................... 7

*Universal City Studios Prods. LLLP v. TickBox TV LLC*,
2018 WL 156869 (C.D. Cal. Jan. 30, 2018) .............................................. 13

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
900 F.3d 250 (6th Cir. 2018) ....................................................................... 3

*WPIX, Inc. v. ivi, Inc.*,
691 F.3d 275 (2d Cir. 2012) ....................................................................... 12

*York Risk Servs. Grp., Inc. v. Couture*,
787 F. App'x 301 (6th Cir. 2019) .............................................................. 13

*Zomba Enters., Inc. v. Panorama Recs., Inc.*,
491 F.3d 574 (6th Cir. 2007) ....................................................................... 9

**STATUTES**

17 U.S.C. § 107(1) ................................................................................................... 7

17 U.S.C. § 107(3) ................................................................................................... 9

**OTHER AUTHORITIES**

AI Foundation Model Transparency Act of 2023, H.R. 6881, 118th Cong. § 2 ......................... 14

OPENAI, COMMENTS OF OPENAI (Oct. 30, 2023),
    https://perma.cc/VK23-VTPC ....................................................................... 14

Yuntao Bai et al., *Training a Helpful and Harmless Assistant*
    *with Reinforcement Learning from Human Feedback*, ANTHROPIC (Apr. 12, 2022),
    https://arxiv.org/pdf/2204.05862.pdf. ....................................................... 2

# INTRODUCTION

Anthropic concedes the critical facts of its infringement. It does not dispute that it copies Publishers' lyrics on a massive scale to train its "Claude" AI models; that its models reproduced, distributed, and displayed copies of those lyrics; or that, additionally, its models generated twisted derivatives of those lyrics that are antithetical to their creators' intent—all without permission.

Instead, Anthropic rests its opposition on three provably false narratives. First, Anthropic downplays its wholesale theft of Publishers' lyrics by claiming that its AI models are "not designed to output copyrighted material," that "[n]ormal people" would not seek lyrics from its models, and that infringing output is a "'bug,' not a 'feature.'" Def.'s Opp'n ("Opp.") 2, 4, ECF No. 67. Those statements are categorically false. Anthropic's ***own training data*** makes clear that it expected its AI models to respond to requests for Publishers' lyrics. In fact, Anthropic trained its models on prompts such as "What are the lyrics to American Pie by Don McLean?" Given this, it is astonishing that Anthropic represents that its models were not intended to respond to such requests.

Second, Anthropic baselessly claims that its new guardrails—installed after this suit was filed—moot Publishers' motion and cure their injuries. But the new guardrails, like those before them, are porous, allowing all forms of infringing outputs. Moreover, unless enjoined, Anthropic remains free to abandon guardrails it adopted only as a litigation strategy. Thus, Publishers continue to face irreparable injury, including lost control and credit, damaged relationships with songwriters and licensees, and irreversible harm to current and future licensing markets for lyrics.

Third, Anthropic misrepresents the relief Publishers seek and overstates the burden of compliance. Publishers request a narrow preliminary injunction requiring that Anthropic (1) implement effective guardrails that prevent Claude's dissemination of Publishers' lyrics and (2) refrain from using Publishers' lyrics in future training of its AI models. Pls.' Mot. 1–2, ECF No. 40. This limited initial relief would prevent further harm to Publishers without overburdening

1

Anthropic. In fact, Anthropic claims to have adopted new guardrails since being sued, conceding that such guardrails are both warranted and feasible. The request that Anthropic refrain from copying Publishers' lyrics for future training will not affect Anthropic's current models or those for which training has begun. These requests serve the purpose of a preliminary injunction: to return the parties to the last uncontested status quo until the Court renders a decision on the merits.[1]

## BACKGROUND: CORRECTING THE RECORD

### I. Anthropic trained Claude intending it to respond to prompts for lyrics.

Anthropic identifies "search" as one of Claude's "[i]ntended uses."[2] Anthropic's own training data betrays its understanding that its AI models would be used to search for and provide copyrighted lyrics.[3] Anthropic "finetuned" Claude to generate "helpful" outputs by entering prompts and rewarding the model for preferred responses.[4] Anthropic workers assigned this task were told to "treat the AI like a friend or expert" and prompt the model "for help with any text-based task"—including "suggesting songs based on your favorite music."[5]

In fact, many of Anthropic's finetuning prompts specifically *requested* lyrics, such as:

- "What are the lyrics to [work-in-suit] American Pie by Don McLean?"
- "Please provide the lyrics for the [work-in-suit] 'Only Hope' by Mandy Moore."
- "Do you know the lyrics to 'I am The Walrus'? . . . . Can you give me the first verse?"
- "Please retype the lyrics, to the song, Mad About You, by Sting."
- "Can you help me identify the name of the song that includes the following lyrics[?]"

Chung Decl., Ex. A, 1–5. Anthropic's prompts also *contained* lyrics for works-in-suit, including "American Pie," "Anaconda," "All Along the Watchtower," "Brown Sugar," "Can't Get You Out

---

[1] Publishers proposed a stipulated preliminary injunction consistent with the relief requested herein, but Anthropic did not agree. Chung Decl., Exs. D, E.

[2] Decl. of Jared Kaplan ("Kaplan Decl."), Ex. A, at 1, ECF No. 67-2.

[3] *See id.*, at 2, 13 (explaining that "human feedback data used to finetune Claude was made public" at https://huggingface.co/datasets/Anthropic/hh-rlhf).

[4] Yuntao Bai et al., *Training a Helpful and Harmless Assistant with Reinforcement Learning from Human Feedback* 13, ANTHROPIC (Apr. 12, 2022), https://arxiv.org/pdf/2204.05862.pdf.

[5] *Id.* at 65.

of My Head," "Only Hope," and "Wild Horses." *Id.*, 1–2, 5, 9–12. Anthropic even coached Claude

to be helpful in response to demands for derivative works. For example, Anthropic prompted the

model to "make a short story from the lyrics to the song, All Along the Watchtower" and to rewrite

"Listen" in "Eminem['s] style" and "Not Afraid" in "Beyonce's style." *Id.*, 10, 13–14.[6]

## II. Anthropic's newly adopted guardrails are inconsistent and ineffective.

Anthropic is wrong that guardrails adopted "since the filing of this lawsuit" prevent further

infringements. Kaplan Decl. ¶ 40. In instance after instance, Claude continues to output Publishers'

lyrics. *See* Candore Decl., Ex. A (detailing infringing output); Chung Decl., Ex. B (same).

## <u>ARGUMENT</u>

## I. Anthropic's jurisdictional and venue arguments do not bar injunctive relief.

Anthropic's jurisdictional and venue arguments lack merit, as detailed in Publishers'

opposition to Anthropic's motion to dismiss or transfer. *See* ECF No. 79, at 6–15. Anthropic's

attempt to stall resolution of the preliminary injunction motion on this basis should be rejected.[7]

## II. Publishers are likely to succeed on their copyright infringement claim.

Publishers have shown—and Anthropic does not dispute—that they own or control

copyrights in the works-in-suit; Anthropic copied Publishers' works to build its AI models; and

those models distributed verbatim and near-verbatim copies of those works, as well as

unauthorized derivatives that Publishers would not have licensed. Mem. 9–12, ECF No. 41.

---

[6] Anthropic also finetuned Claude to steer users away from authorized lyrics sources. After Anthropic prompted the model, "I'm trying to find out who sang the song 'Chicken Fried,'" it ***rejected*** the reply "I'd recommend searching this song on Genius.com or YouTube" in favor of one that misidentified the songwriters but did not direct users elsewhere. Chung Decl. Ex. A, 15.

[7] Anthropic is wrong that Publishers' injunction request triggers a heavier jurisdictional burden. *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.3 (6th Cir. 2018) (citing *Food & Water Watch v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)). When "Plaintiffs filed their complaint and moved for a preliminary injunction contemporaneously," defendant has "not yet filed an answer," and "no [general] discovery ha[s] occurred," jurisdiction is "evaluated under the motion to dismiss standard." *Vilsack*, 808 F.3d at 913; *accord Waksul*, 900 F.3d at 256 n.4.

3

Publishers are thus likely to establish direct infringement. Anthropic's three defenses fail.

### A. Anthropic's new guardrails do not moot Publishers' motion.

Anthropic's new guardrails do not "moot" the need for preliminary relief. Opp. 13. Under the voluntary cessation doctrine, Anthropic "cannot automatically moot a case simply by ending its unlawful conduct once sued." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Rather, Anthropic "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). These principles apply equally to a preliminary injunction. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767–70 (6th Cir. 2019). Without an injunction, Anthropic could abandon the guardrails it implemented as a litigation strategy. "[T]hat the voluntary cessation only appears to have occurred in response to the present litigation . . . shows a greater likelihood that it could be resumed." *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 342–43 (6th Cir. 2007). Because Anthropic remains "free to return to [its] old ways," Publishers' request is not moot. *See Already*, 568 U.S. at 92.

Moreover, Anthropic's new guardrails are not the complete solution it suggests. A claim is not moot unless "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Schlissel*, 939 F.3d at 767 (quoting *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979)). Anthropic's new guardrails fail to eradicate the effects of its past violations and to prevent further infringement. Zhao Reply Decl. ¶¶ 16–21, ECF No. 47. Publishers continue to obtain verbatim and near-verbatim copies, mashups and distortions, and unlicensed derivatives of lyrics to the works-in-suit. *See* Candore Decl., Ex. A; Chung Decl. Ex. B.

### B. Anthropic cannot duck responsibility by claiming lack of volition.

Anthropic cannot shift responsibility for its infringement to Publishers. Anthropic ignores controlling Supreme Court precedent limiting the defense that an infringer lacks "volitional

4

conduct." *See Am. Broad. Cos., v. Aereo, Inc.*, 573 U.S. 431, 444 (2014). In *Aereo*, the Court discounted the importance of who pushes the button or "click[s] on a website [to] activate" infringement and held that the provider of a streaming service directly "performed" copyrighted works, even though its "system remains inert until a subscriber indicates that she wants to watch a program." *Id.* at 443–44. *Aereo*'s logic forecloses Anthropic's defense. Though Claude's users enter queries, Anthropic ***itself*** reproduces, displays, and distributes lyrics and their derivatives.

Moreover, the Sixth Circuit has not adopted the "volitional conduct" requirement articulated by the Second Circuit in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.* (*Cablevision*), 536 F.3d 121, 131 (2d Cir. 2008) (limiting liability to "the person who actually presses the button"), to the extent that case is good law after *Aereo*. Anthropic's primary citation for such a requirement quotes a litigant's misreading of a Sixth Circuit case. Opp. 14.[8] But that case, *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792 (6th Cir. 2005), holds only that sampling a sound recording is an intentional act, ***not*** that a defendant is absolved of liability if he generates infringing material but does not push the proverbial button releasing it. *Id.* at 802.

Even if the Sixth Circuit required volitional conduct, Anthropic's actions would meet that standard. The conduct found nonvolitional in *Cablevision* was defendant's operation of a service "similar to the recording capability of a DVR in a television viewer's home." *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 181 (2d Cir. 2018). But Anthropic's AI models bear no resemblance to an empty vessel recording device like a DVR or VCR. *See* Mem. 20. Anthropic controls Claude's input by choosing to include Publishers' works in its training dataset and storing that dataset indefinitely; it controls Claude's output by finetuning the model to respond "helpfully"

---

[8] *Compare Avg. Joe's Ent. Grp. v. SoundCloud, LTD.*, 2018 WL 6582829, at *2 (M.D. Tenn. Oct. 17, 2018), *with* Def. Mem. 13–14, No. 3:16-cv-03294 (M.D. Tenn. Sept. 7, 2018), ECF No. 121.

to prompts for copyrighted lyrics and installing guardrails that restrict what Claude generates.[9] Because Anthropic "decides what [copyrighted] content to [use]" as training data and controls what Claude distributes, "[v]olitional conduct that infringes is clear." *TVEyes*, 883 F.3d at 181.

Finally, Anthropic cannot escape responsibility by arguing that Publishers prompted its infringements. Anthropic's finetuning data shows that Publishers' queries were the sort it expected from "normal" users. Zhao Reply Decl. ¶ 12. Courts also "consistently rel[y] upon evidence of [distributions to an] investigator to establish both unauthorized copying and distribution of a plaintiff's work." *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1641978, at *8 (S.D.N.Y. Apr. 29, 2011) (collecting cases). Publishers would otherwise have no way to detect infringement.

### C. Anthropic's exploitation of Publishers' lyrics for AI training is not fair use.

Anthropic's massive copying of Publishers' lyrics to build an $18 billion business bears no resemblance to the fair uses contemplated in 17 U.S.C. § 107, such as "criticism, comment, news reporting, teaching[,] . . . scholarship, or research." *See Andy Warhol Found. For Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023) (uses in preamble "guide" fair use inquiry); *Ringold v. Black Ent. Television, Inc.*, 126 F.3d 70, 78 (1997) ("[T]he categories [in § 107] should not be ignored."). Anthropic asserts fair use only as to copying Plaintiffs' lyrics in Claude's training data, arguing that it copies the lyrics to teach its AI model "how language operates." Opp. 5. That argument fails. First, Anthropic does not need to copy Publishers' artistic expression in its entirety to achieve its claimed purpose. Anthropic protests that Publishers' lyrics are a tiny fraction of its training data; it could easily exclude those lyrics and retain the remaining "trillions of tokens of pre-existing text" it allegedly requires. *See id.*; Kaplan Decl. ¶ 17. Anthropic does not do so

---

[9] Anthropic's claim that it does not "store[] complete infringing copies of the plaintiff's works," Opp. 15, is both unlikely, Zhao Decl. ¶ 8, and irrelevant. Unauthorized reproduction infringes even if the copy is not retained. *Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 658 (2d Cir. 2018).

6

because it built Claude knowing and intending the model would respond to queries for lyrics.

Second, in the unlikely event that Anthropic's guardrails prevent its models from distributing copies of Publishers' lyrics in the future,[10] the models' output of "new" lyrics remains unfair. That output is enabled by unauthorized copying, attracts subscription fees and investment, and competes directly with songwriters and publishers whose own lyrics are the raw material for Anthropic's substitutes. In Anthropic's preferred future, songwriters will be supplanted by AI models built on the creativity of the authors they displace. Instead of stimulating creativity and "promoting broad public availability of literature, music, and the other arts," *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975), Anthropic's copying propagates uncopyrightable, synthetic imitations of human expression, subverting the purposes of fair use.

### 1. Anthropic's use is commercial and not transformative.

On the first fair-use factor, Anthropic does not dispute that its copying is commercial but argues that it has a transformative purpose. The Supreme Court's *Goldsmith* decision reigned in the role of transformativeness in assessing "the purpose and character of the [challenged] use," 17 U.S.C. § 107(1).[11] Even if Anthropic's continued reliance on transformativeness as a complete defense to wholesale copying were sound, it has badly misconstrued the facts.

To start, Anthropic mischaracterizes the purported purpose that Publishers challenge. The first factor "requires an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'" *Goldsmith*, 598 U.S. at 533; *see also id.* at 554 (Gorsuch, J., concurring) ("[T]he law trains our attention on the particular use under challenge."). Publishers do not

---

[10] Guardrails are not scalable to stop infringement of the millions of works Publishers own and ill-suited to prevent non-verbatim output, like derivative works. Zhao Reply Decl. ¶¶ 16–20.
[11] The Supreme Court cautions that transformativeness "may not be treated in isolation" or elevated above other fair-use factors. *Goldsmith*, 598 U.S. at 550 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994)). Thus, even if Anthropic's copying is transformative, the use may still be unfair. *E.g.*, *TVEyes*, 883 F.3d at 177; *Meltwater*, 931 F.Supp.2d at 554–55.

7

challenge Anthropic's effort "to teach a neural network how human language works," Opp. 23, or the legality of large language models generally. Publishers object to the use of their works to deliver outputs that compete directly with the copyrighted works on which they were based.

Anthropic also ignores that its use of the copyrighted works does not end with "deriv[ation] of unfathomably complex statistical correlations." Opp. 1. When applying the first fair-use factor, courts analyze the infringing steps in a defendant's process in light of the challenged end use. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861–62 & n.12 (9th Cir. 2017) (analyzing "intermediate" copying in light of streaming service offered to end users). Courts do not divorce the purpose of a defendant's process from that of the resulting use, but rather make "[a]n objective inquiry into what use was made, *i.e.*, what the user does with the original work." *Goldsmith*, 598 U.S. at 545. Here, Anthropic's purpose was to build an AI model that could respond to lyrics requests, often with verbatim copies of Publishers' lyrics or derivative works excluded from fair use's ambit. *See id.* at 541 (adding new expression or character cannot "swallow the copyright owner's exclusive right to prepare derivative works").

Moreover, and regardless of whether its outputs ultimately infringe, Anthropic's purpose in copying Publishers' lyrics as training data is the same as Publishers' purpose in licensing works to lyrics aggregators and search engines. Anthropic's own data, replete with queries like "Please provide the lyrics for the song 'Only Hope,'" Chung Decl., Ex. A, at 2, proves that Anthropic intended searching for and accessing lyrics to be part of Claude's feature set. Zhao Reply Decl. ¶ 12. Anthropic's claim that reproducing those lyrics is a "bug," Opp. 2, is demonstrably untrue.

To make matters worse, Anthropic creates a substitute for accessing Publishers' lyrics through legitimate sources, precluding a finding that its use is transformative. *Goldsmith*, 598 U.S. at 528. Anthropic **knows** that Claude can supplant the authorized use of search engines like Google

or websites like Genius.com, both Publisher licensees, to find and view Publishers' works. *See* Chung Decl., Ex. A, 15. Anthropic trained Claude understanding that it would usurp a typical use of Publishers' lyrics, undercutting the notion that its purpose is any different. *See Associated Press v. Meltwater U.S. Holdings*, 931 F.Supp.2d 537, 554–55 (S.D.N.Y. 2013).

Where, as here, the secondary use "is so similar to the [the copyrighted work]'s typical use, a particularly compelling justification is needed." *Goldsmith*, 598 U.S. at 547. Anthropic has identified no such justification. If it sought "to effectively train AI models to recognize language patterns," Opp. 25, it could do so without Publishers' lyrics, *see* Peterson Decl. ¶¶ 23–24, ECF No. 67-19 (estimating that if Anthropic excluded copyrighted lyrics from Claude's corpus, ▇▇▇▇ would remain). Anthropic admits that "it does not ultimately matter what specific articles are included in the training data," and texts that are similar in kind "are considered fungible for purposes of the model." Kaplan Decl. ¶ 19. Anthropic had no need to use Publishers' copyrighted lyrics in its dataset over any other lyrics. The first factor thus weighs heavily against fair use.

### 2. Lyrics are undisputedly within the core of copyright protection.

Unlike the "unprotected," "functional" computer object codes in *Sega* and *Connectix*, *see* 203 F.3d at 599, or the "declaring code . . . inherently bound together with uncopyrightable ideas" in *Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183, 1202 (2021), Publishers' lyrics are artistic expression at the core of copyright protection—and thus far less susceptible to fair use. *Zomba Enters., Inc. v. Panorama Recs., Inc.*, 491 F.3d 574, 582 (6th Cir. 2007).

### 3. Anthropic does not deny it copies Publishers' lyrics fully or nearly so.

"[T]he amount and substantiality of the portion used" also weighs against fair use. 17 U.S.C. § 107(3). Anthropic does not deny copying Publishers' lyrics in full. It concedes that its "training process . . . necessarily sweeps up billions of texts including song lyrics." Opp. 25. Unlike those cases where total copying was held fair, *see Authors Guild v. Google, Inc.*, 804 F.3d 202,

221–22 (2d Cir. 2015); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 102–03 (2d Cir. 2014), the amount Anthropic copied is excessive in relation to its purported purpose. *See* Kaplan Decl. ¶ 19.

### 4. Anthropic's use harms the market for Publishers' lyrics.

Anthropic tries to shrug off the ample evidence of licensing markets for lyrics by insisting that it does not compete with Publishers' licensees. But Publishers have shown their lyrics are licensed and sublicensed to digital music services, lyrics aggregators, lyrics websites, and search engines, authorizing those services to display lyrics to those who search for them online. Mem. 2–3, 21–22. Anthropic's AI models function precisely like these licensed websites and services by allowing users to find and access Publishers' lyrics. *See* Smith Reply Decl. ¶¶ 11–21. Indeed, Anthropic finetuned Claude expecting it would do just that.

Instead, Anthropic faults Publishers for not providing "evidence of licenses they have issued to other LLMs" or "evidence of a general AI LLM that has licensed all the copyrighted material used to train its model." Opp. 26. Such evidence is not required. Under the fourth fair-use factor, courts ask whether the challenged use undermines the market for the copyrighted work or "any derivative markets that exist or that its author might reasonably license others to develop, regardless of whether the particular author claiming infringement has elected to develop such markets." *Andy Warhol Found. For Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 48 (2d Cir. 2021).

First, there is a licensing market for AI training data in which Publishers could participate. Anthropic's overblown claim that such a market "simply could not exist for the inputs to technological tools like Claude," Opp. 26, contradicts its statement that it trained Claude on "datasets that [it] licenses from third party businesses," Kaplan Decl. ¶ 6. Second, the nascent market for copyrighted works as training data continues to grow. Many AI developers license copyrighted works to train their models, and some undertake to use **only** licensed works. Smith Decl. ¶ 28, ECF No. 52; Smith Reply Decl. ¶ 30. Since generative AI models have been widely

10

available for less than two years, the licensing market is just starting to develop. Smith Reply Decl. ¶¶ 22–32. When online peer-to-peer file-sharing services began illegally distributing music, a licensing market to stream or download music did not yet exist. But enjoining the illegitimate market allowed a legitimate one to develop and thrive. *Id.* ¶¶ 31–32.

Courts routinely find copyright plaintiffs likely to succeed on the merits and enter preliminary injunctions, even when defendants claim fair use or emphasize the novelty of their technologies.[12] Here, because all four fair-use factors favor Publishers, Anthropic falls far short of establishing its affirmative defense and Publishers are likely to succeed on the merits.

## III. Anthropic ignores the irreparable harm its infringement causes.

Anthropic's infringement denies Publishers and their songwriters control over their works, harms their reputations, deprives them of proper attribution and goodwill, erodes the licensing market for lyrics, damages Publishers' position in future licensing negotiations, and harms their relationships with songwriters. Mem. 22–28. Anthropic's opposition glosses over those harms.

First, damages—statutory or otherwise—cannot fully compensate Publishers for the loss of control over how, when, and by whom their lyrics are used. *See Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 968 (8th Cir. 2005). Publishers have the exclusive right to **refuse** to license their works, a right Anthropic denies when it copies lyrics as Claude's input and output.

Moreover, it is hard to imagine a machine more destructive to artistic control than one that first copies lyrics, then alters them or combines them with works by other songwriters (or AI-generated text) in ways that contravene the songwriters' intent. Anthropic disregards the examples of error-filled or offensive outputs of Publishers' lyrics, which Publishers would not license at any

---

[12] *See, e.g.*, *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F.Supp.3d 957, 974 (C.D. Cal. 2016); *A&M Recs., Inc. v. Napster, Inc.*, 114 F.Supp.2d 896, 913–17 (N.D. Cal. 2000); *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 99 (2d Cir. 2002).

price. *See, e.g.*, ECF No. 50, at ¶ 50 (combining "Candle in the Wind" and "Baby Got Back"). Anthropic's insistence that Claude is not a "reliabl[e]" source of lyrics, Opp. 4, only underscores the harm: distributing lyrics with errors, omissions, or additions degrades their integrity. Further, those distorted outputs damage the reputations of Publishers and their songwriters.

Anthropic also overlooks the importance of proper attribution in the music industry, *see, e.g.*, ECF No. 45, at ¶ 14, and that Claude's outputs reproduce lyrics with incorrect attributions or none at all. Publishers' inability to protect songwriters' interests as artists and copyright-holders would cause incalculable harm to Publishers' most crucial business relationships.

Further, Anthropic ignores the harm to the lyrics licensing market and Publishers' competitive position in future negotiations. Mem. 22–23, 26–27. Anthropic copied Publishers' lyrics expecting Claude to replace search engines like Google and lyrics websites like Genius.com, both licensed providers of Publishers' lyrics. By taking for free what others license and using its unlawful copies to compete with Publishers' licensees, Anthropic threatens the long-term licensing prospects for Publishers' works. Smith Reply Decl. ¶¶ 20–21. Anthropic also diminishes Publishers' leverage in negotiations with other AI companies. Denying the preliminary injunction "would encourage . . . other internet services[] to follow [Anthropic's] lead" rather than license lyrics as training inputs legitimately. *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 286 (2d Cir. 2012).

Instead of addressing these harms, Anthropic rehashes its theory that distributions to Plaintiffs' investigators cannot show infringement or its ensuing harms, urging the Court to assume that Anthropic distributed copyrighted lyrics to Publishers alone.[13] That premise is factually

---

[13] Anthropic apparently tracks user queries and Claude's responses, Kaplan Decl. ¶¶ 38–39, but avoids disclosing how many outputs provide Publishers' lyrics. It also claims to have no record of outputs before September 29, 2023. Lowd Decl. ¶ 20, ECF No. 67-5. "If [Anthropic] itself does not know what content [its] users have accessed, it is not clear how [else] Plaintiffs might go about gathering such evidence at this early stage of the action." *TickBox*, 2018 WL 1568698, at *12.

untrue. Chung Decl., Ex. C(showing Claude distributed copyrighted lyrics to third party).It is also legally unfounded. *See Universal City Studios Prods. LLLP v. TickBox TV LLC*, 2018 WL 1568698, at *9, 12 (C.D. Cal. Jan. 30, 2018) (inferring harm to goodwill and licensing market from distributions to investigator and rejecting idea that plaintiffs "failed to show [defendant's] users have actually . . . accessed Plaintiffs' copyrighted works"). Publishers establish irreparable harm.[14]

## IV. The balance of equities and public interest both favor the preliminary injunction.

The balance of equities tips decidedly in Publishers' favor. In copyright infringement cases, "[c]ourts generally ignore the harm to others consideration because an infringer could set up his infringement with substantial investment and thereby claim harm by the injunctive relief." *Tree Publ'g Co. v. Warner Bros. Recs.*, 785 F. Supp. 1272, 1276 (M.D. Tenn. 1991). Regardless, any minimal impact on Anthropic cannot outweigh the harm its infringement causes Publishers.

To distort the balance of equities, Anthropic mischaracterizes the scope of the proposed injunction. Publishers' first request—that Anthropic implement effective guardrails—is so modest that Anthropic purports to have adopted them voluntarily. "Defendants will not be harmed by having to comply with what they have effectively agreed to do." *Jones v. Coleman*, 2017 WL 1397212, at *7 (M.D. Tenn. Apr. 19, 2017) (Crenshaw, C.J.). Absent a court order, however, Anthropic could withdraw its latest guardrails, omit them from future models, or fail to update them to capture the full universe of Publishers' works. The Court should "take [Anthropic] at their word and . . . make official that which they have promised" by entering a preliminary injunction requiring Anthropic to implement and maintain effective guardrails during this litigation. *Id.*

---

[14] Finally, Publishers have not "delayed" bringing suit. Opp. 20. The Sixth Circuit has held that filing suit within six months is reasonable and condoned waiting up to three years. *York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 309 (6th Cir. 2019) (collecting cases). Publishers moved as quickly as possible given the challenges of evidence gathering. Devoting four months to factual investigation reflects Plaintiffs' diligent research of their claims, not unreasonable delay.

As for Publishers' second request, Anthropic misstates the relief Publishers seek to vastly overstate the purported the burden it places on Anthropic. Publishers are not asking that Anthropic retrain or extract data from its existing AI models or those for which training has already begun. Rather, Publishers ask that Anthropic refrain from exploiting Publishers' lyrics for *future* training. Anthropic already "cleans" its datasets to remove unwanted material, such as duplicate data, *see* Kaplan Decl. ¶ 26, so it can surely exclude Publishers' lyrics from future training data, as other prominent AI companies have done voluntarily.[15] Because the requested relief is forward-looking, it would not "dramatically disrupt[]" Anthropic's business, particularly given Anthropic's claim that the lyrics make up an "infinitesimally small portion" of its training corpus. *See* Opp. 2, 27.

Likewise, the public interest is best served by upholding copyright protections that encourage the creation and distribution of new expressive works. *Sony/ATV Publ'g, LLC v. 1729172 Ontario, Inc.*, 2015 WL 13030253, at *4 (M.D. Tenn. Sept, 25, 2015), *aff'd* 651 F. App'x 482 (6th Cir. 2016). The proliferation of proposed bills addressing the threat that AI can pose to creators underscores the public interest in the entry of a preliminary injunction here. *See, e.g.*, AI Foundation Model Transparency Act of 2023, H.R. 6881, 118th Cong. § 2 ("[U]sers should be equipped with the information necessary to enforce their copyright protections.").

## V.    Publishers' requested preliminary injunction is not overbroad.

Publishers have been clear that the 500 works-in-suit are a non-exhaustive list of works they own and Anthropic has infringed. Compl. ¶¶ 37, 113, 127; Mem. 2. Courts routinely "extend[] injunctive relief beyond the four corners of the litigated copyrighted works to cover non-litigated items of similar character." *Sony/ATV Publ'g, LLC v. Marcos*, 651 F. App'x 482, 488 (6th Cir.

---

[15] *E.g.*, OPENAI, COMMENTS OF OPENAI 7 (Oct. 30, 2023), https://perma.cc/VK23-VTPC (noting that it has worked with authors "to identify sites on the internet that reproduce their copyrighted works" and "has then been able to exclude those sites from being crawled for future training").

2016). Further, "[t]he weight of authority supports the extension of injunctive relief to future works" that Publishers' songwriters create and Publishers own or control. *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1392 (6th Cir. 1996). A preliminary injunction that "applies to all musical compositions owned or administered by Publishers," like the one sought here, gives "fair warning" of the conduct prohibited and is thus appropriate. *Id.* at 487–88.

As a practical matter, Anthropic should have little trouble identifying the works that will be subject to an injunction. Publishers have ***already*** given Anthropic detailed spreadsheets identifying their catalogs of works by song title, songwriter, and unique identifying numbers—a fact Anthropic omitted from its opposition.[16] Once the preliminary injunction is entered, Publishers are more than willing to work with Anthropic to provide additional information and updated lists of works to ensure that the injunction is not needlessly limited. *See* Chung Decl., Exs. D, E.

## VI. Anthropic's request for a ▮▮▮▮▮ security bond is baseless.

Anthropic fails to justify its absurdly disproportionate demand for a ▮▮▮▮▮▮. Opp. 30 n.11. Nor does it address case law supporting waiving a bond in like cases. Mem. 30 & n.11. The requested relief would not force Anthropic to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.*, or spend ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ them, Kaplan Decl. ¶ 8. *See* Zhao Reply Decl. ¶ 22, Smith Reply Decl. ¶ 39. It would protect lyrics that represent a fraction of Anthropic's training data but the whole of Publishers' business. The narrow relief sought and Anthropic's choice to make infringement the backbone of its model warrant a bond of less than $10,000, if any. *See, e.g.*, *Ever-Seal, Inc. v. Halferty*, 2022 WL 418692, at *10 (M.D. Tenn. Feb. 10, 2022).

### CONCLUSION

Publishers respectfully request that the Court grant the motion for preliminary injunction.

---

[16] Publishers have also referred Anthropic to the publicly available database maintained by the Mechanical Licensing Collective, which includes the same information.

15

Dated: February 14, 2024

Steven A. Riley (No. 6258)
Tim Harvey (No. 21509)
Grace Peck (No. 38558)
RILEY & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
Telephone: (615) 320-3700
sriley@rjfirm.com
tharvey@rjfirm.com
gpeck@rjfirm.com

Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
COWAN, LIEBOWITZ & LATMAN, P.C.
114 West 47th Street
New York, NY 10036-1525
Telephone: 212-790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

Respectfully submitted,

/s/ Timothy Chung
Timothy Chung
Jennifer Pariser
Andrew Guerra
(admitted *pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
tchung@oandzlaw.com
jpariser@oandzlaw.com
andrew@oandzlaw.com

Matthew J. Oppenheim
Nicholas C. Hailey
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2024, I authorized the electronic filing of a true and exact copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent notice of such filing to the following:

Aubrey B. Harwell III (No. 017394)
Nathan C. Sanders (No. 33520)
Olivia R. Arboneaux (No. 40225)
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
tharwell@nealharwell.com
nsanders@nealharwell.com
oarboneaux@nealharwell.com

Joseph R. Wetzel
Andrew M. Gass
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
joe.wetzel@lw.com
andrew.gass@lw.com

Allison L. Stillman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
alli.stillman@lw.com

Sarang V. Damle
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
sy.damle@lw.com

Kevin C. Klein
KLEIN SOLOMON MILLS, PLLC
1322 4th Avenue North
Nashville, TN 37208
kevin.klein@kleinpllc.com

Eric P. Tuttle
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104
eric.tuttle@wsgr.com

Nicole Saad Bembridge
NETCHOICE, LLC
1401 K St. NW, Suite 502
Washington, DC 20005
nsaadbembridge@netchoice.org

/s/ Timothy Chung
Timothy Chung