# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., | Case No. 3:23-cv-01092 |
| Plaintiffs, | |
| v. | Chief Judge Waverly D. Crenshaw, Jr. |
| ANTHROPIC PBC, | Magistrate Judge Alistair Newbern |
| Defendant. | |

**BRIEF OF THE RECORDING INDUSTRY ASSOCIATION OF AMERICA, NATIONAL MUSIC PUBLISHERS' ASSOCIATION, THE ASSOCIATION OF AMERICAN PUBLISHERS, INC., NEWS/MEDIA ALLIANCE, SONGWRITERS OF NORTH AMERICA, BLACK MUSIC ACTION COALITION, MUSIC ARTISTS COALITION, ARTIST RIGHTS ALLIANCE, AND AMERICAN ASSOCIATION OF INDEPENDENT MUSIC AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. ii

INTERESTS OF *AMICI CURIAE* .................................................................................1

PRELIMINARY STATEMENT ........................................................................................5

ARGUMENT .......................................................................................................................6

    I.     ACCEPTING AI TECHNOLOGY'S BENEFITS DOES NOT
          REQUIRE ABANDONING COPYRIGHT LAW PRINCIPLES....................................6

    II.    A PRELIMINARY INJUNCTION AGAINST ANTHROPIC IS
         APPROPRIATE...............................................................................................11

         A.    The Motion Entails Applying Well-Established Copyright
              Principles to Admitted Facts ..................................................................11

         B.    Anthropic Cannot Plausibly Claim Harm from the Limited
              Injunction Publishers Seek......................................................................15

         C.    An Injunction Need Not Await Decisions In Other AI Cases .............................17

         D.    The Public Interest Is Best Served By Granting Publishers'
              Motion......................................................................................................17

CONCLUSION...................................................................................................................18

**<u>TABLE OF AUTHORITIES</u>**

<u>PAGE(s)</u>

**<u>CASES</u>**

*A&M Recs., Inc. v. Napster, Inc.*,
114 F. Supp. 2d 896 (N.D. Cal. 2000), *affirmed in part, reversed in part, and
remanded for modification of injunction by* 239 F.3d 1004 (9th Cir. 2001) ..........................10

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ...........................................................................................14

*Aaron v. O'Connor*,
914 F.3d 1010 (6th Cir. 2019) ...........................................................................................17

*Andersen v. Stability AI Ltd.*,
3:23-cv-00201 (N.D. Cal. Apr. 18, 2023)...........................................................................17

*Anderson v. TOL, Inc.*,
927 F. Supp. 2d 475 (M.D. Tenn. 2013).............................................................................8

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
143 S. Ct. 1258 (2023)..........................................................................................10, 13, 15

*Associated Press v. Meltwater U.S. Holdings, Inc*.,
931 F. Supp. 2d 537 (S.D.N.Y. 2013).................................................................................14

*Basic Books, Inc. v. Kinko's Graphics Corp*.,
758 F. Supp. 1522 (S.D.N.Y. 1991)..........................................................................7, 10, 11

*Cadence Design Sys., Inc. v. Avant! Corp.*,
125 F.3d 824 (9th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998)...........................................9

*Cook v. Meta Platforms Inc.*,
No. 4:22-CV-02485-YGR, 2023 WL 6370891 (N.D. Cal. Jan. 4, 2023) ...............................13

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2803 (2021).....................................14

*Getty Images (US), Inc. v. Stability AI, Ltd. et al.*,
23-cv-135 (D. Del. May 2, 2023) .......................................................................................17

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)..........................................................................................................6, 13

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ........................................................9

*Kadrey et al. v. Meta Platforms, Inc.*,
    3:23-cv-03417 (N.D. Cal. Sept. 18, 2023) ..............................................................17

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    No. 04-480, 2005 WL 508120 (U.S.), (Mar. 1, 2005) ........................................................10

*MGM Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ................................................................11

*Silverman et al. v. OpenAI, Inc. et al.*,
    3:23-cv-03416 (N.D. Cal. Aug. 28, 2023) ..............................................................17

*Stross v. Meta Platforms, Inc.*,
    No. 2:21-CV-08023-MCS-AS, 2022 WL 1843129 (C.D. Cal. Apr. 6, 2022) ........................12

*Tremblay et al. v. OpenAI, Inc. et al.*,
    3:23-cv-03223 (N.D. Cal. Aug. 28, 2023) ..............................................................17

## OTHER AUTHORITIES

Exec. Order No. 14110 on Safe, Secure, and Trustworthy Development and Use of
    Artificial Intelligence (Oct. 30, 2023),
    https://www.whitehouse.gov/briefing-room/presidential-actions/2023/10/30/
    executive- order-on-the-safe-secure-and-trustworthy-development-and-use-of-
    artificial-intelligence/ ................................................................7

## WEBSITES

*About*, FAIRLY TRAINED, https://www.fairlytrained.org/about ........................................................7

*Adobe Firefly*, ADOBE, https://www.adobe.com/products/firefly.html ........................................................7

*AI Risk*, CENTER FOR AI SAFETY, https://www.safe.ai/statement-on-ai-risk ........................................................7

*Alphabet A (Ex Google)*, MARKETS INSIDER,
    https://markets.businessinsider.com/stocks/googl-stock (last visited Feb. 6, 2024) ................9

*Amazon and Anthropic announce strategic collaboration to advance generative AI,*
    AMAZON (Sept. 25, 2023),
    https://www.aboutamazon.com/news/company-news/amazon-aws-anthropic-ai ....................9

*Amazon*, MARKETS INSIDER,
    https://markets.businessinsider.com/stocks/amzn-stock (last visited Feb. 6, 2024) ................9

*Anthropic Reportedly In Talks To Raise $750M At $18B-Plus Valuation,* CRUNCHBASE
    NEWS (Dec. 21, 2023),
    *https*://news.crunchbase.com/ai/unicorn-anthropic-funding-menlo-goog-amzn/ .............10, 16

*Apple Music strikes new multiyear deals with major record labels*, FINANCIAL TIMES
    (Mar. 12, 2020),
    https://www.ft.com/content/2b57fc8c-ef3b-40f5-83a5-2373ff203bfb .....................................8

*Association Members*, NETCHOICE, https://netchoice.org/about/#association-members; ...............9

Berber Jin, Miles Kruppa, *Google Commits $2 Billion in Funding to AI Startup
    Anthropic*, WALL STREET JOURNAL (Oct. 27, 2023),
    https://www.wsj.com/tech/ai/google-commits-2-billion-in-funding-to-ai-startup-
    anthropic-db4d4c50 .................................................................................................................16

*Generative AI*, NVIDIA (Mar. 21, 2023)
    https://blogs.nvidia.com/blog/generative-ai-getty-images/........................................................7

*Google Invests In Anthropic For $2 Billion As AI Race Heats Up*, FORBES (Oct.
    31, 2023), https://www.forbes.com/sites/qai/2023/10/31/google-invests-in-
    anthropic-for-2-billion-as-ai-race-heats-up/ ...........................................................................9

*Introducing Claude*, ANTHROPIC (Mar. 14, 2023),
    https://www.anthropic.com/news/introducing-claude ............................................................14

Jeff Goodell, *Steve Jobs: Rolling Stone's 2003 Interview*, ROLLING STONE (Oct. 6,
    2011), https://www.rollingstone.com/culture/culture-news/steve-jobs-rolling-
    stones-2003-interview-243284/ .............................................................................................11

Matt O'Brien, *ChatGPT-maker OpenAI signs deal with AP to license news stories*,
    THE ASSOCIATED PRESS (July 13, 2013),
    https://www.ap.org/ap-in-the-news/2023/chatgpt-maker-openai-signs-deal-with-
    ap-to-license-news-stories...........................................................................................................8

*Meet Claude*, ANTHROPIC, https://www.anthropic.com/product ..................................................14

*Moving Pictures: NVIDIA, Getty Images Collaborate on Generative AI*,
    NVIDIA (Mar. 21, 2023)
    https://blogs.nvidia.com/blog/generative-ai-getty-images/........................................................7

*Music in the Air*, GOLDMAN SACHS (June 13, 2022),
    https://www.goldmansachs.com/intelligence/pages/gs-research/music-in-the-
    air/report.pdf ...............................................................................................................................8

*Music Rights Management on YouTube*, YOUTUBE,
    https://support.google.com/youtube/answer/7071269 (last visited Feb. 6, 2024) ....................8

iv

*MusicXMatch for Publishers*, MUSICXMATCH,
    https://about.musixmatch.com/business/overview; ...................................................................8

*Partners*, CHAMBER OF PROGRESS, https://progresschamber.org/partners/ ....................................9

*Publishing With LyricFind*, LYRICFIND, https://www.lyricfind.com/publishing ...........................8

Robert Stoner et al., IIPA, *Copyright Industries in the U.S. Economy, 2022 Report*, IIPA,
    https://www.iipa.org/files/uploads/2022/12/IIPA-Report-2022_Interactive_12-12-
    2022-1.pdf...................................................................................................................................18

SHUTTERSTOCK, *Shutterstock Expands Partnership with OpenAI, Signs New Six-
    Year Agreement to Provide High-Quality Training Data* (July 11, 2023),
    https://investor.shutterstock.com/news-releases/news-release-
    details/shutterstock-expands-partnership-openai-signs-new-six-year;.....................................8

Tim Ingham, *Spotify and Warner Music Group Agree New Global Licensing Deal*,
    MUSIC BUSINESS WORLDWIDE (Apr. 1, 2020),
    https://www.musicbusinessworldwide.com/spotify-and-warner-music-group-
    agree-new-global-licensing-deal/..............................................................................................8

Tom Dotan, Berber Jin, Deepa Seetharaman, *Amazon to Invest Up to $4 Billion in
    Anthropic as AI Arms Race Escalates*, WALL STREET JOURNAL (Sept. 25, 2023),
    https://www.wsj.com/business/deals/amazon-to-invest-up-to-4-billion-in-anthropic-
    as-ai-arms-race-escalates-649dee22 .......................................................................................16

v

# INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* submitting this memorandum are trade groups representing owners and authors of some of this country's most valuable creative content.

RIAA is a nonprofit trade organization that supports and promotes the creative and financial vitality of recorded music and the people and companies that create it. RIAA's several hundred members – ranging from major American music companies with global reach to artist-owned labels and small businesses – make up this country's most vibrant and innovative music community. RIAA's members create, manufacture, and/or distribute sound recordings representing the majority of all legitimate recorded music consumption in the U.S., and own the copyrights and/or other exclusive rights in sound recordings embodying the performances of some of the most popular and successful recording artists of all time. RIAA has been actively involved in representing the interests of its members as they relate to artificial intelligence ("AI") issues, including by recently submitting comments to the U.S. Copyright Office on such issues.

NMPA is the principal trade association representing the U.S. music publishing and songwriting industry. NMPA's membership includes "major" music publishers affiliated with large entertainment companies as well as independently owned and operated publishers of all sizes representing musical works of all genres. Taken together, compositions owned or controlled by NMPA's hundreds of members account for the vast majority of musical compositions licensed for commercial use in the U.S. NMPA has been actively engaged in the conversation around

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person other than *amici,* their members, or their counsel made any monetary contribution intended to fund the preparation or submission of this brief. Certain of the plaintiff music publishers in this lawsuit are among the members (or affiliates of such members) of *amici* the National Music Publishers' Association ("NMPA") and the Recording Industry Association of America ("RIAA"), each of whom also represents the interests of hundreds of other companies in the music industry.

generative AI and its relationship with, and impact on, the creative economy. It is a founding member of the Human Artistry Campaign, and has participated in numerous panels, roundtables and other industry discussions, and submitted comments to the Copyright Office on AI and copyright.

The Association of American Publishers, Inc. ("AAP") represents book, journal, and education publishers in the U.S. on matters of law and policy, including major commercial houses, small and independent houses, and university presses and other noncommercial scholarly publishers. AAP seeks to promote an effective and enforceable framework that enables publishers to create and disseminate a wide array of original works of authorship to the public on behalf of their authors. AAP members support and embrace innovation, including responsibly designed AI tools that are accountable, transparent, and respect copyright protections. The works AAP members publish are especially valuable to training generative AI systems, including because they provide high quality expression that results in commercially valuable, expressive output. AAP has been actively involved in representing the interests of its members as they relate to AI issues, and recently submitted comments to the Copyright Office on such issues.

The News/Media Alliance represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to papers who have printed news since before the Constitutional Convention. Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties. The Alliance diligently advocates for newspapers, magazine, and digital publishers, and like the other *amici*, has been active on AI issues, including publishing a White Paper documenting systemic uses of media content in generative AI training, participating in the

2

U.S. Senate's AI Insight Forum, leading the development of publisher AI principles, and submitting comments to the Copyright Office on AI and copyright.

Songwriters of North America ("SONA") is a membership-based advocacy organization formed by and for professional songwriters in 2015. SONA advocates on behalf of songwriters' interests before legislative bodies, administrative agencies, and the courts. SONA is an open and diverse community that unites enthusiastic music creators and thoughtful business leaders to create a unified voice to protect artistic expression, compensation, and the rights of songwriters in North America. Regarding AI, SONA represented its members by participating in the recent U.S. Copyright Office Listening Sessions and submitting comments for the Office's recent Notice of Inquiry on AI, and is an active member of the Human Artistry Campaign. SONA continues to advocate for and educate songwriters about AI developments as they relate to songwriters' rights.

Black Music Action Coalition ("BMAC") works to create a unified force of action for racial equity and justice within the music industry and to use the power of its collective voice to improve communities and drive systemic change. BMAC advocates on behalf of Black artists, songwriters, producers, managers, agents, executives, and lawyers to create access, equity and opportunity for Black artists and industry professionals. BMAC works together with business leaders to hold companies accountable and ensure change takes root. BMAC works to drive policy change around social and racial justice and protection of artists with a focus on causes that directly impact Black people and Black communities. Regarding AI, BMAC advocates on behalf of a network of music managers, entertainment attorneys, and Black creatives, and is a member of the Human Artistry Campaign. It also participated in drafting comments on the U.S. Copyright Office's recent Notice of Inquiry on AI and participated in that Office's Informational Sessions. In its ongoing fight for economic justice, AI is at the forefront of BMAC's agenda.

The Music Artists Coalition ("MAC") was founded by music creators and industry leaders to advocate on pressing topics that impact music creators. MAC represents artists' and songwriters' interests without compromise because music creators should be driving the conversation about the issues that shape their lives. MAC believes artists should have the opportunity to decide how to best protect the fate of their music, their rights and their fans, and that the advancement of AI can be a benefit to music creators and music lovers, but only if properly regulated so that artists' interests are protected.

The Artist Rights Alliance ("ARA") is an artist-run, non-profit organization fighting for the rights of working musicians in the modern music economy. Co-founded by a group of dedicated artists including GRAMMY winner Rosanne Cash, ARA's Board of Directors includes award-winning producer/songwriter/engineer Ivan Barias, music manager Thomas Manzi, John McCrea of CAKE, critically-acclaimed singer/songwriter Tift Merritt, world guitar innovator Matthew Montfort, and Indie label executive and musician Maggie Vail.

The American Association of Independent Music ("A2IM") is a 501(c)(6) not-for-profit trade organization headquartered in New York City that exists to support and strengthen the independent recorded music sector and the value of recorded music copyrights. Membership currently includes a broad coalition of hundreds of independently owned American music labels. A2IM represents these independently owned small and medium-sized enterprises' interests in the marketplace, in the media, on Capitol Hill, and as part of the global music community. In doing so, it supports a key segment of America's creative class that represents America's diverse musical and cultural heritage. Billboard Magazine identified the independent music label sector as over 40% of the music industry's global recorded music revenue in 2020 based on copyright ownership.

4

## PRELIMINARY STATEMENT

Anthropic and putative *amici*, the Chamber of Progress and NetChoice, LLC (together, "COP") pretend that technological progress demands the abandonment of well-settled copyright law principles. It does not. AI can both reach its full potential and respect the rights of creators at the same time. The arguments that no one in the AI field, including Anthropic, can or should have to license copyrighted works before copying and exploiting them, are pretense. Many of Anthropic's competitors are obtaining licenses for copyrighted content in connection with their AI products, and technology companies routinely license copyrighted works on a mass scale in similar contexts. Others who in their heyday used new technology to engage in massive infringement made similar justifications, which failed in court. Anthropic's excuses should fare no better.

The copyright principles at issue are also far from novel. Rather, they are well established and can readily be applied at this stage to the admitted facts in this case. This Court need not wait for determinations in other cases, pending in other jurisdictions, involving other conduct by other defendants, to grant the preliminary injunction requested by plaintiff publishers ("Publishers") in their motion (the "Motion").

Anthropic and COP argue that granting the Motion will spell doom for the AI industry, to the public's detriment. It will not. The scope of the relief sought by Publishers is quite narrow. With respect to Anthropic's conceded copying of Publishers' lyrics in training its model (which Anthropic states constitute "a minimal fraction of [its] training data"[2]), Publishers seek only a prospective injunction preventing such copying from occurring in future training. And, with respect to the copying of Publishers' lyrics in Anthropic's responses to user queries, Publishers

---

[2] (Defendant Anthropic PBC's Opposition to Plaintiffs' Motion for Preliminary Injunction ("Def. Br.") at 6.)

seek guardrails Anthropic admits it can implement. (*Id.* at 8, 13.) The relief the Motion seeks, if granted, will not cause any colorable harm to Anthropic, let alone to the field of AI more generally. To the contrary, allowing Anthropic's infringement to continue unabated will harm content owners such as those represented by *Amici*, and their licensees, and encourage others to similarly infringe.

## ARGUMENT

### I. ACCEPTING AI TECHNOLOGY'S BENEFITS DOES NOT REQUIRE ABANDONING COPYRIGHT LAW PRINCIPLES.

Copyright law, "the engine of free expression," incentivizes and advances individual creativity and the public interest in the creation and distribution of new expressive works. *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985). To do so, the Copyright Act requires that those who wish to use such works obtain necessary authorizations, usually in the form of licenses that compensate the author or owner, prior to exploiting the works.

These principles have coexisted with technological progress for well over a hundred years. However, Anthropic and COP now contend that Anthropic's product, which concededly copies protected works on a mass scale, should be exempt from complying with copyright law. (Def. Br. at 28 (arguing it would "subvert the public interest by hampering access" to AI.) The majority of COP's brief is devoted to a parade-of-horribles-type argument: identifying various benefits of AI technology that it suggests an injunction against Anthropic may threaten. (Putative *Amici Curiae* Brief of Chamber of Progress and NetChoice, LLC, ECF Doc. 75-1 ("COP Br.") at 3-10.)

These arguments are transparently a scare tactic. The Motion (and this case) is not a referendum on all of generative AI. The Motion concerns only the particular acts – the unlicensed reproduction and display of lyrics to musical compositions – of one party, Anthropic. Anthropic and COP never explain, for example, how enjoining Anthropic from copying the lyrics to Don

6

McLean's "American Pie" will hamper the development of technology that someday may help mitigate climate change or bring about a medical breakthrough. (*See id.*) Nor do they ever claim that Anthropic itself is positioned to provide such benefits. Conversely, Anthropic and COP also ignore the many documented harms and dangers of the technology they champion.[3]

Anthropic also argues that it need not obtain copyright licenses because it is too difficult to do so. (Def. Br. at 6-7, 26.) But that is not a defense to copyright infringement. *See, e.g.*, *Basic Books, Inc. v. Kinko's Graphics Corp*., 758 F. Supp. 1522, 1535 (S.D.N.Y. 1991) (rejecting "fair use by reason of necessity" argument that requiring licenses to reproduce excerpts of books in course packs would "halt the educational process"). The argument also ignores that many of Anthropic's competitors ***are*** obtaining licenses for copyrighted content in connection with their AI products. For example, Adobe has stated a commitment to training its Firefly AI model solely on licensed and public domain content.[4] NVIDIA has partnered with Getty Images to develop fully licensed generative AI models.[5] A program has been started to certify generative AI models that do not use unlicensed copyrighted works.[6] Even OpenAI, while seemingly having trained on

---

[3] Anthropic's declarant Mr. Kaplan has stated publicly that AI threatens humanity's very "extinction." *Statement on AI Risk*, CENTER FOR AI SAFETY, https://www.safe.ai/statement-on-ai-risk. *See also* Exec. Order No. 14110 on Safe, Secure, and Trustworthy Development and Use of Artificial Intelligence (Oct. 30, 2023), https://www.whitehouse.gov/briefing-room/presidential-actions/2023/10/30/executive-order-on-the-safe-secure-and-trustworthy-development-and-use-of-artificial-intelligence/ (AI may "exacerbate societal harms such as fraud, discrimination, bias, and disinformation; displace and disempower workers; stifle competition; and pose risks to national security.").

[4] *Adobe Firefly*, ADOBE, https://www.adobe.com/products/firefly.html.

[5] *Moving Pictures: NVIDIA, Getty Images Collaborate on Generative AI*, NVIDIA (Mar. 21, 2023) https://blogs.nvidia.com/blog/generative-ai-getty-images/.

[6] *About*, FAIRLY TRAINED, https://www.fairlytrained.org/about.

some unlicensed data (as indicated in the recent New York Times lawsuit), has nonetheless entered into licensing deals with Shutterstock and the Associated Press.[7]

These examples belie Anthropic's claim that its purported need to copy millions of works renders compliance impossible. So too does technology companies' licensing of copyrighted works in similar contexts. In music streaming, on-demand services including Spotify and Apple Music have negotiated and licensed tens of millions of sound recordings.[8] Audiovisual services such as YouTube, and fitness services like Peloton, have licensed millions of recordings and songs.[9] Lyrics services have likewise licensed the lyrics to millions of songs – the very same works that Anthropic used but chose not to license – a fact admitted by Anthropic's own witness. (Declaration of Dawn R. Hall, ECF Doc. 67-17 ("Hall Decl."), ¶ 41.)[10]

Anthropic's refusal to comply with copyright law is thus not representative of many of its competitors' practices. And compelling Anthropic to cease infringing Publishers' copyrights on a

---

[7] Press Release, SHUTTERSTOCK, *Shutterstock Expands Partnership with OpenAI, Signs New Six-Year Agreement to Provide High-Quality Training Data* (July 11, 2023), https://investor.shutterstock.com/news-releases/news-release-details/shutterstock-expands-partnership-openai-signs-new-six-year; Matt O'Brien, *ChatGPT-maker OpenAI signs deal with AP to license news stories*, THE ASSOCIATED PRESS (July 13, 2013), https://www.ap.org/ap-in-the-news/2023/chatgpt-maker-openai-signs-deal-with-ap-to-license-news-stories.

[8] *See, e.g.*, Tim Ingham, *Spotify and Warner Music Group Agree New Global Licensing Deal,* MUSIC BUSINESS WORLDWIDE (Apr. 1, 2020), https://www.musicbusinessworldwide.com/spotify-and-warner-music-group-agree-new-global-licensing-deal/; *Apple Music strikes new multiyear deals with major record labels*, FINANCIAL TIMES (Mar. 12, 2020), https://www.ft.com/content/2b57fc8c-ef3b-40f5-83a5-2373ff203bfb.

[9] *Music Rights Management on YouTube*, YouTube, https://support.google.com/youtube/answer/7071269 (last visited Feb. 6, 2024); *Music in the Air*, GOLDMAN SACHS (June 13, 2022), at 32, https://www.goldmansachs.com/intelligence/pages/gs-research/music-in-the-air/report.pdf.

[10] *See also MusicXMatch for Publishers*, MUSICXMATCH, https://about.musixmatch.com/business/overview; *Publishing With LyricFind*, LYRICFIND, https://www.lyricfind.com/publishing.

8

going-forward basis does not threaten Anthropic's non-infringing competitors. To the contrary, an injunction will help level the playing field for Anthropic's competitors that are paying for content that Anthropic takes for free.

Anthropic admits it is concerned that by having to pay to use copyrighted content, it may lose the competitive "advantage" it currently enjoys. (Hall Decl. ¶ 68.) Of course, courts routinely reject the argument that a defendant should be allowed to continue infringing because ceasing its illegal practices would harm its business interests. *See, e.g.*, *Anderson v. TOL, Inc.*, 927 F. Supp. 2d 475, 488 (M.D. Tenn. 2013) (harm flowing from being ordered to cease infringing is "self-inflicted" and "does not weigh against issuance of an injunction"); *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).

And to be clear, Anthropic and similar generative AI developers are not struggling "start-ups," but highly capitalized ventures funded by some of the largest technology companies in the world. Anthropic is funded by Google and Amazon – two trillion-dollar companies that are themselves significant players in the AI space.[11] Anthropic itself is valued in the tens of billions

---

[11] *Amazon and Anthropic announce strategic collaboration to advance generative AI,* AMAZON (Sept. 25, 2023), https://www.aboutamazon.com/news/company-news/amazon-aws-anthropic-ai; *Google Invests In Anthropic For $2 Billion As AI Race Heats Up*, FORBES (Oct. 31, 2023), https://www.forbes.com/sites/qai/2023/10/31/google-invests-in-anthropic-for-2-billion-as-ai-race-heats-up/; *Alphabet A (Ex Google)*, MARKETS INSIDER, https://markets.businessinsider.com/stocks/googl-stock (last visited Feb. 6, 2024); *Amazon*, MARKETS INSIDER, https://markets.businessinsider.com/stocks/amzn-stock (last visited Feb. 6, 2024).

Chamber of Progress and Net Choice are themselves also funded by Google and Amazon. *Association Members*, NETCHOICE, https://netchoice.org/about/#association-members; *Partners*, CHAMBER OF PROGRESS, https://progresschamber.org/partners/.

of dollars.[12] There is no public policy reason to create legal immunities for such companies. *Cf. Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith* ("*Warhol*"), 143 S. Ct. 1258, 1286 (2023) ("It will not impoverish our world to require AWF to pay Goldsmith a fraction of the proceeds from its reuse of her copyrighted work.").

Copyright and creative expression are not obstacles to innovation. In fact, copyright is responsible for incentivizing creative expression to society's great benefit, and serving as a key driver for the American culture and economy. The false choice that Anthropic and COP present between compliance with copyright law and technological progress is a well-worn, losing policy argument previously made by other mass infringers such as Napster and Grokster. *See* Opposition of Defendant Napster, Inc. to Plaintiffs' Motion for Preliminary Injunction in *A&M Recs., Inc. v. Napster, Inc*., Nos. C 99-5183 MHP (ADR), C 00-0074 MHP (ADR), 2000 WL 34016494 (N.D. Cal. July 26, 2000) (contending that "Napster's one-to-one file sharing and Internet directory service has ignited a revolution" and that "extend[ing] judicially copyright protection [would] stifle a new technology"); Brief for Respondents in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, No. 04-480, 2005 WL 508120 (U.S.), at *8 (Mar. 1, 2005) ("[P]eer-to-peer file-sharing software has obvious benefits…. Condemning its distribution as unlawful … would cause real social harm.") (internal citation omitted); *Basic Books*, 758 F. Supp. at 1535 (Kinko's arguing that an "injunction against the educational photocopying at issue would pose a serious threat to teaching and the welfare of education"). The courts (including the Supreme Court) rejected those arguments, and the district court in *Napster* granted a preliminary injunction to plaintiffs. *A&M*

---

[12] Marlize van Romburgh, *Anthropic Reportedly In Talks To Raise $750M At $18B-Plus Valuation,* CRUNCHBASE NEWS (Dec. 21, 2023), https://news.crunchbase.com/ai/unicorn-anthropic-funding-menlo-goog-amzn/ ("Romburgh").

*Recs., Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 911-25 (N.D. Cal. 2000), *affirmed in part, reversed in part, and remanded for modification of injunction by* 239 F.3d 1004 (9th Cir. 2001); *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005); *Basic Books*, 758 F. Supp. at 1535. Prohibiting these illegal practices also helped responsible, licensed business models – such as the Apple's iTunes store, which paid for the content it offered – to grow and flourish.[13]

## II.   A PRELIMINARY INJUNCTION AGAINST ANTHROPIC IS APPROPRIATE

Anthropic and COP seek to delay a determination on the merits in the hope that Anthropic's infringing AI model may become more entrenched and widespread, to the detriment of copyright owners and their licensees. *Amici* and their members have a significant interest in this Court applying well-settled copyright principles to undisputed facts on this Motion, particularly where infringement being engaged in is on a mass scale.

### A.   The Motion Entails Applying Well-Established Copyright Principles to Admitted Facts.

Anthropic's and COP's requests that the Court defer any merits ruling until after discovery (or longer) (Def. Br. at 20-21; COP Br. at 10-14) ignore that Anthropic has admitted the facts that are fundamental to the Motion. It admits that its AI platform is capable of generating reproductions or derivative works of copyrighted material, and that its platform did so in the case of Publishers' lyrics. (*See* Def. Br. at 7.) It does not deny that it also trained its AI model on Publishers' lyrics. (Declaration of Jared Kaplan, ECF No. 67-1 ("Kaplan Decl."), ¶ 21 (acknowledging Anthropic

---

[13] Jeff Goodell, *Steve Jobs: Rolling Stone's 2003 Interview*, Rolling Stone (Oct. 6, 2011), https://www.rollingstone.com/culture/culture-news/steve-jobs-rolling-stones-2003-interview-243284/ (quoting Steve Jobs: "If copyright dies, if patents die, if the protection of intellectual property is eroded, then people will stop investing. That hurts everyone. . . . It is corrosive to one's character to steal. We want to provide a legal alternative.").

11

may have done so via, *inter alia*, the Common Crawl dataset).)[14] And, it does not claim to have obtained a single license to undertake any copying.

Anthropic's claim that its model does not "store" copyrighted works is a red herring. (*See* Def. Br. at 6, 15-16.) Plaintiffs need not demonstrate storage in order to prevail on claims of copying and distribution. And the accuracy of that representation is doubtful: if Claude does not "store" the lyrics to "American Pie," for example, it would not be able to reproduce the lyrics to that song in response to the query, "Write me a song about the death of Buddy Holly." (Complaint ¶ 73.)

Anthropic's other asserted defenses are also meritless. Its argument that it is not a direct infringer because it supposedly has not engaged in volitional acts – an attempt to shift blame to its users – is unsupported by the facts and the law. Anthropic admits that it trained its AI models, not its users or another third party. (*See, e.g.*, Kaplan Decl. ¶ 21.)[15] As to Claude's infringing outputs, the courts have rejected the argument that volition requires "[some]one at Anthropic" tot have prompted such outputs. (*See* Def. Br. at 15.) A company whose technology plays an active role in infringing, such as designing an algorithm that selects copyrighted works for copying, is directly liable just as if its flesh-and-blood employees performed the actions of the algorithm. *Stross v. Meta Platforms, Inc.*, No. 2:21-CV-08023-MCS-AS, 2022 WL 1843129, at *3 (C.D. Cal. Apr. 6,

---

[14] Notably, Anthropic does not offer any theory for how its large language model (LLM), Claude, is able to include Publishers' lyrics in its output other than by having previously been trained on those lyrics.

[15] Anthropic claims that the "mix" of content on which it has trained Claude is ***"proprietary" to it***. (Kaplan Decl. ¶ 22.) Not only is it audacious for Anthropic to claim a proprietary interest in content it argues the content's own creators have no right to protect, but its claim to an interest in its selection further demonstrates volitional conduct and an ability to cease training on particular content.

2022) ("There is no basis in the law to conclude that active management of a website, which would constitute volitional conduct if performed by a human, fails to meet that element because an algorithm designed by a human engineer manages the website instead."); *see also Cook v. Meta Platforms Inc.*, No. 4:22-CV-02485-YGR, 2023 WL 6370891, at *4-5 (N.D. Cal. Jan. 4, 2023).

Anthropic's analogy to digital video recorders is also inapt. (*See* Def. Br. at 14-15.) Anthropic is not merely providing a physical product that, like a digital video recorder or photocopier, enables copying of a work that its customers supply. Rather, it controls the service that it offers, including its outputs. It directly copies protected works in the first instance (by using them as training materials and incorporating them into its model), before any interactions with users, and then reproduces and displays those works and derivatives thereof in response to written user prompts. In fact, some of those prompts do not even identify the work that Claude nonetheless reproduces in its output. (*See* Complaint, ECF. No. 1, ¶ 73.)

Nor is Anthropic's copying a fair use. With respect to the first fair use factor, Anthropic's use is for a commercial purpose. By copying and displaying lyrics on its own platform (rather than directing users to view the lyrics on licensed third-party sites), Anthropic usurps those lyrics' commercial value to both the licensed third-party sites and to their copyright owners (whose ability to license and royalties from such sites is diminished). *See Harper & Row Publishers*, 471 U.S. at 562 ("The crux of the [first factor's] profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."). Anthropic stands to profit from exploiting the very same lyrics it scrapes from websites that license those lyrics. *See, e.g.*, *Warhol*, 143 S. Ct. at 1274-80 ("[T]he first factor relates to the problem of substitution—copyright's bête

noire. . . . If the secondary use "is of a commercial nature," that "tends to weigh against a finding of fair use.").

Anthropic's use of the lyrics is decidedly not "transformative." (Def. Br. at 23-24.) Anthropic has not transformed the lyrics themselves – it copied them verbatim in training, and copied them again in response to queries. *See, e.g.*, *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 552-61 (S.D.N.Y. 2013) (program that scraped news articles on the web and provided excerpts of same to end users was not transformative nor a fair use); *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 455 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2803 (2021) (defendant's mere "repackaging, copying, and lack of critique of [the plaintiff's copyright works], coupled with its commercial use of [same], do not result in a transformative use"). Nor is converting lyrics scraped or copied from third-party websites into "tokens" and then converting them back into lyrics in response to queries a transformative use. *Napster, Inc.*, 239 F.3d at 1015 ("Courts have been reluctant to find fair use when an original work is merely retransmitted in a different medium").

Nor is Anthropic's purpose in copying "transformative." It copies copyrighted content to provide that content, or derivatives thereof, to its users. It wants to be the destination for getting any type of written content, on demand.[16] "The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or

---

[16] *See Press Release, Introducing Claude*, ANTHROPIC (Mar. 14, 2023), https://www.anthropic.com/news/introducing-claude ("Claude can help with . . . summarization, search, creative and collaborative writing, Q&A, coding, and more."); *Meet Claude*, ANTHROPIC, https://www.anthropic.com/product ("Claude has extensive general knowledge honed from its vast training corpus, with detailed background on technical, scientific, and cultural knowledge.").

14

supplan[t], the work," which "weigh[s] against a finding of fair use." *Warhol*, 143 S. Ct. at 1274, 1280.[17]

The other fair use factors also weigh heavily in favor of Publishers. Their works are expressive and creative (factor two), and they are copied in their entirety by Anthropic in its training and also verbatim or nearly so in Anthropic's output (factor three). Anthropic never explains why it needs to take lyrics in their entirety. As for potential market harm (factor four), whether or not there is yet a licensing market for training large language models specifically (Def. Br. at 26) is irrelevant; Anthropic concedes that the legal standard is whether such a market is likely to be developed (*id*.). And music publishers and songwriters license lyrics sites in exchange for royalties. If lyrics can be obtained from Anthropic, there will be no need for its users to go to those licensed sites, hindering publishers and songwriters' efforts to license their works to those or other sites in the future.

**B. Anthropic Cannot Plausibly Claim Harm from the Limited Injunction Publishers Seek.**

The relief that Publishers have requested is notable in its restraint. Anthropic's arguments about the supposed harms that may result from that request (Def. Br. at 27-28) ring hollow.

As to training, Publishers ask only that Anthropic not "creat[e] or us[e] unauthorized copies of Publishers' lyrics to train ***future*** AI models." (Motion, ECF Doc. 40, at 1-2 (emphasis added).) They are not seeking to enjoin Anthropic from using existing models built on unauthorized copies of Publishers' lyrics. Particularly where Anthropic claims that lyrics are an insignificant portion

---

[17] In this respect, Anthropic's copying of lyrics in training its model would not be fair use even if it did not (as the facts show) result in output that consists of verbatim or near-verbatim copies of lyrics, or derivatives thereof, but rather, new lyrics that compete with the originals. *See id.*

15

of its vast training datasets (Def. Br. at 6), refraining from further training on Publishers' lyrics will not result in harm.[18]

As to output, Publishers ask Anthropic to "implement effective guardrails" to prevent continued reproduction, distribution and display of copies of their lyrics to users. (Motion, ECF Doc. 40, at 1-2.) Anthropic asserts that it has already implemented the requested guardrails with respect to the works in suit, and that it "does not want" copies of lyrics included in its AI models' output anyway. (*Id.*) Anthropic cannot plausibly claim it will be damaged by being ordered to implement and maintain guardrails similar to those it has already adopted, to prevent results it claims are undesirable.[19]

An order requiring Anthropic to implement guardrails is not "moot" either. (*See id.*) Although Anthropic claims to have implemented guardrails with respect to the works in suit, it does not state that it will do so for other lyrics owned by Publishers, and absent a court order, nothing will prevent Anthropic from ceasing to apply the remedy it has crafted for itself. An issue

---

[18] Anthropic's arguments that an injunction would result in "catastrophic cost" to its "product development and competitive standing" (Def. Br. at 27-28) are contradicted by its own economist, who states that Anthropic does not need to copy lyrics because all content is "fungible" and "the contribution of any particular copyright owner's content to the model has no discernable impact on the operation of the model." (Declaration of Steven Peterson, ECF Doc. 67-19, ¶¶ 17, 26.)

[19] Market realities also contradict Anthropic's portrayal of this lawsuit as an existential risk. One week after this case was filed, Google reportedly agreed to invest up to $2 billion in Anthropic, on top of the $4 billion Amazon already committed to invest. In December, Anthropic was engaged in yet another funding round. Over the course of 2023, Anthropic reportedly "more than triple[d] its valuation" to $15 billion in December 2023, the month ***after*** Publishers filed the Motion. Berber Jin, Miles Kruppa, *Google Commits $2 Billion in Funding to AI Startup Anthropic*, WALL STREET JOURNAL (Oct. 27, 2023), https://www.wsj.com/tech/ai/google-commits-2-billion-in-funding-to-ai-startup-anthropic-db4d4c50 ("Jin & Kruppa"); Tom Dotan, Berber Jin, Deepa Seetharaman, *Amazon to Invest Up to $4 Billion in Anthropic as AI Arms Race Escalates*, WALL STREET JOURNAL (Sept. 25, 2023), https://www.wsj.com/business/deals/amazon-to-invest-up-to-4-billion-in-anthropic-as-ai-arms-race-escalates-649dee22; Romburgh.

is not rendered "moot" by claims that a practice "capable of repeating itself" has been discontinued. *See*, *e.g.*, *Aaron v. O'Connor*, 914 F.3d 1010, 1016 (6th Cir. 2019).

### C. An Injunction Need Not Await Decisions In Other AI Cases.

Anthropic and its *amici* point to other AI cases in different jurisdictions by different plaintiffs against different defendants with different facts and different procedural postures to argue that Publishers are not entitled to an injunction. (Def. Br. at 20-21; COP Br. at 13-14.) The Court need not, and should not, await developments in those cases. Nearly all of them have been bogged down in pre-answer motion practice by defendants.[20] There is unlikely to be early determination of the merits in those cases. Moreover, many are class action lawsuits not conducive to preliminary adjudication. And while Anthropic claims the plaintiffs in those class actions "purport[] to represent" Publishers here (Def. Br. at 2), Publishers themselves did not bring those other actions and are not bound by positions taken therein. Whatever the posture of such earlier-filed cases, the issues here are ripe for preliminary adjudication, and what may or may not be an appropriate procedural path and set of remedies in a different case has no bearing on this case.

### D. The Public Interest Is Best Served By Granting Publishers' Motion.

The delay Anthropic seeks would allow it to continue to infringe for months and perhaps years. Such delay may lead to its infringing models becoming ever more entrenched in our society, to the detriment of copyright owners as well as Anthropic's competitors that pay to license the works for their AI platforms. If Anthropic is not enjoined at this stage, it may be too late for AI

---

[20] *Kadrey et al. v. Meta Platforms, Inc.*, 3:23-cv-03417 (N.D. Cal. Sept. 18, 2023), ECF Doc. 23 (motion to dismiss); *Tremblay et al. v. OpenAI, Inc. et al.*, 3:23-cv-03223 (N.D. Cal. Aug. 28, 2023), ECF Doc. 33 (same); *Silverman et al. v. OpenAI, Inc. et al.*, 3:23-cv-03416 (N.D. Cal. Aug. 28, 2023), ECF Doc. 32 (same); *Getty Images (US), Inc. v. Stability AI, Ltd. et al.*, 23-cv-135 (D. Del. May 2, 2023), ECF Doc. 16 (motion to dismiss or transfer); *Andersen v. Stability AI Ltd.*, 3:23-cv-00201 (N.D. Cal. Apr. 18, 2023), ECF Docs. 49-52 (motions to dismiss, strike).

17

models that avoided training on copyrighted works or licensed such uses to "catch up" (indeed, this appears to be Anthropic's admitted strategy).[21]

At the same time, copyright owners such as those represented by *amici* will suffer enormous damage from Anthropic's ongoing infringement. The full extent of such damage is incalculable, but very real. Anthropic's infringement imperils the fundamental manner by which content creators are compensated. By seeking to become the destination where its users can access (unlicensed) copies of copyrighted content, Anthropic unfairly competes with and may well usurp the services that pay copyright owners for the very same right to use protected content, and those operated by copyright owners themselves.

Development of AI cannot come at the cost of harming creators, rightsholders, their licensees, or the public interest in protecting copyright. The total copyright industries contributed nearly $3 trillion to GDP in 2021 and employed over 15 million workers.[22] Protecting copyrights is also a Constitutional mandate, one that incentivizes the creation and licensed dissemination of new works, with immense attendant public benefits. The Copyright Act balances those benefits and the interests of those who seek to develop new technologies and services. Enforcing that Act against Anthropic and similarly situated infringers is necessary to ensure that the owners of copyrighted content do not become casualties of the technology industry's relentless pursuit of profits and so-called "progress."

---

[21] (Hall Decl. ¶ 67 ("particularly [for] AI, the importance of entering the market early is of utmost importance, with all major technology companies clamoring to create a niche for themselves with enhanced products and new product offerings, while the late entrants try to play catch-up.").)

[22] Robert Stoner et al., *Copyright Industries in the U.S. Economy, 2022 Report*, IIPA, at 8, https://www.iipa.org/files/uploads/2022/12/IIPA-Report-2022_Interactive_12-12-2022-1.pdf.

## <u>CONCLUSION</u>

For the foregoing reasons, *amici* respectfully request that the Motion be granted.


Dated: February 14, 2024          Respectfully submitted,


                                   /s/ Lauren Kilgore

Lauren Kilgore

SHACKELFORD, BOWEN, MCKINLEY & NORTON, LLP

1 Music Circle South, Suite 300

Nashville, Tennessee 37203

(615) 329-4440

LKilgore@shackelford.law


Frank P. Scibilia (*pro hac vice* admission pending)

Maya Katalan (*pro hac vice* admission pending)

PRYOR CASHMAN LLP

7 Times Square, 40th Fl.

New York, NY 10036

(212) 421-4100

fscibilia@pryorcashman.com

mkatalan@pryorcashman.com


*Counsel for Amici*

19