# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| CONCORD MUSIC GROUP, INC. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:23-cv-01092 |
| | ) | |
| ANTHROPIC PBC, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

Before the Court is Anthropic PBC's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue or, in the Alternative, to Transfer Venue. (Doc. No. 54). This matter has been fully briefed and is ripe for review. (See Doc. Nos. 55, 79, 89). For the following reasons, Anthropic's Motion will be granted in part, and this case will be transferred to the United States District Court for the Northern District of California.

## I. BACKGROUND[1]

### A. Case Overview

Plaintiffs[2] are eight music publishers who allege that Anthropic, an artificial intelligence ("AI") "safety and research company," improperly used their copyrighted song lyrics to train its signature product—a series of generative AI conversational interface models referred to as "Claude." Claude is a large language model that is "trained" with "vast amounts of text copied

---

[1] The Court draws the following facts from the Complaint (Doc. No. 1) as well as the uncontroverted assertions contained in the exhibits and declarations to the parties' briefs (see Doc. Nos. 55-1; 80–85). See Anwar v. Dow Chem. Co., 876 F.3d 841, 847 (6th Cir. 2017).

[2] Concord Music Group, Inc.; Capitol CMG, Inc.; Universal Music Corp.; Songs of Universal, Inc.; Universal Music - MGB NA LLC; Polygram Publishing, Inc.; Universal Music - Z Tunes LLC; and ABKCO Music, Inc.

from the internet, totaling billions or trillions of words," known as its "training corpus." (Doc. No. 1 ¶¶ 50, 62; see also Doc. No. 55-1 ¶ 17). Claude does not simply regurgitate this information when prompted; rather, it applies complex reasoning and creativity to its training corpus in a way that approximates human cognition. (See Doc. No. 55-1 ¶¶ 11, 13). As a result, users can have open-ended text conversations with Claude, and Claude is "able to provide text-based responses to user queries in a seemingly intelligent, human-like manner." (Id.).

Plaintiffs allege Anthropic used their copyrighted song lyrics to "train" Claude. (Doc. No. 1 ¶ 6; see also Doc. No. 63 at 5). Thus, when a user prompts Claude to provide lyrics to Plaintiffs' copyrighted songs, Claude outputs identical or nearly identical copies of those lyrics. (Doc. No. 1 ¶ 8). Plaintiffs argue that by "copying and exploiting [their] lyrics in this manner—both as the input it uses to train its AI models and as the output those AI models generate—Anthropic directly infringes their exclusive rights as copyright holders." (Id. ¶¶ 11, 111–18). Plaintiffs further contend that Anthropic is secondarily liable for the infringing acts of its users, and for unlawfully removing or altering copyright management information from their musical compositions. (Id. ¶¶ 11, 119–53). Anthropic maintains that its inclusion of copyrighted song lyrics in the training corpus for Claude constitutes "fair use" under 17 U.S.C. § 107, and, therefore, Anthropic is not required to pay for licenses over those lyrics. (See Doc. No. 63 at 5).

On October 18, 2023, Plaintiffs filed this lawsuit in the United States District Court for the Middle District of Tennessee, raising four causes of action under the federal Copyright Act, 17 U.S.C. § 101, et seq.: (1) direct copyright infringement; (2) contributory infringement; (3) vicarious infringement; and (4) removal or alteration of copyright management information.[3]

---

[3] Plaintiffs have also moved for a preliminary injunction under Federal Rule of Civil Procedure 65. (See Doc. No. 40).

### B. Jurisdictional Facts and Allegations

Anthropic is a Delaware company with its principal place of business in San Francisco, California. (Doc. No. 1 ¶¶ 7, 33). Plaintiffs are mostly California, Delaware, or New York companies with their principal place of business in California, except for Concord Music Group, Inc. (a Delaware company with its principal place of business in Tennessee) and ABKCO Music, Inc. (a New York company with its principal place of business in New York). (Id. ¶¶ 21–33).

Claude was created, trained, and developed in California, the computers and data used to train Claude are hosted in Virginia, the servers that host Claude are based in Iowa, and Claude's source code is located remotely with a Delaware company, Github, whose headquarters are in California. (Doc. No. 55-1 ¶¶ 20–22). Moreover, Anthropic's offices in the United States are all located in California, with the vast majority of Anthropic's 261 employees living in and working from California. (Id. ¶¶ 5, 7). Most engineers who work on and train Claude on a day-to-day basis are in California, though there are a few engineers in London, New York, and Seattle. (Id. ¶¶ 9). There are a total of three Anthropic employees who live in Tennessee and work remotely out of their Tennessee homes for California offices. (Id.). Those three employees' job titles are: (1) Head of Product and Head of Business Operations; (2) Recruiter; and (3) Research Engineer. (Id.). Anthropic permits, but does not require, these three employees to work remotely from Tennessee. (Id. ¶ 8).

Claude's expansive training corpus of "more than a trillion" units of data includes some information related to Tennessee. (See Doc. No. 80-6; Doc. No. 55-1 ¶¶ 17, 20). For example, Anthropic's California-based engineers "taught" Claude how to respond to Tennessee-focused queries like: "What are good places to visit in Nashville?" and "How do you make Nashville hot chicken?" (See Doc. No. 80-6 at 5). With that training *input*, Claude can also generate *outputs* regarding Tennessee-specific information.

Anthropic provides access to its Claude AI models in two ways. First, Anthropic's website allows users to "Talk to Claude" through a chatbox, which is available as a limited free version or as a more robust paid version. (Doc. No. 1 ¶ 52). Anthropic's website (located at https://www.anthropic.com/product) and the Claude chatbox (located at https://claude.ai) are available to users globally and throughout the United States, including to users in Tennessee. (Doc. Nos. 80-3, 80-4; see also Doc. No. 55-1 ¶ 24). To access and "talk" to Claude, a user must first create an account on Anthropic's website by providing their email address, full name, phone number, and a login code that Anthropic emails them.[4] (Doc. No. 80-4). The second way Anthropic makes Claude available is by selling or licensing a commercial Application Programming Interface ("API") that allows businesses to incorporate Claude into their own software. (Doc. No. 1 ¶ 52; Doc. No. 80-15). Anthropic allegedly sold API access and licensed Claude to three Tennessee companies. (See Doc. No. 79 at 4–5, 8). Both "Anthropic's Claude website and API are maintained by employees based in California." (Doc. No. 55-1 ¶ 23).

Based on these facts, Anthropic filed the instant motion to dismiss for lack of personal jurisdiction and improper venue. (See Doc. No. 54).

## II.     MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Anthropic moves to dismiss the Complaint for "lack of personal jurisdiction" under Federal Rule of Civil Procedure 12(b)(2). The Court may decide a 12(b)(2) "motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." Malone v. Stanley Black & Decker, Inc., 965 F.3d 499, 505 (6th Cir. 2020) (citation omitted). Where, as here, the Court rules on written submissions alone, the plaintiff bears the "relatively slight" burden of making a prima facie

---

[4] Users must also agree to Anthropic's Terms of Service, which require, among other things, that the *user* agree to "submit to the personal and exclusive jurisdiction of courts in California." (Doc. No. 55-1 ¶ 25).

showing that personal jurisdiction exists.  See id.  In considering whether the plaintiff has satisfied its prima facie burden, the Court may accept as true the: (1) allegations in the Complaint that "are uncontroverted by the defendant-movant," (2) "averments in the plaintiff's declarations (even if contradicted)," and (3) "defendant's undisputed factual assertions."  See Ncontracts LLC. v. Holmberg, 2022 WL 17724148, at *3 (M.D. Tenn. Dec. 15, 2022) (summarizing applicable standards of review).  The Court must view the above-referenced "pleadings and affidavits in a light most favorable to the plaintiff and not weigh the controverting assertions of the party seeking dismissal."  Peters Broad. Eng'g, Inc. v. 24 Cap., LLC, 40 F.4th 432, 437 (6th Cir. 2022) (citation and internal quotation marks omitted).  Dismissal is appropriate only if these facts collectively fail to state a prima facie case for jurisdiction.  See CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1262 (6th Cir. 1996).

Here, because the "court's subject-matter jurisdiction is based on a federal question, the court's exercise of personal jurisdiction must be both authorized by the forum State's long-arm statute and in accordance with the Due Process Clause of the Fourteenth Amendment."  AlixPartners, LLP v. Brewington, 836 F.3d 543, 549–50 (6th Cir. 2016) (citing Bird v. Parsons, 289 F.3d 865, 871 (6th Cir. 2002)).  Tennessee's long-arm statute, Tenn. Code Ann. § 20-2-214, extends its jurisdiction to the limits of the Due Process Clause, so the Court need only determine whether exercising personal jurisdiction would violate Anthropic's due process rights.  See Intera Corp. v. Henderson, 428 F.3d 605, 616 (6th Cir. 2005) (citing Aristech Chem. Int'l v. Acrylic Fabricators, 138 F.3d 624, 627 (6th Cir. 1998)).

Due Process requires the defendant to have sufficient "minimum contacts with [the forum State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (citations

and internal quotation marks omitted). "Minimum contacts" exist when the nonresident's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475–76 (1985). "Personal jurisdiction may be found either generally or specifically," Miller v. AXA Winterthur Ins. Co., 694 F.3d 675, 678 (6th Cir. 2012), but only specific personal jurisdiction is relevant here. (See Doc. No. 79 at 6 n.2 ("Publishers do not assert general jurisdiction.")).

Specific, or limited, jurisdiction exists "only to the extent that a claim arises out of or relates to a defendant's contacts in the forum state." Miller, 694 F.3d at 679 (citing Kerry Steel, Inc. v. Paragon Indus., Inc., 106 F.3d 147, 149 (6th Cir. 1997)). In Southern Machine Co. v. Mohasco Indus., Inc., the Sixth Circuit identified a three-part test to determine whether due process requirements have been met for specific jurisdiction:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

401 F.2d 374, 381 (6th Cir. 1968). "If any of the three requirements is not met, personal jurisdiction may not be invoked." Miller, 694 F.3d at 680. That is, each Mohasco criterion "represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction" does not exist. LAK Inc. v. Deer Creek Enters., 885 F.2d 1293, 1303 (6th Cir. 1989).

With these standards in mind, the Court now turns to the three Mohasco criteria and whether Plaintiffs have met their burden to establish that this Court has specific personal jurisdiction over Anthropic.

## A.    Purposeful Availment and the Effects Test

Before a nonresident defendant may be sued in federal court, the defendant must have purposefully availed itself of the "privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Burger King, 471 U.S. at 475.  Purposeful availment is "something akin to a deliberate undertaking" and exists "when the defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum state, and when the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." Bridgeport Music, Inc. v. Still N The Water Pub., 327 F.3d 472, 478 (6th Cir. 2003) (citation and internal quotation marks omitted).  This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." Burger King, 471 U.S. at 475.

When the case involves an intentional tort (here, copyright infringement), "the focus of the purposeful availment analysis shifts to consider whether the defendant's conduct was 'purposefully directed' or 'expressly aimed' at the forum state." Devnani v. DKM Solutions, Inc., 2017 WL 4682273, at *6 (E.D. Mich. Oct. 18, 2017); see also Bucklew v. Hawkins, Ash, Baptie & Co., LLP, 329 F.3d 923, 931 (7th Cir. 2003) ("Copyright infringement . . . is an intentional tort.").  Thus, copyright infringement claims "are analyzed under an 'updated' version of the 'effects test' first enunciated in Calder v. Jones, 465 U.S. 783 (1984), which considers whether the defendant (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." Devnani, 2017 WL 4682273, at *6; see also Scotts Co. v. Aventis S.A., 145 F. App'x 109, 113 (6th Cir. 2005).  The Court will assume, without deciding, that Plaintiffs have made a prima facie showing that Anthropic committed an intentional act and caused harm to Concord (the only Tennessee

7

Plaintiff) in Tennessee.  See Pearl Records, Inc. v. Conner, 2023 WL 351203 (M.D. Tenn. Jan. 20, 2023) (quoting Yellow Pages Photos, Inc. v. Ziplocal, LP, 2012 WL 2952452, at *5 (M.D. Fla. 2012)) ("The situs of the injury in copyright infringement for purposes of personal jurisdiction, has generally been held to be the state where the copyright owner resides.").  The Court will therefore focus on the second element—whether Anthropic expressly aimed its conduct at Tennessee—because it is dispositive of the analysis.[5]  See Walden v. Fiore, 571 U.S. 277, 290 (2014) ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").

Plaintiffs argue that Anthropic purposefully directed or expressly aimed its conduct at Tennessee because it: (1) conducts business through Tennessee-based employees, (2) maintains contractual relationships with Tennessee businesses, (3) reaches Tennessee users through its highly interactive website, and (4) infringes Plaintiffs' copyrighted works in Tennessee.  (See Doc. No. 79 at 7–14).  As explained below, Plaintiffs have failed to make a prima facie showing of purposeful availment because none of these alleged contacts satisfies the "expressly aimed" prong of the effects test.

### 1.  Remote Employees Working from Tennessee

Plaintiffs claim that Anthropic purposefully availed itself of this District because it maintains three full-time "key" employees in Tennessee.  (Doc. No. 79 at 1, 3–4, 7–8).  Those employees include Thomas Paine (Anthropic's Head of Product and Head of Business Operations), Brian Kustera (a Recruiter), and an unidentified Research Engineer.  (Doc. Nos. 55-

---

[5] The parties mention the effects test in their briefs (see Doc. Nos. 55 at 9–10; 79 at 11), but they do not acknowledge that this test guides the Court's analysis.  As such, the parties sometimes conflate the "purposeful availment" standard for contract-based claims and the "effects test" standard for intentional tort claims.  To avoid confusion and unfair prejudice, the Court will liberally construe the parties' arguments as though made within the appropriate framework.

1 ¶ 7; 80-7; 80-13).  In response, Anthropic submitted a declaration from its co-founder and Chief Science Officer, Jared Kaplan, stating that out of Anthropic's "261 employees, only [these] three live in Tennessee, working their California-based jobs remotely with California-based teams."  (Doc. No. 55 at 3–4 (citing Doc. No. 55-1 ¶ 7); Doc. No. 89 at 1–2).  Anthropic further represents that these three employees "have no responsibility for the training, development, or sales and marketing of Claude or the model's decision-making," and they voluntarily work from their homes rather than "an office paid for or established by Anthropic."  (See Doc. Nos. 55 at 4; 89 at 1–2).

Neither party has cited, and the Court is not aware of, any Supreme Court or Sixth Circuit decision addressing "the question of personal jurisdiction over a nonresident employer of a fully-remote employee."  See Carpenter v. S. Airways Express, 2021 WL 5937749, at *5 (S.D. Ohio Dec. 16, 2021).  "[A]s remote work has become more common, recent [district court] decisions have looked for additional conduct from employers beyond the mere hiring of a remote employee to establish they expressly aimed their activities at the forum."  See Wiseman v. Ravyn Grp., Inc., 2023 WL 8472806, at *3 n.6 (Dec. 7, 2023) (citations omitted).  To this end, the Court finds instructive the multi-factor approach adopted by several sister courts, in which the Court considers "whether (1) the defendant solicited the employment of the plaintiff in the forum state; (2) the plaintiff worked predominantly from within the forum state; (3) the plaintiff was a high-level employee in the defendant's business; (4) the plaintiff signed the employment contract in the forum state; (5) the defendant had knowledge of, and 'facilitated,' the plaintiff's remote employment; and (6) the work the plaintiff performed in the forum state advanced the defendant's business interests in the forum state."  Hall v. Rag-O-Rama, LLC, 359 F. Supp. 3d 499, 511 (E.D. Ky. 2019) (collecting cases).  While these nonexhaustive factors focus on

circumstances involving the *plaintiff* (rather than the defendant's *nonparty* employees, as is the case here), the Court nevertheless finds them helpful to determine whether Anthropic purposefully availed itself of Tennessee through its remote employees.

Analyzing similar considerations here, the Court concludes that Plaintiffs have not met their burden to show Anthropic expressly aimed its activities at Tennessee by allowing three employees to work remotely from their Tennessee homes. To be sure, the Court may reasonably infer that these three employees "worked predominantly from within" Tennessee, and that Anthropic "had knowledge of" their remote employment. See id. at 511. But, unlike in other cases finding purposeful availment, there are no allegations that Anthropic affirmatively recruited these allegedly "key" employees to work in Tennessee, requested or required them to work in Tennessee after hiring them, came to Tennessee to meet with them, or expressly tasked them with establishing or extending Anthropic's business in Tennessee. See Carpenter, 2021 WL 5937749, at *6; see also Senne v. Kan. City Royals Baseball Corp., 105 F. Supp. 3d 981, 1023 (N.D. Cal. 2015). Moreover, there are no allegations regarding *where* these employees signed their employment agreements. Anthropic merely permitted these employees to work from home, and "[a]n agent's decision to work from home in the forum state generally does not bind an entity to personal jurisdiction in that state where the purpose of the arrangement is merely for the agent's personal convenience." See Lucachick v. NDS Americas, Inc., 169 F. Supp. 2d 1103, 1107 (D. Minn. 2001).

Plaintiffs similarly lack support for their contention that Anthropic used Paine and Kustera's physical location to attract employees and advance Anthropic's business in Tennessee. (Doc. No. 79 at 7). For example, Plaintiffs include as an exhibit one of Paine's social media posts, in which he states that "Anthropic is hiring" and encourages interested individuals to

"apply directly" on Anthropic's website. (Doc. No. 80-12). Plaintiffs also cite to several social media posts on LinkedIn and the X platform where Paine discusses Claude and its features, including a post stating he is "[e]xcited and proud to share what the team @AnthropicAI has been working on." (See Doc. No. 79 at 3–4; see also Doc. Nos. 80-8; 80-9; 80-10; 80-11). And Plaintiffs cite to a LinkedIn post by an individual (whose location is unknown) asking whether "anyone in my network [is] able to help me contact folks at Anthropic so I can get API access to Claude," to which Paine responds: "Invite sent!" (Doc. No. 80-11 at 2).

The Court infers that Paine, as the "Interim Head of Product and Head of Business Operations," made these social media posts in his capacity as a high-level employee. But the Court does not find Plaintiffs met their burden to show purposeful availment merely because one high-level Anthropic employee happens to work remotely from Tennessee. Critically, none of Paine's social media posts mention Tennessee, and there is nothing to suggest that Paine's messages were expressly aimed at Tennessee residents. (See id.). Even if some of Paine's social media connections were in Tennessee and saw these posts, that still would not be enough to constitute purposeful availment under Sixth Circuit law. See Blessing v. Chandrasekhar, 988 F.3d 889, 905 (6th Cir. 2021) (holding that defendant's "tweets 'did not create sufficient contacts' with Kentucky 'simply because' the plaintiffs have Kentucky connections"). Thus, the Court cannot conclude, consistent with due process, that Anthropic expressly aimed its conduct at Tennessee merely because a remote (albeit, high-level) employee talked about Claude on social media and sent an "[i]nvite" in response to a general inquiry on LinkedIn.

### 2.    Contracts with Tennessee Businesses

Next, Plaintiffs assert that Anthropic expressly aimed its conduct at Tennessee because it has at least three long-term agreements to provide and license its AI services to Tennessee

businesses. (Doc. No. 79 at 1, 4–5, 8). Plaintiffs' primary support for this argument is the Sixth Circuit's 1998 decision in Cole v. Mileti, 133 F.3d 433 (6th Cir. 1998), which involved an appeal from a Northern District of Ohio order denying defendant's motion to dismiss for lack of personal jurisdiction. The defendant in Cole was a former Ohio resident and longtime business partner of the Ohio plaintiff, and the parties negotiated a surety agreement by means of repeated mail and wire communications. Id. at 435. The final contract was also executed in Ohio. Id. In affirming the district court's judgment, the divided Cole panel held that if "a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio." Id. at 436. In other words, Ohio could exercise personal jurisdiction over the nonresident defendant because the parties' business relationship arose directly out of the defendant's contacts with Ohio. Id.; see also Kobill Airways Ltd. v. Nat'l Flight Servs., Inc., 92 F. Supp. 2d 689, 693 (N.D. Ohio 2000).

Plaintiffs' reliance on Cole is misplaced for several reasons. To begin with, this is a copyright infringement case, not a breach of contract case. Moreover, "courts analyzing personal jurisdiction in the context of a contractual relationship have often distinguished Cole, or cautioned that its holding should not be read outside of the factual context in which it was written." See McMunigal v. Bloch, 2010 WL 2106186, at *9 (N.D. Ohio May 25, 2010) (collecting cases); see also Baker v. Bensalz Prods., Inc., 480 F. Supp. 3d 792, 804 (S.D. Ohio 2020) (noting that "the Sixth Circuit has walked back any such broad reading of Cole"). These courts repeatedly highlight that Cole was a breach of contract action arising out of the parties' extensive ongoing business relationship in Ohio, and it was that unique *pre-existing* business relationship that permitted Ohio to exercise personal jurisdiction over the defendant. See, e.g.,

id.; Condon v. Flying Puck, LLC, 35 F. App'x 173, 174 (6th Cir. 2002); Shaker Const. Grp., LLC v. Schilling, 2008 WL 4346777, at *6 (S.D. Ohio Sept. 18, 2008); Matrix Essentials, Inc. v. Harmon Stores, Inc., 205 F. Supp. 2d 779, 789 (N.D. Ohio 2001). Here, unlike with the defendant in Cole, there is no indication that Anthropic previously resided in Tennessee or had any sort of pre-existing business relationships with any Tennessee businesses that now license Claude.

The Court is more persuaded by the reasoning in Calphalon Corp. v. Rowlette, 228 F.3d 718 (6th Cir. 2000), which "held that the mere fact that a defendant has a contract with a resident of the forum state is insufficient in itself to demonstrate purposeful availment." Oaks v. Largo Bioscience, Inc., 2022 WL 765506, at *7 (M.D. Tenn. Mar. 11, 2022) (citing Calphalon, 228 F.3d at 722–23; see also Baker, 480 F. Supp. 3d at 804 (holding that it is "well settled that the mere existence of a contract with a citizen of a foreign state is not enough to show purposeful availment"). In Calphalon, the nonresident defendant agreed to be the Ohio plaintiff's manufacturer representative in Minnesota, Iowa, South Dakota, North Dakota, and Nebraska. Calphalon, 228 F.3d at 723. The Sixth Circuit found that the parties' contractual relationship was insufficient to confer personal jurisdiction in Ohio because the defendant's contacts with Ohio existed solely because the plaintiff happened to be headquartered there, "not because [the defendant] sought to further its business and create 'continuous and substantial' consequences" in Ohio. Id. Because the defendant arguably "would have served as [plaintiff's] representative in the designated states, regardless of [plaintiff's] base of operation" in Ohio, the defendant's "contacts were precisely the type of random, fortuitous, and attenuated contacts that the purposeful availment requirement is meant to prevent from causing jurisdiction." Id. (internal quotation marks omitted).

13

_Calphalon_ and other cases post-dating _Cole_ make clear that "there is no per se rule that a contractual relationship with an in-state citizen, coupled with interstate communications related to that contract, automatically suffice[s] to render an out-of-state defendant subject to personal jurisdiction where the plaintiff resides." _Baker_, 480 F. Supp. 3d at 804 (citing _McMunigal_, 2010 WL 2106186, at *9. Instead, "a court must undertake a holistic analysis of the totality of the circumstances surrounding the prior negotiations and contemplated future consequences, the terms of the contract, and the parties' actual course of dealing[.]" _Id._ (citing _Nationwide Mut. Ins. Co. v. Tryg Intern. Ins. Co., Ltd._, 91 F.3d 790, 795 (6th Cir. 1996)). Rather than offering evidence for each of these considerations, Plaintiffs rely solely on their allegation that Anthropic contracted with three Tennessee businesses to license the Claude API, and that Anthropic mentioned in a public online press statement that one of those businesses was an Anthropic customer. (Doc. No. 79 at 4–5; Doc. No. 80-19 at 4). But there is nothing to suggest that Anthropic provided Claude API access to these Tennessee businesses _because_ they were in Tennessee. Indeed, as Plaintiffs recognize in their opposition, Anthropic "accept[s] applications" from any business that wants to incorporate Claude in their products regardless of where those businesses are located in the United States. (Doc. No. 79 at 4 (citing Doc. No. 80-14)). That Anthropic has contracts with some businesses located in Tennessee is a "fortuitous" contact that does not give rise to purposeful availment under these circumstances. _Baker_, 480 F. Supp. 3d at 804 (internal quotation marks omitted) (citing _Calphalon_, 228 F.3d at 722).

Accordingly, the Court finds that Anthropic did not expressly aim its conduct at Tennessee or purposefully avail itself of the privilege of acting in Tennessee merely by having contracts with three Tennessee companies.

3.   Anthropic's Website

Plaintiffs next argue that Anthropic purposefully availed itself of Tennessee because it offers its Claude AI models to Tennessee users through its "highly interactive" website. (Doc. No. 79 at 1). A website operator "purposefully avails itself of the privilege of acting in a state through its website if the website is interactive to a degree that reveals *specifically intended interaction* with residents of the state." Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 887 (6th Cir. 2002) (emphases added); Bird, 289 F.3d at 874. However, courts in this Circuit have routinely held that "the mere maintenance of an interactive, commercial website, accessible from anywhere, without more, cannot constitute purposeful availment." Cap. Confirmation, Inc. v. Auditconfirmations, LLC, 2009 WL 2823613, at *7 (M.D. Tenn. Aug. 28, 2009) (collecting cases); see also Impulsaria, LLC v. United Distrib. Grp., LLC, 2012 WL 4341058, at *3 (W.D. Mich. Sept. 20, 2012).

"[T]o determine whether an operator of a website purposefully availed [itself] of the forum state, the Court looks at the website's level of interactivity." See, Inc. v. Imago Eyewear Pty, Ltd., 167 F. App'x 518, 522 (6th Cir. 2006) (citation omitted). The Court evaluates a website's level of interactivity based on a "sliding scale" (often referred to as the Zippo sliding scale), which ranges from purely passive sites that only offer information for the user to access, in which case jurisdiction is not proper, to highly interactive sites where a defendant clearly transacts business or forms contracts with users, in which case jurisdiction is proper. Id. at 522 (citing Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)); One Media IP Ltd. v. S.A.A.R. SrL, 122 F. Supp. 3d 705, 717–18 (M.D. Tenn. 2015). In the middle of these extremes are "hybrid or interactive sites that allow users to 'exchange information with the host computer.'" Imago Eyewear, 167 F. App'x at 522 (quoting Zippo, 952 F. Supp. at

1124)).  "In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and the commercial nature of the exchange of information that occurs on the [website]."  Zippo, 952 F. Supp. at 1124.

Based on the current record, the Court finds that Anthropic's website is neither "passive" nor "highly interactive" under the Zippo sliding scale.  It is not "passive" because users interact with Claude directly to ask it questions and receive AI-generated replies.  (Doc. No. 55 at 4; Doc. No. 1 ¶¶ 18, 52, 65, 96, 123).  And although the Claude AI models on the website "engage in sophisticated, human-like conversations with Tennessee users," (see Doc. No. 79 at 1), the website does not appear to be highly interactive or transaction-oriented because there is no allegation that Tennessee residents could download and enter into contracts on the site.  Pride Distribs., Inc. v. Nuzzolo, 2007 WL 1098286, at *3 (E.D. Mich. Apr. 10, 2007); see also Lift Holding Co., Inc. v. Prendiville, 768 F. Supp. 2d 929, 934 (E.D. Mich. 2011) (citing CompuServe, 89 F.3d at 1264).  Because Anthropic's website likely falls somewhere in the middle, the Court "must engage in a fact-specific inquiry to determine whether [the] website's interactive features support a conclusion that [Anthropic] intended contact with [Tennessee] residents."  Noco Co. v. Jasper Indus. Supply, Inc., 2023 WL 8600503, at *5 (N.D. Ohio Dec. 12, 2023); see also Zippo, 952 F. Supp. at 1124.

Plaintiffs do not dispute that the computers and data used to train Claude, Claude's source code, and Claude's host servers are located outside of Tennessee.  (See Doc. No. 55-1 ¶ 22).  Nor do they dispute that Anthropic's website is maintained solely by employees in California.  (See id. ¶ 23).  Plaintiffs instead highlight two "interactive" features of Anthropic's website that allegedly reveal specifically intended contact with Tennessee residents.  (See Doc. No. 79 at 9).  First, the website invites Tennessee users to "Talk to Claude" through a chatbox interface on the

website itself, and "Claude" can output information specific to Tennessee. (Id.; see also Doc. No. 1 ¶ 18; Doc. No. 80-6). Second, users who access Claude on Anthropic's website must first complete a "multistep process," which requires them to provide an email address, input a verification code, confirm their name and age, accept the website's Terms of Service, and provide a cell phone number. (Doc. No. 79 at 9–10). Viewing these facts in the light most favorable to Plaintiffs, the Court cannot conclude that Anthropic, through its website, purposefully availed itself of the privilege of doing business in Tennessee.

Although Anthropic's website is available in Tennessee and Claude can output content related to Tennessee (if the user specifically requests it), that alone does not amount to purposeful availment. To "support a finding of jurisdiction," Plaintiffs "must also show that the website interactivity actually generated business with residents of the forum state." Silent Events, Inc. v. Quiet Events, Inc., 2016 WL 4466657, at *3 (M.D. Tenn. Aug. 24, 2016). Indeed, district courts in this Circuit have emphasized that "the most important factor for purposeful availment is whether forum residents actually ordered products from the defendant, and whether the defendant actually sold products to forum residents through its website." See Noco, 2023 WL 8600503, at *4 (citing Zoya Co. v. Julep Nail Parlor Co., 2011 WL 5975054, at *3 (N.D. Ohio Nov. 29, 2011)); Stewart v. M & M Headgear, Inc., 2015 WL 1423560, at *4 (N.D. Ohio Mar. 27, 2015); see also Mosure v. Southwest Airlines, Co., 2023 WL 6199762, at *6 n.6 (N.D. Ohio Sept. 22, 2023) ("Under Sixth Circuit law, even a highly interactive website must target residents of that state to confer specific jurisdiction."). Notably absent from Plaintiffs' opposition, however, is any evidence that Anthropic made any sales through its website to

Tennessee customers.[6]  Nor have Plaintiffs met their burden to show that Anthropic intentionally reached out to Tennessee customers for business, said anything on its website to target Tennessee business specifically, or deliberately interacted with Tennessee residents in a meaningful way beyond "random or fortuitous events" of users interacting with Claude or applying for API access while in Tennessee.  See Neogen, 282 F.3d at 891; see also e.g., Impulsaria, 2012 WL 4341058, at *4 (finding that Michigan district court lacked personal jurisdiction because "Plaintiff has shown nothing more than that Defendant offers [its product] for sale on a website that is accessible by Michigan residents").

It is well-settled that "[h]aving an interactive website . . . should not open a defendant up to personal jurisdiction in every spot on the planet where that interactive website is accessible." Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc., 751 F.3d 796, 803 (7th Cir. 2014); see also Cadle Co. v. Schlichtmann, 123 F. App'x 675, 679 (6th Cir. 2005) ("The law does not require that people avoid using the internet altogether in order to avoid availing themselves of the laws of every state."); Carefirst v. Carefirst Pregnancy Ctrs., 334 F.3d 390, 401 (4th Cir. 2003) (finding no personal jurisdiction in Maryland where "generally accessible, semi-interactive Internet website [did not] direct electronic activity into Maryland with the manifest intent of engaging in business or other interactions within that state in particular").  That is particularly true where, as here, Plaintiffs "failed to present any evidence of actual, quantifiable sales through such website to [Tennesee] customers."  See Stewart, 2015 WL 1423560, at *4.  Thus, even if Tennessee users interacted with Claude on Anthropic's website, or submitted

---

[6] That is not to say that some sales to Tennessee users, alone, would be enough to establish purposeful availment.  "[T]he Sixth Circuit and the district courts within the Sixth Circuit have generally found that isolated sales to a forum, through an interactive website or otherwise, will not satisfy the purposeful availment requirement."  Oaks, 2022 WL 765506, at *7 (collecting cases).  While the Sixth Circuit has not fashioned a precise cut-off point for the number of sales that would amount to purposeful availment, certainly *zero* sales would not suffice.

applications for API access, there is no allegation or evidence that those interactions between the website and Tennessee users had any commercial purpose sufficient for purposeful availment.

Plaintiffs also rely on <u>Neogen</u> in support of their argument that "[t]he multistep process through which Anthropic creates accounts . . . reflects a deliberate choice to interact with accountholders" in Tennessee. (Doc. No. 79 at 10). The defendant in <u>Neogen</u>, NGS, was a Pennsylvania infant blood testing business sued in Michigan. <u>Neogen</u>, 282 F.3d at 886–87. The district court initially dismissed the case for lack of personal jurisdiction, but the Sixth Circuit reversed because several aspects of NGS's website supported a finding of purposeful availment. <u>Id.</u> at 890. First, when customers (including Michigan residents) purchased NGS's services, NGS would send them a unique password that they could use to access their test results directly on the website. <u>Id.</u> Second, NGS held itself out as welcoming Michigan business by stating on its website that it would provide a "screening test for any parent in any state." <u>Id.</u> at 891. Third, NGS's website "enable[d] Michigan residents to print out the testing form to send along with payment." <u>Id.</u> And last, NGS posted on its website a geographical breakdown of testing data that expressly included Michigan. <u>Id.</u> According to the Sixth Circuit, these contacts combined were sufficient for the district court to exercise specific jurisdiction over NGS. <u>Id.</u> at 892–93.

Contrary to Plaintiffs' suggestion, <u>Neogen</u> does not stand for the broad principle that purposeful availment exists whenever a defendant sends out "a password to be used interactively on its website." (<u>See</u> Doc. No. 79 at 10 (citing <u>Neogen</u>, 262 F.3d at 892)). Indeed, the <u>Neogen</u> panel expressly ruled that "[w]hether NGS's website alone would be sufficient to sustain personal jurisdiction in Michigan . . . is a close question that *need not be decided* . . . because NGS's website is not its only contact with the state." <u>Neogen</u>, 262 F.3d at 891 (emphases added). The Sixth Circuit emphasized that NGS' "most significant[]" contact with Michigan was

that "when potential customers from Michigan have contacted NGS to *purchase* its services, NGS has welcomed their individual business on a regular basis" and "reasonably expects to conduct a given level of business in Michigan year after year." Id. (emphasis added).

Here, even if the Court accepts that Anthropic provided API access to three businesses that just happen to be in Tennessee, see Section II.A.2 supra, there is no allegation that Tennessee residents used Anthropic's website to *purchase* services on a regular basis or that Anthropic reasonably expects a given level of business in Tennessee. Ultimately, "when district courts in this Circuit have exercised personal jurisdiction in [the Internet] context, they have done so because, in addition to a generally accessible website, the plaintiff showed that the defendant made other, purposeful and significant contacts with the forum." Cap. Confirmation, 2009 WL 2823613, at *8 (citations omitted). Because Anthropic did not take an additional step of targeting Tennessee residents for the opportunity to do business there, the Court concludes that Anthropic's website is insufficient to establish purposeful availment in accordance with due process.

### 4. Allegedly Infringing Outputs in Tennessee

Plaintiffs' final argument is that Anthropic purposefully availed itself of Tennessee "by unlawfully reproducing, distributing, and displaying infringing copies of [their] works to users in Tennessee." (Doc. No. 79 at 12). This is simply another way of saying users can access Anthropic's Claude AI models while in Tennessee. For the same reasons mentioned above in the context of Anthropic's website, the Court does not find that Anthropic purposefully availed itself of Tennessee merely because users can access Claude in Tennessee and Claude can output content related to Tennessee upon request.

### B. Cause of Action Arising Out of In-State Activities and Reasonableness

Given that Plaintiffs failed to make a prima facie showing of purposeful availment, the Court concludes that exercising personal jurisdiction over Anthropic would offend due process regardless of whether Plaintiffs satisfy the second and third prongs of the Mohasco test. See LAK Inc., 885 F.2d at 1303. As such, the Court need not analyze whether Plaintiffs' causes of action "arise from" Anthropic's in-state activities, or whether exercising personal jurisdiction over Anthropic would be fair and reasonable. See Oaks, 2022 WL 765506, at *8 (citations omitted) ("Because purposeful availment is 'the *sine qua non* of *in personam* jurisdiction,' the court will grant the defendant's motion without reaching the other factors relevant to the exercise of personal jurisdiction"); see also Devnani, 2017 WL 4692273, at *12 (collecting cases).

### III. MOTION TO DISMISS FOR IMPROPER VENUE OR, IN THE ALTERNATIVE, TO TRANSFER

Where, as here, the Court determines that it lacks personal jurisdiction over the defendant, the Court must either dismiss the action without prejudice or transfer it to a court that has personal jurisdiction. See Stanifer v. Brannan, 564 F.3d 455, 456–57 (6th Cir. 2009). Because this analysis remains the same regardless of whether venue is proper, the Court will deny as moot Anthropic's alternative request to dismiss this case under Rule 12(b)(3) for improper venue. See Richardson v. Cnty. of Wayne, 2009 WL 2777671, at *6 (E.D. Mich. Aug. 27, 2009) ("Because the Court has determined that it lacks personal jurisdiction over [the] Defendants, the motion to dismiss or transfer because of improper venue is moot.").

There are three federal statutes that provide the Court with authority to transfer a case to another district: 28 U.S.C. §§ 1404(a), 1406(a), and 1631. See In re RealPage, Inc., Rental Software Antitrust Litig., 2024 WL 993302, at *4 (M.D. Tenn. Mar. 7, 2024). The parties' briefs focus exclusively on whether the Court should transfer this case under § 1404(a), with Anthropic

inviting a transfer and Plaintiffs resisting. (See Doc. No. 55 at 14–24; Doc. No. 79 at 17–25). The problem with these arguments is that § 1404(a) does not apply here because the Court does not have personal jurisdiction over Anthropic. See Pittock v. Otis Elevator Co., 8 F.3d 325, 329 (6th Cir. 1993) ("[A] transfer under section 1404(a) may not be granted when the district court does not have personal jurisdiction over the defendants."). And although the parties have not indicated a preference for transfer or dismissal in the event the Court found it lacked personal jurisdiction over Anthropic, the Court may infer that Plaintiffs would prefer a transfer rather than dismissal under these circumstances.

Although neither party mentions §§ 1406(a) or 1631 in their briefs, the Court has the power to transfer this action *sua sponte* under either provision. See Woodward v. Dignity Health Rehabilitation Hosp., 2021 WL 3860554, at *3 (N.D. Ohio Aug. 30, 2021). Section 1406(a) *may* apply here because it allows the Court to transfer an action filed in the wrong venue. But because this Court does not have personal jurisdiction over Anthropic, and because the Court did not separately consider whether venue is proper, the most appropriate vehicle for transfer is § 1631. Section 1631 provides that if the Court lacks jurisdiction in a civil action, it "*shall*, if it is in the interest of justice, transfer such action . . . to any other such court in which the action . . . could have been brought at the time it was filed or noticed." 28 U.S.C. § 1631 (emphasis added). Thus, the Court must determine whether this action "could have been brought" in another forum, and whether transfer is "in the interest of justice." Id.

First, the Court agrees with Anthropic that this action "could have been brought" in the Northern District of California. "[A]n action might have been brought in another forum if, at the time the action was originally filed, the transferee court would have had subject matter jurisdiction and personal jurisdiction over the defendants, and if venue would have been proper

in the transferee court." E.g., Posven, C.A. v. Liberty Mut. Ins. Co., No. 02 Civ. 0623(PKL), 2004 WL 63497, at *7 (S.D.N.Y. Jan. 12, 2004). There is no dispute that the Northern District of California would have federal-question subject matter jurisdiction over Plaintiffs' copyright claims, see 28 U.S.C. § 1331, and both personal jurisdiction and venue would be proper because Anthropic's principal place of business is in San Francisco, see 28 U.S.C. §§ 1391(b), 1400(a). Thus, the "could have been brought" requirement for transfer is easily satisfied here.

Second, the Court has "broad discretion" to determine whether transfer to another district is in the interest of justice. See Stanifer, 564 F.3d at 456–57. Given Plaintiffs' pending and fully briefed Motion for Preliminary Injunction (Doc. No. 40), and the time-sensitive nature of the request (see Doc. No. 119 at 2), the Courts find that it is in the interests of justice to transfer the case to a court where jurisdiction and venue are not disputed.

Last, the Court acknowledges that Plaintiffs seek "expedited disposition" of their Motion for a Preliminary Injunction, and that transferring this case will create additional unanticipated delays. As a recent case from this district explained:

> The Court is aware of the lapse of time between the filing of the motion for a TRO and the filing of this memorandum opinion and order, and it understands that this is far from ideal. But the lapse was occasioned by the need for the Court to consider, and ultimately resolve conclusively—and explain thoroughly its view regarding—the crucial challenge to the existence of personal jurisdiction in this Court. The best way for a plaintiff to avoid a delay in the consideration of a motion for TRO pending resolution of a serious challenge to personal jurisdiction is to play it safe by filing in a forum that clearly has personal jurisdiction. That is to say, there can be natural tradeoff for a plaintiff between filing in its preferred jurisdiction and filing in a jurisdiction that is not preferred but which will not foster a colorable personal-jurisdiction challenge. Here, even if one reasonably could disagree with the Court's conclusion that it lacks personal jurisdiction over Defendant, one could not reasonably dispute that Defendant could make a very colorable personal jurisdiction challenge in this Court. Plaintiff made a choice to file in the jurisdiction that it preferred, not the jurisdiction that was safer from a personal-jurisdiction standpoint. That is not [to] say that this was a bad choice,

but it is to say that it was a choice that imperiled the promptness of the ruling on the motion for TRO.

Ncontracts, 2022 WL 17724148, at *10 n.16. Here, too, Plaintiffs made a strategic decision to sue a California-based company in the Middle District of Tennessee, and in doing so ran the risk of encountering a jurisdictional hurdle too high to climb. Once that hurdle is pushed to the side and this case is transferred to the Northern District of California, Plaintiffs will be free to run their case to the finish line on the merits.

## IV. CONCLUSION

For the foregoing reasons, Anthropic's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue or, in the Alternative, to Transfer Venue (Doc. No. 54) will be granted in part and denied in part, and this case will be transferred to the United States District Court for the Northern District of California.

An appropriate order will enter.

WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE